UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Stuart Krohnengold,
as representative of a class of similarly
situated persons, and on behalf of the New
York Life Insurance Employee Progress
Sharing Investment Plan, and the New York
Life Insurance Company Agents Progress
Sharing Plan,

               Plaintiff,

    v.

New York Life Insurance Company; The
Boards of Trustees of the New York Life
Insurance Employee Progress Sharing
Investment Plan and the New York Life
Insurance Company Agents Progress Sharing
Plan; Katherine O'Brien; Anthony R. Malloy;
Yie-Hsin Hung; Arthur A. Seter; Scott L.
Lenz; and Robert J. Hynes; and John and Jane
Does 1-20,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case No.

**CLASS ACTION COMPLAINT**

## I.     NATURE OF THE ACTION

1.    This is a class action brought by Stuart Krohnengold ("Plaintiff") under the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, as a

representative on behalf of tens of thousands of current and former employees and insurance agents

of New York Life Insurance Company ("New York Life," "NYL," or "the Company"). This

ERISA class action is brought against New York Life, the Boards of Trustees of the  New York

Life Insurance Employee Progress Sharing Investment Plan and the New York Life Insurance

Company Agents Progress Sharing Plan ("Trustees" or "Boards of Trustees"), individual members

of the Boards of Trustees: Katherine O'Brien, Anthony R. Malloy, Yie-Hsin Hung, Arthur A. Seter, Scott L. Lenz, Robert J. Hynes (collectively, "Defendants"), related to the management of the New York Life Insurance Employee Progress Sharing Investment Plan and the New York Life Insurance Company Agents Progress Sharing Plan (the "401(k) Plans" or "Plans").

2.      As described herein, this suit is about corporate self-dealing and the prohibited transfer of employees' retirement assets to Defendants at the expense of the retirement savings of company employees and its agents. Defendants are all fiduciaries and parties-in-interest of the 401(k) Plans who are required by ERISA to act prudently and solely in the interest of the Plans' participants when making decisions with respect to 401(k) Plan investments. Defendants have breached their fiduciary duties with respect to their disloyal and imprudent management of the Plans in violation of ERISA, to the detriment of participant investors who lost millions of dollars. Plaintiff brings this action to recover the losses caused by Defendants' fiduciary breaches, disgorge the profits earned by Defendants and their affiliates[1] as a result of these breaches, prevent further mismanagement of the Plans, and obtain equitable and other relief as provided by ERISA.

3.      ERISA fiduciaries are bound to act with an "eye single" to the interest of the plan participants and beneficiaries to whom they owe a duty. *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). Defendants, rather than fulfilling these fiduciary duties, violated that bedrock principle by favoring the economic interests of New York Life over those of the Plans' participants to whom they owe the highest duty.

---

[1] "Affiliate(s)" means any entity directly or indirectly owned or controlled by NYL in whole or substantial part.

4.      Defendants did so by in two principal ways during the Class Period (March 2, 2015 and thereafter). *First*, certain Participants, including Plaintiff, were invested by default, without their consent and in contravention of applicable regulations, in a New York Life general account insurance fund called the Fixed Dollar Account. Despite the fact that this fund is itself undiversified and not a permissible "qualified default investment alternative" ("QDIA"). This means that for any participants who did not choose the investment options in which their retirement contributions would be invested, the fiduciary Defendants directed the participants' retirement savings into the Fixed Dollar Account during the Class Period, which provided New York Life and its affiliates with enormous profits and billions of dollars to be used for its own business purposes while exposing most of the Plans' assets to New York Life's credit risk.

5.      *Second*,  Defendants offered New York Life's own in-house investment funds in its Plans (specifically the MainStay Income Builder Fund, MainStay Epoch U.S. All Cap Fund and MainStay Epoch U.S. Small Cap Fund), earning New York Life and its affiliates windfall profits at the expense of the retirement savings of New York Life employees and its agents.

6.      Defendants selected and retained the in-house funds in the Plans without a prudent or loyal process that considered non-proprietary fund alternatives and whether those alternatives would better serve the Plans' participants through lower cost and better performance. Instead, because of the financial benefit to New York Life, Defendants chose and retained the in-house funds for the Plan.

7.      Defendants further failed to loyally and prudently monitor the fees and performance of the Plans' investment options—they simply retained the in-house funds to enrich New York Life and/or its affiliates.

8.      As a result of Defendants' fiduciary breaches and prohibited transactions, the 401(k) Plans' participants were deprived of millions of dollars in retirement plan returns that they would have earned if Defendants had selected non-proprietary fund options for the Plans and a QDIA that met applicable regulations. For example, if Defendants defaulted participants' retirement savings into a permissible QDIA, such as a diversified suite of target date funds, the Plans and participants would have earned hundreds of million more in retirement savings. Similarly, if better investment funds had been offered in the Plans rather than New York Life investments with weak performance, participants in both Plans would have earned $68 million *more*.

## II.      JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1).

10.      This Court has personal jurisdiction over New York Life Insurance Company because it transacts business in, employs people in, and has significant contacts with this District, and because ERISA provides for nationwide service of process.

11.      This Court has personal jurisdiction over the Boards of Trustees of the New York Life Insurance Employee Progress Sharing Investment Plan and the New York Life Insurance Company Agents Progress Sharing Plan, because they transact business in and have significant contacts with this District, and because ERISA provides for nationwide service of process.

12.      Venue is proper in this District pursuant to ERISA, 29 U.S.C. § 1132(e)(2) because many of the breaches complained of occurred in this District, New York Life's headquarters are located in New York, New York, the Plan is administered in this District, Plaintiff resides in this District, and one or more of the Defendants reside or may be found in this District.

### III.    PARTIES

A.    **Plaintiff Stuart Krohnengold**

13.    **Plaintiff Stuart Krohnengold** ("Plaintiff Krohnengold" or "Plaintiff") is a resident of Scarsdale, New York and is a current participant in the Employee Progress Sharing Investment Plan ("the Employee 401(k) Plan"). He worked for New York Life from 1988 through 2012. Plaintiff Krohnengold's individual account in the Employee 401(k) Plan was invested in one or more of the New York Life proprietary MainStay funds offered by the Employee 401(k) Plan during the Class Period, and was defaulted into NYL's Fixed Dollar Account. Plaintiff, like substantially all other participants in the Plans, was not provided any information regarding the substance of deliberations, if any, of the Boards of Trustees concerning the Plans' menu of investment options, and otherwise has no knowledge of the substance of the deliberations. Plaintiff discovered his claims shortly before commencing this action. Plaintiff has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. In turn, New York Life has been unjustly enriched from the various fees and expenses generated as a result of Plaintiff's Employee 401(k) Plan investments.

B.    **Defendants**

14.    Every employee benefit plan must provide for one or more named fiduciaries that jointly or severally possess the authority to control and manage the operation and administration of the plan. 29 U.S.C. § 1102(a)(1). Further, a person who functions as a fiduciary is a fiduciary, even if he or she is not named as such, so long as the person exercises any discretionary authority or control over the administration of the plan or any authority or control over the disposition of plan assets. 29 U.S.C. §1001(21)(A).

15.     **Defendant New York Life Insurance Company** ("New York Life," "NYL," or "the Company"), headquartered in New York, New York, is a mutual life insurance company organized under the laws of the State of New York.  Through a network of related entities, it markets to the public (and its own employees and agents) mutual funds, life insurance policies, annuity contracts, financial contracts, retirement contracts, and other money management services.

16.     Pursuant to the terms governing the Plans, Defendant NYL is one of the Named Fiduciaries to the Plans along with the Plan Administrator (Maria J. Mauceri) and Defendant Boards of Trustees. Defendant NYL serves as the Plan Administrator for purposes of the reporting and disclosure requirements under ERISA. Additionally, NYL is responsible for appointing and monitoring the Plan Administrator (also a fiduciary to the Plan) and Defendant Boards of Trustees, and through this appointment power over other fiduciaries, NYL is a fiduciary of each of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

17.     Defendant NYL is the sponsor of the 401(k) Plans and a party in interest to the Plans within the meaning of 29 U.S.C. §1002(14) because, among other things, it is a Named Fiduciary to the Plan and an employer whose employees and agents are covered by the Plans.

18.     **Defendant Boards of Trustees**. At all relevant times the Board of Trustees of each of the Plans has been co-extensive and identical.

19.     The Boards of Trustees and their individual members are Named Fiduciaries pursuant to the terms governing the Plans. The Boards of Trustees and their members also control and manage the assets of the Plans under the terms of the Plans, and are therefore Named Fiduciaries the Plans under ERISA § 402(a)(2), 29 U.S.C § 1102(a)(2). Additionally, the Boards of Trustees and their members have been fiduciaries within the meaning of ERISA § 3(21)(A), 29

U.S.C. § 1002(21)(A), with respect to each of the Plans by virtue of exercising authority or control over the disposition of the assets of each of the Plans.

20.     As Named Fiduciaries for the Plans, the members of the Boards of Trustees held high-level corporate positions at New York Life and had compensation arrangements tied directly or indirectly to NYL's and/or its affiliates' revenues, profitability, and/or growth in assets under management.

21.     The compensation of some individual members of the Boards of Trustees was tied to the revenue, profits, size and/or performance of the MainStay Funds and Fixed Dollar Account.

22.     The members of the Boards of Trustees consist of the following individuals, each of whom were employees of Defendant New York Life or a related entity and are named as Defendants here:

1)  **Defendant Katherine O'Brien**, serves as chairperson of the Boards of Trustees of the Plans and has also been a Senior Vice President & Chief Human Resources Officer of New York Life, first joining the Company in 1995.

2)  **Defendant Anthony R. Malloy** is a member of the Boards of Trustees of the Plans and has also been an Executive Vice President and Chief Investment Officer for New York Life, first joining the Company in 1999.

3)  **Defendant Yie-Hsin Hung** is a member of the Boards of Trustees of the Plans and has also been a Senior Vice President of New York Life and Chief Executive Officer of New York Life Investment Management LLC (NYLIM), New York Life's global multi-boutique third party asset management business, first joining the Company in 2010.

7

4) **Defendant Arthur A. Seter** is a member of the Boards of Trustees of the Plans and has also been a Senior Vice President and Managing Director for New York Life, first joining the Company in 1989.

5) **Defendant Scott L. Lenz** is a member of the Boards of Trustees of the Plans and has also been a Senior Vice President, Deputy General Counsel and Chief Tax Counsel for New York Life, first joining the Company in 2004.

6) **Defendant Robert J. Hynes**, upon information and belief, is a member of the Boards of Trustees of the Plans and has also been a Vice President for New York Life.  He first joined the Company in 1975 and retired in January 2021.

23.    **John and Jane Does 1-20.** The names of all members of the Boards of Trustees during the class period are currently unknown to Plaintiff. Parties to whom NYL's or the Boards of Trustees' fiduciary authority was delegated are similarly unknown to Plaintiff. Those Defendants are therefore collectively named as John and Jane Does 1–20. The Boards of Trustees and their individual members are collectively referred to as the "Trustee Defendants."

## IV.    LEGAL BACKGROUND

### A.    <u>ERISA Fiduciary Duties</u>

24.    ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest  of the participants and beneficiaries and—
>
> > (A)    for the exclusive purpose of
> >
> > > i.    providing benefits to participants and their beneficiaries; and
> > >
> > > …

(B)    with the care, skill, prudence, and diligence under the circumstances  then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

25.    These ERISA fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

26.    Any person who exercises control over plan assets is deemed to be a fiduciary. 29 U.S.C. § 1002(21)(A).

### Duty of Loyalty

27.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000); *Bierwirth*, 680 F.2d at 271. "Perhaps the most fundamental duty of a [fiduciary] is that he must display  complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram,* 530 U.S. at 224 (quotation  marks and citations omitted).

28.    While ERISA does not prohibit an employer's corporate officers or high-level employees from serving as plan fiduciaries—basically wearing two hats—it does require that they "wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225.

29.    "[A]n ERISA fiduciary must 'act for the exclusive purpose' of providing benefits to plan beneficiaries." *Bierwirth,* 680 F.2d at 271. Thus, "in  deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988)

(emphasis added).

  B. <u>Duty of Prudence</u>

  30. ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted).

  31. The fact that participants exercise "independent control" over the assets in their defined contribution plan accounts "does not serve to relieve a fiduciary from its duty to prudently select and monitor any … designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d)(1)(iv).

  C. <u>Co-Fiduciary Liability</u>

  32. ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C. § 1105(a) states, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> 1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> 2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

D.    **Qualified Default Investment Alternatives ("QDIAs")**

33.    Generally speaking, ERISA § 404(c), 29 U.S.C. § 1104(c) offers a "safe harbor" for plan fiduciaries to avoid liability for investment losses suffered by plan participants who self-direct their investments. In other words, while plan fiduciaries, as alleged here, still have liability for the selection and retention of particular funds for the Plan's menu, they will not be responsible if participants make poor selections from the plan menu *if* and only if the plan meets all of ERISA § 404(c) requirements which are explained in detail in 29 C.F.R. § 2550.404c-5.

34.    Before the Pension Protection Act of 2006 (the "Pension Protection Act"), which created the QDIA safe harbor for plan fiduciaries, studies showed that employer-sponsored defined contribution plans that automatically enrolled employees in their plans had higher rates of participation. But plan fiduciaries were reluctant to automatically enroll employees in the plan because if the participant did not elect an investment option for her plan account, the plan fiduciaries would be forced to make that investment selection for them – exposing the fiduciaries to greater liability because the participant would not be exercising control over her individual retirement account consistent with ERISA's safe harbor provision at 29 U.S.C. § 1104(c).

35.    The Pension Protection Act removed the impediment to auto-enrollment for 401(k) plans by extending the safe harbor, which previously only applied to the participant's direction of their 401(k) account investments, to include situations where participants who failed to direct their 401(k) account and were directed by default into a "Qualified Default Investment Alternative" ("QDIA") as defined under 29 C.F.R. 2550.404c-5(e)(1)-(3) (discussed *infra*). In other words, if the participants were directed by default into an investment that met all the QDIA safe harbor

requirements, then the plan fiduciaries do not retain fiduciary responsibility for the direction of the participant retirement assets into the QDIA. However, as noted above, the Plan fiduciaries always retain fiduciary responsibility for ensuring that each and every investment option in the Plan, including the QDIA remains a prudent and loyal investment for the plan.

36.    In order for plan fiduciaries to have their selected default investments be deemed a QDIA and receive protection from liability for directing a participant's elective contributions in the plan's default investment option, that default option must satisfy the following requirements:[2]

1)  the investment may not impose financial penalties or otherwise restrict the ability of a participant or beneficiary to transfer the investment from the qualified default investment alternative to any other investment alternative available under the plan;

2)  the investment must be either managed by an ERISA § 3(38) investment manager, a plan trustee that satisfies provisions under ERISA § 3(38), a plan sponsor or committee which is named fiduciary under the plan, or an investment company registered under the Investment Company Act of 1940;

3)  the investment must be diversified so as to minimize the risk of large losses; and

4)  the investment may not invest participant contributions directly in employer securities.

29 C.F.R. § 2550.404c-5(e)(1)-(3).

37.    Further, in promulgating these regulations, the Department of Labor (DOL) required that for an investment to be a QDIA it must be "designed to provide long-term appreciation and capital preservation through a mix of equity and fixed income exposures." 29 C.F.R. § 2550.404c-5(e)(4)(i)-(iii) (limiting the types of funds that can provide fiduciaries with

---

[2] "Elective contributions" refers to contributions made from employees' paychecks, not the act of participant selection of investment for those contributions. 26 U.S. Code § 414(w)(2)-(4), (x)(5).

liability protection to those that offer a blend of asset classes to target date funds, balanced funds, or managed accounts).

38.     The DOL's restriction of QDIAs to target date funds, balanced funds, or managed accounts was based on its concern that default investments often turn out to be long-term investments – participants that do not actively select which funds to invest their retirement savings are more likely to retain their contributions in the fiduciary-selected investment option, and therefore heavily rely on that investment to provide retirement security. *See* Default Investment Alternatives Under Participant Directed Individual Account Plans, 72 Fed. Reg. 60452-01.

39.     In contrast, low-risk, low-return, capital preservation products, like the stable value Fixed Dollar Fund Defendants selected as the Plans' default option, were determined by the DOL not to satisfy the asset accumulation requirements to be deemed a QDIA. 72 Fed. Reg. 60452-01. Consequently, if plan fiduciaries default participants' retirement assets into a stand-alone principal protecting fund option (such as a money market fund or a guaranteed account contract) for longer than 120 days, as Defendants did here, those fiduciaries are not afforded the regulation's protection from liability for ERISA fiduciary breach. In other words, as a non-QDIA default investment, as explained above, Defendants bear fiduciary responsibility for the direction of the participants' investment of retirement savings into the default investment chosen by the plan's fiduciaries.

40.     This outcome makes sense because in defaulting plan participants in such funds, these fiduciaries fail to protect the most vulnerable of their participants by directing those participants' retirement savings into an investment option that likely will not provide them with investment income to adequate save for retirement.

41.     By contrast, if plan fiduciaries direct individual participant accounts into a default investment that does not meet the requirements the QDIA safe harbor provisions, including 29

C.F.R. § 2550.404c-5(e)(1)-(3), then the plan fiduciaries remain responsible for the direction of participant accounts into a default investment that the participants themselves did not choose. In these instances where responsibility for the direction of participant accounts into the Plan's default option remains within the plan's fiduciary, the so-called "Prudent Man Standard of Care" requires fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and … with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a), ERISA § 404(a).

42.     In meeting this prudence standard, the fiduciary must consider such things as "the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action, compared to the opportunity for gain (or other return) associated with reasonably available alternatives with similar risks," as well as the diversification, liquidity and current and projected returns of the plan's portfolio. 29 C.F.R. § 2550.404a–1(b)(2).

## V.    FACTS

### A.    <u>**The 401(k) Plans**</u>

43.     The New York Life Insurance Company Employee Progress Sharing Investment Plan ("the Employee 401(k) Plan") and the New York Life Insurance Agent Progress Sharing Investment Plan ("the Agent 401(k) Plan") (together "the 401(k) Plans" or "Plans") are both "defined contribution plan[s]" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). In these Plans, typically referred to as a "401(k) plan" (as described in Section 401(k) of the Internal Revenue Code of 1986), each participant is credited with an individual account funded through a combination of participant contributions, deducted from their salaries, and employer contributions.

14

Whether the contributions come out of participants' salaries or from their employer, the 401(k) Plans' participants have a fully vested, nonforfeitable interest in the monies in their accounts.

44.     The potential for disloyalty and imprudence is much greater in 401(k) plans than in traditional pension plans. Whereas in a traditional pension plan (i.e. defined benefit plan) the plan's sponsor bears the risk associated plan investments, in a 401(k) plan the participants retirement benefits are directly related to the investment gains or losses associated with the plan's retirement investments and can be eroded by fees and expenses associated with those plan investments.

45.     Ultimately, 401(k) plan participants are limited to the value of their own investment accounts, which is determined by the market performance of the retirement contributions, less fees and expenses.

46.     Participants in the 401(k) Plans had 5% of their pre-tax salaries deducted from their paycheck and contributed to the 401(k) Plans.

47.     Participants in a 401(k) plan can only invest in a fund option selected for the Plans by the Trustee Defendants. At all relevant times, each Plan was an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A).

48.     In 2019, the 401(k) Plans' assets were consolidated into a single Master Trust, effectively merging the Employee 401(k) Plan with the Agent 401(k) Plan. Effective January 1, 2019, State Street Bank and Trust Company became the directed trustee of the New York Life Progress-Sharing Investment Program Trust (the "Master Trust"), a trust established to hold and invest the commingled assets of both Plans.

49.     The Plans cover eligible employees and insurance agents of New York Life, including all subsidiaries of New York Life with U.S.-based employees.

50.     New York Life is the sponsor of the Plans. As Plan sponsor, New York Life intends for the Plan to encourage savings and provide retirement income for New York Life employees and insurance agents, former employees and insurance agents, and their beneficiaries.

51.     Historically, the 401(k) Plans have offered a number of different investment options, and at one time the Plans' investments were limited to New York Life proprietary funds (i.e., funds managed, for a fee, by New York Life or its affiliates). Since then, and the Plans have continued to offer underperforming New York Life proprietary funds along with some funds offered by other financial institutions.

52.     At issue in this Action are the "Fixed Dollar Account," (which Defendants designated as the Plans' default option, but does not satisfy the DOL's regulations as a QDIA) the MainStay Income Builder Fund, MainStay Epoch U.S. All Cap Fund and MainStay Epoch U.S. Small Cap Fund.

53.     The three MainStay Funds are proprietary mutual funds managed for a fee by New York Life, and all four NYL proprietary funds underperformed their benchmarks and were more expensive than better performing alternatives.

54.     The Trustee Defendants have at all relevant times had exclusive discretion and control over the selection of the investment vehicles offered as options to those Plans' participants for the investment of their accounts.

55.     The value of each participant's individual account in the 401(k) Plans depends on contributions made on behalf of each employee or agent by his or her employer, deferrals of employee compensation and employer matching contributions, and on the performance of investment options net of fees and expenses. Participants pay fees and expenses (both direct and indirect) based on the fund options selected and maintained by the fiduciaries of the Plans.

56.     As of the end of 2019, the Employee 401(k) Plan had approximately $3.5 billion in assets and 15,132 participants. The Agent 401(k) Plan had approximately $846 million in assets and 14,532 participants, for a combined total of approximately $4.35 billion in assets in the Master Trust covering over 29,600 participants.

57.     The Plans' Master Trust represents one of the largest amounts of defined contribution plan assets in the country, thus giving the Trustee Defendants enormous bargaining power to receive superior investment products and services at extraordinarily low cost for the Plans' participants.

58.     By the end of 2019, nearly 60% of the Employee 401(k) Plans' assets – over two billion dollars – were invested in NYL's proprietary Fixed Dollar Account. By the end of 2019, nearly 43% of the Agent 401(k) Plans' assets – nearly $362 million – were invested in NYL's proprietary Fixed Dollar Account.  In total, of the $4.35 billion in the Master Trust, more than 54%, or more than $2.36 billion, was invested in this single NYL proprietary fund designated by the Trustee Defendants as the Plans' default option for all participants who do not elect an investment option. Of the remaining assets in the Master Trust, nearly 15% is invested in the MainStay funds at issue, totaling nearly $300 million.

B.      Trustee Defendants Violated their ERISA Fiduciary Duties to the Plans' Participants

59.     ERISA strictly regulates the manner in which retirement plan fiduciaries must manage and administer the retirement assets under their management and/or control. Among other things, ERISA requires that fiduciaries act: a) prudently; b) solely in the interest of participants and beneficiaries; c) for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of administering the plan; and d) in avoidance of prohibited transactions.

60.     ERISA's duty of prudence required the Trustee Defendants to follow reasonable standards of investment due diligence by giving appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the investment of the Plans' assets, and then to act accordingly. 29 C.F.R. § 2550.404a-1.

61.     ERISA's duty of loyalty required the Trustee Defendants to ensure that New York Life's business interests did not, in any way, influence how the Plans' assets would be invested, including which funds to select and maintain for the Plan's investment lineup.

62.     These duties of prudence and loyalty required the Trustee Defendants to (1) refrain from investing participants' retirement savings, by default, in a manner inappropriate for long-term asset accumulation and in contravention of applicable regulations; and (2) adequately consider non-proprietary funds that could be included on the Plans' investment menus, as well as to carefully avoid conflicts of interests arising from profiting from the Plans' investments.

63.     The Trustee Defendant also had and have ongoing monitoring duties with respect to the Plan's assets. These monitoring duties include: reviewing and re-evaluating whether the Plans' default investment offers an appropriate mix of asset classes that offer long-term capital appreciation and capital preservation necessary for retirement investment; reviewing and re-evaluating the Plans' investment fund options on a regular and frequent basis (at least as frequently as every quarter) to ensure that they continue to be prudent investments for the Plans based on performance metrics and cost/fee structure; to not give preferential treatment to New York Life proprietary funds; and to remove investment options that either alone, or in the context of the entire Plans' portfolios, were imprudent.

64.     As part of their monitoring duties, the Trustee Defendants had a duty to remove imprudent or disloyal Plan investments, such as the default investment that was inappropriate for long-term retirement investing; investments that underperformed and/or were more expensive relative to available alternatives; investments that constituted prohibited transactions because they involved proscribed compensation to fiduciaries or parties in interest; and investments that were selected based on preferential treatment for proprietary funds.

65.     However, the Trustee Defendants selected and maintained investments for the Plans in a manner that benefited New York Life (and its affiliates and executives) rather than selecting and maintaining investments with an eye single to the interests of the Plans and their participants and beneficiaries, in dereliction of their ERISA fiduciary duties. This pattern and practice violated ERISA in a number of ways, and constituted prohibited transactions, as described in further detail below.

    1.    <u>The Trustee Defendants Designated the Fixed Dollar Account as the Plans' Default Investment in Breach of their Duties to Participants.</u>

66.     Since at least 2003, for all participants in the Plans who have not selected an investment option for contributions into their retirement accounts, their contributions were (and continue to be) automatically invested in the default option selected by the Trustee Defendants – the Fixed Dollar Account.

67.     In order to obtain the Safe Harbor protections of ERISA § 404(c), the Plan's default investment must fall within the definition of a Qualified Default Investment Alternative as defined at 29 C.F.R. § 2550.404c-5(e)(1)-(3).

68.     Generally, a QDIA is an investment option that provides a mix of asset classes, such as stocks and bonds, that ensures a participant's retirement savings are invested according to

19

generally accepted investment theories and prevailing investment industry standards, including the Modern Portfolio Theory, and enables a participant's savings to grow into a meaningful retirement.

69.     However, because the Trustee Defendants selected and maintained the NYL proprietary Fixed Dollar Account as the default investment for the Plans, which was not a QDIA within the meaning of 29 C.F.R. § 2550.404c-5(e)(1)-(3), they retained fiduciary responsibility for the direction of thousands of participants who were directed by default into the low-return Fixed Dollar Account. This decision to direct thousands of the Plan's participant into the Fixed Dollar Account, which did provide the long-term capital appreciation necessary for retirement, impaired the  retirement security of Plan participants while providing NYL enormous profits and billions of dollars to be used for its own business purposes.

70.     The instruments governing the 401(k) Plans provide that participants were and are invested into the Fixed Dollar Account by default without their consent and in contravention of applicable regulations. If, upon the date a participant is automatically enrolled in one of the Plans, a participant has an existing balance in his or her Plan account but has made no investment election, then his or her Plan account will be invested in the Fixed Dollar Account.

71.     The Fixed Dollar Account is the single largest investment in the 401(k) Plans. As of December 31, 2019, more than $2.36 billion or 54% of the Plans' assets (all commingled in the Master Trust) were invested in the Fixed Dollar Account.

72.     The high concentration of plan investment in a stable value product like the Fixed Dollar Account is unusual. According to a study by NYL itself, participants in other 401(k) plans allocated just 12% on average into stable value products. Furthermore, surveying large defined contribution plans, like the 401(k) Plans, shows that weighted-average stable value holdings in the four largest private 401(k) plans is under 17%.

20

73.     To the best of Plaintiffs' knowledge based on the available information, approximately $375 million of the Master Trust's assets were transferred to the Fixed Dollar Account over the past six years.

74.     The Fixed Dollar Account is offered through a "group annuity contract" ("GAC"). This GAC is a benefit-responsive group annuity contract between the 401(k) Plans and NYL, providing a guaranteed rate of return as specified in the contract, and allowing contributions and withdrawals by the participant. Through this group annuity contract, participants' contributions to the Fixed Dollar Account are transferred to and maintained in NYL's general account. The Plan's assets invested in NYL's general account are credited a periodic rate of return as determined by NYL and charged for participant withdrawals and administrative expenses.

75.     Each year, NYL credits interest to Fixed Dollar Account investors based on a crediting rate set by NYL.

76.     NYL's general account assets are subject to claims by its creditors and are subject to the liabilities arising from any of its businesses.

77.     NYL's ability to satisfy its obligation to the Plans is subject to its financial strength and claims-paying ability. There is a risk that NYL may default on its obligations to the Plans.

78.     Although the Fixed Dollar Account has been the default investment for the 401(k) Plans since at least 2003, it is not a permissible QDIA under 29 C.F.R. § 2550.404c–5(e) for periods longer than 120 days after the first elective contribution (the first contribution made from an employee's or agent's paycheck).[3]

---

[3] As described above, "elective contributions" refers to contributions made from employees' paychecks, not the act of participant selection of investment for those contributions. 26 U.S.C.

79.    The DOL issued the QDIA regulation at 29 C.F.R. § 2550.404c–5 pursuant to a Congressional requirement that DOL promulgate regulations to "provide guidance on the appropriateness of designating default investments that include a mix of asset classes consistent with capital preservation or long-term capital appreciation, or a blend of both," 29 U.S.C. § 1104(c)(5)(A), ERISA § 404(c)(5)(A).

80.    The QDIA regulation provides, among other things, that to be a QDIA, the default investment must be the result of a prudent process and must generally be an investment that offers a blend of asset classes, such as a target date fund,[4] balanced fund, or managed account. 29 C.F.R. § 2550.404c–5(e).

81.    The QDIA regulation describes the types of investment options that the Trustees may use that qualify as a QDIA. Specifically, 29 C.F.R. § 2550.404c-5(e)(4)(iv) and (v) governs the use of investment products like the Fixed Dollar Account that are "designed to preserve principal" as default options. The QDIA regulation provides that stable value, principal preservation funds like the Fixed Dollar Account cannot be a QDIA after December 24, 2007, unless those plan contributions are held in such a fund for "not more than 120 days after the date of the participant's first elective contribution," and could only remain a QDIA for money invested before that date ("grandfathered money") if the investment "provide[s] a rate of return generally consistent with that earned on intermediate investment grade bonds." *Id.*

---

§ 414(w)(2)-(4), (x)(5). Therefore, "first elective contribution" means the first payroll deduction made to begin participation in the Plans.

[4] A target-date fund is a class of funds (often mutual funds) that periodically rebalances asset class weights to optimize risk and returns for a predetermined time frame. The asset allocation of a target-date fund is typically designed to gradually shift to a more conservative profile as the plan participant moves closer to retirement age.

82.     The Plan terms and the Summary Plan Description do not provide for any other default investment option into which participants' first payroll contribution (the "first elective contributions") will be directed within 120 days of this contribution to the Plans being made. As such, participants who are defaulted into the Fixed Dollar Account remain in that default investment for longer than 120 days after the participant's first elective contribution, i.e., after their first payroll contribution to the Plans.

83.     Furthermore, the massive Plan allocation in the Fixed Dollar Account (54%), provides additional evidence that participants are defaulted into this non-QDIA investment and remain invested in the Fixed Dollar Account for longer than 120 days after the participant's first elective contribution.

84.     Accordingly, to the best of Plaintiffs' knowledge based on the available information, when used as a default investment option, the Fixed Dollar Account's use is not limited to 120 days after the date of the participant's first elective contribution, placing Defendants in violation of the QDIA regulation.

85.     Further, as the following table illustrates, the rate of return credited through the Fixed Dollar Account is substantially below that earned on intermediate investment grade bonds, and therefore the "grandfathered money" likewise cannot be considered properly invested in a QDIA. Namely, when compared to the Bloomberg Barclays U.S. 5-10 Yr. Government/Credit Float Adjusted Index, which is a commonly recognized intermediate investment grade bond index, the Fixed Dollar Account has had materially lower returns:

| Intermediate Bond Index vs. Approximate Fixed Dollar Account Average Annual Returns (as of 12/31/2020) | | | |
|---|---|---|---|
| Period | Index | Fixed Dollar Account | Underperformance |
| 1 Year | 9.73% | 4.30% | -65% |
| 3 Years | 6.57% | 4.41% | -33% |
| 5 Years | 5.31% | 4.40% | -17% |

86.     The DOL excluded stable value products, like the Fixed Dollar Account, from the category of investments deemed QDIAs based on its determination that stable value products do not provide sufficient asset accumulation for participants and should be discouraged as a primary source of investment returns:

> It is the view of the Department that investments made on behalf of defaulted participants ought to and often will be long-term investments and that investment of defaulted participants' contributions and earnings in money market and stable value funds will not over the long-term produce rates of return as favorable as those generated by products, portfolios and services included as qualified default investment alternatives, ***thereby decreasing the likelihood that participants invested in capital preservation products will have adequate retirement savings.***

> Lastly, the Department is concerned that inclusion of a capital preservation product as a qualified default investment alternative, without limitation, may be perceived by participants and beneficiaries as an endorsement by the government, by virtue of its inclusion in the regulation, or as an endorsement by the employer, by virtue of its selection as the qualified default investment alternative, as an appropriate investment for long-term retirement savings. Although the Department recognizes that such perceptions on the part of some participants and beneficiaries might be addressed with investment education and investment advice, the Department nonetheless is concerned that, overall, ***the potentially adverse effect on long-term retirement savings may be significant.***

Default Investment Alternatives Under Participant Directed Individual Account Plans, 72 FR 60452-01 (emphasis added).

87.     As discussed above and as the DOL feared, Defendants' inclusion of the Fixed Dollar Account as the Plans' default investment has resulted in the participants' retirement savings being highly concentrated in an investment product that does not provide exposure to a mix of

accumulation and preservation asset classes and lacks suitable growth to secure sufficient retirement savings. As the following table illustrates, this violation of fiduciary duties has had a severe detrimental effect on participants' ability to adequately save for retirement:

| Annual Returns and Gains (Losses) of TDF and Balanced Fund vs. Fixed Dollar Account | | | | | |
|---|---|---|---|---|---|
| Year | TDF | Balanced | Fixed Dollar | TDF | Balanced |
| 2020 | 13.74% | 16.41% | 4.300% | ($229,813,859.78) | ($294,708,977.44) |
| 2019 | 20.46% | 21.79% | 4.550% | ($363,910,890.48) | ($394,219,839.20) |
| 2018 | -5.49% | -2.82% | 4.375% | $219,412,025.24 | $160,056,228.60 |
| 2017 | 16.90% | 13.86% | 4.280% | ($276,021,329.58) | ($209,505,317.65) |
| 2016 | 7.72% | 8.81% | 4.510% | ($64,054,950.37) | ($85,920,533.58) |
| 2015 | -0.89% | 0.52% | 5.05% | $111,198,822.07 | $84,813,196.80 |
| Total Loss[5] | | | | ($933,801,030.21) | ($984,354,667.87) |

88.     Accordingly, at all times during the Class Period, the Trustee Defendants' duty to monitor investments required them to remove and reinvest the Fixed Dollar Account as the default investment with a proper QDIA. Had Defendants not allowed the Fixed Dollar Account to remain as the default investment throughout the Class Period, the Plan's participants would have gained hundreds of millions of dollars more for their retirement.

---

[5] The Target Date Fund (TDF) used here as a comparator is the Vanguard Target Retirement Trust Plus suite of TDFs, and is a weighted average of the rate of returns from the 2020, 2030, 2040, 2050, and 2060 retirement funds within that suite of funds. The Balanced Fund used here as a comparator is the Vanguard Balanced Index Fund, Institutional Shares. These Vanguard funds are appropriate comparators because they are widely used as plan options in defined contribution plans similar in size to the 401(k) Plans offered by NYL. Based on Information and belief, Vanguard Trust Plus is Vanguard's least expensive target date fund suite, offering an expense ratio approximately 3 basis points less than the Vanguard Institutional target date fund currently available in the 401(k) Plans (albeit not by default). One basis point is the equivalent of one one-hundredth of one percent). Had participants been defaulted into a target date fund rather than Fixed Dollar Account, the 401(k) Plans would likely have sufficient target date assets to quality for the cheapest share class. Accordingly, Plaintiff has used the Vanguard Trust Plus suite of TDFs as a comparator to the Fixed Dollar Account.

2.   <u>The Trustee Defendants Imprudently and Disloyally Disregarded Fiduciary Norms to Select and Retain Proprietary MainStay Investments for the Plans.</u>

89.   ERISA requires the Trustee Defendants to engage in a thorough, unbiased deliberative process when selecting and monitoring investment options in the Plans. This process must always be scrupulous.

90.   Here, because New York Life is a financial services company that offers investment products to retirement plan, the potential for conflicted decisions by the New York Life executives who controlled the Plans' investments is especially high. Specifically, the Trustee Defendants were in a position to use the Plans' $4.3 billion of assets to benefit New York Life through investing their employees' retirement savings in New York Life investment products, such as the MainStay Funds and the Fixed Dollar Account.

91.   The Department of Labor has provided guidance to plan fiduciaries explaining that the "decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988).

92.   Here, a disinterested plan fiduciary would have avoided or removed the underperforming and expensive MainStay Funds.

93.   Due to their conflicted loyalties between promoting New York Life's investment products and acting solely for the benefit of the Plans' participants here, the Defendant Trustees were required to use the utmost care and unbiased procedures as a check against their conflict.

94.   The Trustee Defendants should have taken actions or implemented procedures to mitigate the conflict they suffered and to avoid acting in New York Life's business interest. There

were several measures that the Trustee Defendants could have taken to mitigate their conflict , but did not. For example, they could have appointed an independent fiduciary who had full power and authority to select and monitor the Plan's investment and who was not a high level New York Life executive. The Trustee Defendants also could have created an administrative wall between the Trustee Defendants and New York Life's business personnel.

95.     Research studies in reputable finance journals show that where a mutual fund manager controls the plan menu for a 401k plan, the plan's menu "display[s] favoritism toward their own affiliated funds." Veronika K. Pool, Clemens Sialm, and Irina Stefanescu, "It Pays to Set the Menu: Mutual Fund Investment Options in 401(k) Plans," The Journal of Finance, Vol LXI, No. 4, August 2016. The researcher explained that:

> Fund families involved in a plan's design can face conflicting incentives. While they work with plan sponsors to create menus that serve the interest of plan participants, they also have an incentive to promote their own proprietary funds, even when more suitable options are available from other fund families. . . We further hypothesize that, due to this provider influence, fund addition and deletion decision may be less sensitive to prior performance of affiliated funds as mutual fund families have an incentive to smooth money flows across their funds with differential past performance… Our results reveal significant favoritism toward affiliated funds [which] are significantly less likely to be removed from the plan's menu than unaffiliated funds. The biggest relative difference between how affiliated and unaffiliated funds are treated arises among the worst-performing funds, which have been shown to exhibit significant performance persistence…These results suggest that decisions to change the composition of 401(k) plan menus are driven not simply by meritocracy, but also by favoritism. Protecting poorly performing funds by keeping them or adding them to plan menus helps mutual fund families smooth the money flows into their various offerings.

96.     The Trustee Defendants had a duty to monitor the Plans' investments and remove funds that suffered from sustained underperformance and could not meet their own self-identified performance benchmarks.

97.     Instead, the Defendant Trustees failed to satisfy threshold procedural norms needed for a non-conflicted fiduciary to satisfy their duties of loyalty and prudence under ERISA. For instance, the Defendant Trustees retained the underperforming and expensive MainStay Epoch U.S. All Cap Fund and MainStay Income Builder Fund proprietary mutual funds throughout the Class Period, and failed to remove the MainStay Epoch U.S. Small Cap Fund until March 26, 2019.

98.     According to the Securities and Exchange Commission, all registered mutual funds must file a prospectus that "should clearly disclose the fundamental characteristics and investment risks of the Fund, using concise, straightforward, and easy to understand language" and must include performance information (i.e., the average annual returns for 1, 5, and 10 years periods) compared with the returns of an appropriate index. [6]

99.     The prospectus for the MainStay Epoch U.S. All Cap Fund reports that "the fund has selected the Russell 3000 Index as its primary benchmark" and discloses "how the Fund's average annual total returns (before and after taxes) compare to those of a broad-based securities market index," which is the Russell 3000 Index. As such, according to New York Life itself, the Russell 3000 Index is an appropriate benchmark, and therefore provides a meaningful evaluation of whether the MainStay Epoch U.S. All Cap Fund is underperforming. [7]

100.    The prospectus for the MainStay Income Builder Fund discloses a "Blended Benchmark Index, [which is] a composite representation prepared by the Manager [New York Life

---

[6] See SEC's Form N-1A disclosure rules, *available at* https://www.sec.gov/files/formn-1a.pdf.

[7] MainStay Epoch U.S. All Cap Fund, Summary Prospectus (Feb. 28, 2020), *available at* https://www.newyorklifeinvestments.com/assets/documents/summarypro/mainstay-epoch-us-all-cap-fund-spro.pdf

Investment Management] of the performance of the Fund's asset classes weighted according to their respective weightings in the Fund's target range. The Blended Benchmark Index is comprised of the MSCI World Index and the Bloomberg Barclays U.S. Aggregate Bond Index weighted 50%/50%." Given this disclosure to fund investors that the Blended Benchmark Index is weighted according to the respective weightings in the Fund's target range, it provides a meaningful comparison from which to evaluate the performance of the MainStay Income Builder Fund.[8]

101.    The prospectus for the MainStay Epoch U.S. Small Cap Fund identifies the Russell 2000 Index as its primary benchmark and the Russell 2500 Index as its secondary benchmark for which investors should evaluate the fund's performance. As such, both the Russell 2000 Index and the Russell 2500 Index are appropriate benchmarks and provide a meaningful evaluation of the performance of the MainStay Epoch U.S. Small Cap Fund.[9]

102.    The following tables show that the MainStay Funds continuously failed to meet the performance benchmarks that NYL itself selected as well as their Morningstar index benchmarks over 1, 3, 5 and 10 year trailing returns[10]:

| Ticker | Fund Name | Avg. Annual Trailing Returns as of 12/31/2020 | | | |
|--------|-----------|-------|-------|-------|--------|
| | | 1-yr | 3-yr | 5-yr | 10-yr |
| MAWDX | **MAINSTAY EPOCH U.S. ALL CAP FUND** | **10.4** | **9.0** | **11.7** | **11.3** |
| | Russell 3000 | 20.9 | 14.5 | 15.4 | 13.8 |

[8] MainStay Income Builder Fund, Summary Prospectus (Feb. 28, 2020), *available at* https://www.newyorklifeinvestments.com/assets/documents/summarypro/mainstay-income-builder-fund-spro.pdf

[9] MainStay Epoch U.S. Small Cap Fund (Feb. 28, 2020), *available at* https://www.newyorklifeinvestments.com/assets/documents/summarypro/mainstay-mackay-small-cap-core-fund-spro.pdf

[10] Morningstar is a highly respected provider of mutual fund data to a broad range of investors. Its database includes relevant information on mutual funds past and present.

| Ticker | Fund Name | Avg. Annual Trailing Returns as of 12/31/2020 | | | |
|---|---|---|---|---|---|
| | | 1-yr | 3-yr | 5-yr | 10-yr |
| | Russell 1000 (Morningstar[11]) | 21.0 | 14.8 | 15.6 | 14.0 |
| MTODX | **MAINSTAY INCOME BUILDER FUND** | **7.3** | **6.4** | **8.2** | **8.1** |
| | Blended Benchmark Index | 12.5 | 8.4 | 8.6 | 7.1 |
| | Global Allocation (Morningstar[12]) | 13.6 | 8.4 | 10.3 | 8.2 |
| MOPIX | **MAINSTAY EPOCH U.S. SMALL CAP FUND** | **10.0** | **2.7** | **7.8** | **8.4** |
| | Russell 2000 | 20.0 | 10.3 | 13.3 | 11.2 |
| | Russell 2500 | 20.0 | 11.3 | 13.6 | 12.0 |

| Ticker | Benchmark Comparator | Average Annual -Under/Outperformance of Fund versus Benchmarks as of 12/31/2020 | | | |
|---|---|---|---|---|---|
| | | 1-yr | 3-yr | 5-yr | 10-yr |
| MAWDX | vs. R3000 | -10.50% | -5.48% | -3.77% | -2.45% |
| | vs. R1000 | -10.56% | -5.81% | -3.93% | -2.66% |
| MTODX | vs. Blended Benchmark Index | -5.20% | -1.97% | -0.39% | 1.04% |
| | vs. Global Alloc. Idx. | -6.26% | -1.99% | -2.11% | -0.03% |
| MOPIX | vs. Russell 2000 | -9.92% | -7.56% | -5.51% | -2.80% |
| | vs. Russell 2500 | -9.95% | -8.64% | -5.89% | -3.57% |

103.    Trustee Defendants failed to remove the MainStay Funds from the Plan's lineup even though they were more expensive than virtual identical funds and could not match the performance benchmarks that New York Life itself chose to evaluate performance of these funds.

104.    Inclusion and retention of these poor performing proprietary funds resulted in tens of millions of dollars of lost investment returns for the participants, totaling more than $68 million

---

[11] Morningstar benchmarks the MainStay Epoch U.S. All Cap Fund against the Russell 1000 Index.

[12] Morningstar benchmarks the MainStay Income Builder Fund against the Morningstar Global Allocation Index.

compared to NYL's selected benchmarks and more than $78 million compared to the Morningstar

Index Benchmarks:

| Fund Name | Losses (Present Value) | |
|---|---|---|
| | Versus NYL Prospectus Benchmark | Versus Morningstar Index Benchmark |
| MainStay Epoch U.S. All Cap Fund | ($45,981,770.57) | ($49,532,561.02) |
| MainStay Income Builder Fund | ($11,557,648.82) | ($18,343,965.40) |
| MainStay Epoch U.S. Small Cap Fund[13] | ($10,900,179.00) | ($10,900,179.00) |

105.    Further, the Plans' investments in the MainStay Epoch U.S. All Cap Fund consists

of a disproportionate percentage of assets under management, amounting to nearly one-third of all

assets under management for that fund.

106.    Outside investors (i.e., plans not controlled by the Trustee Defendants) lost

confidence in the MainStay Epoch U.S. All Cap Fund during the Class Period and divested. Based

on the best information available to Plaintiff, the fund experienced approximately $275 million in

net outflows during the Class Period – almost half of the fund's total assets under management.

107.    While Defendant Trustees understood that should they likewise cause the Plans to

divest, this action would severely impair the marketability and profitability of the NYL proprietary

fund. In retaining this underperforming fund – even when other investors, including institutional

investors, saw the imprudence of continuing to invest – Defendant Trustees chose NYL's business

interests over the interests of the Plans' participants. As shown above, in so doing, Defendant

Trustees caused the Plans' participants to conservatively lose more than $46 million on this fund

alone.

---

[13] Losses incurred through the selection and retention of the Epoch U.S. Small Cap Fund are
computed through March 31, 2019.

108.    The Trustee Defendants' failures all served New York Life's interests, as the selection of proprietary investments for the Plans earned New York Life money and supported its asset management business.

109.    Defendant New York Life Investment Management LLC, an indirect wholly owned subsidiary of New York Life, established and manages the MainStay Funds. It receives fees for managing the MainStay funds.

110.    The fees for the MainStay proprietary funds far exceeded the average fee paid by similarly situated plan investors for similar funds (and sometimes virtually identical funds).

111.    **The MainStay Epoch U.S. All Cap Fund** has an expense ratio of 89 basis points for the share class offered by the Plans.[14]  However, the Epoch Investment Partners, Inc. manages a separate account that uses an identical strategy as the MainStay Epoch U.S. All Cap Fund, but has an expense ratio of only 60 basis points, 33% cheaper than what the 401(k) Plans pay for the same strategy.

112.    Until June 26, 2018, the Plans were invested in a more expensive share class of the MainStay Epoch U.S. All Cap Fund, which had an expense ratio of at least 92 bps.

113.    The Investment Company Institute has reported publicly that the average expense ratio that 401k plans with assets over $1 billion paid for domestic equity funds was 36 basis points and its reported findings show that, on average, plans with greater assets pay less in fees for domestic equity funds.[15] Thus the average domestic equity fund expense ratio for 401k plans of

---

[14] One basis point is the equivalent of one one-hundredth of one percent.
[15] *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016* (June 2019) *available at*, https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

the same size as the Master Trust here that holds the Plan's assets of $4.3 billion would be substantially lower than 36 bps in 2016.

114.    Additionally, given the fund's inability to beat its benchmark, the Russell 3000, the 401(k) Plans could have paid just 8 basis points, or 91% less, to invest in a Russell 3000 index fund. As shown above, had Defendants replaced the MainStay Epoch U.S. All Cap Fund with a Russell 3000 index fund at the start of the class period, the Plans' participants would have earned nearly $46 million more.

115.    **The MainStay Income Builder Fund** has an expense ratio of 67 basis points for the share class offered by the Plans. However, many reputable managers offer funds in the same World Allocation Morningstar Category as the MainStay Income Builder Fund that are less expensive and have performed better. For instance, the American Funds Global Balanced Fund is 27% cheaper than the MainStay alternative, and has garnered 1,400% more assets than the MainStay Income Builder Fund. Similarly, the Vanguard Global Wellington has an expense ratio of just 34 basis points, or 49% that of the MainStay Income Builder Fund.

116.    Until June 26, 2018, the Plans were invested in a more expensive share class of the MainStay Income Builder Fund, which had an expense ratio of at least 76 bps.

117.    Based on the Investment Company Institute publicly available report, for Balanced Funds, the average expense ratio for 401k plans with assets over $1 billion paid was 31 basis points in 2016 (and was decreasing over time).[16] Thus, the average expense ratio for 401k plans of the same size as the Master Trust here that holds the Plan's assets of $4.3 billion would likely be lower than 31 bps in 2016 and substantially lower now.  The substantially greater fees the Plans paid for

---

[16] *Id*.

the MainStay Income Builder Fund were not justified given the fund's substantial underperformance compared to its own self-identified benchmark.

118. **The Mainstay Epoch U.S. Small Cap Fund** has an expense ratio of 98 basis points for the share class that was offered by the Plans. However, the fund that belatedly replaced the MainStay Epoch U.S. Small Cap Fund, the Fidelity Small Cap Index Fund, has an expense ratio of only 2.6 basis points, or 97% cheaper than what the 401(k) Plans paid for the lagging proprietary fund.

119. The substantially greater fees the Plans paid for the MainStay Epoch U.S. Small Cap Fund were not justified given the fund's substantial underperformance compared to its own self-identified benchmark and the substantially cheaper Fidelity fund that replaced it.

120. In total, the Plans' participants were required to pay in excess of $15.5 million in fees to NYL due to the Defendant Trustees' selection and retention of these three proprietary funds in the Plans. Plaintiff has determined that if alternative comparable funds such as those listed above had been used in the Plans, rather than the NYL proprietary MainStay funds, the Plans' participants would have paid over $6.5 million less in fees during the Class Period.

## VI.   CLASS ACTION ALLEGATIONS

121. Plaintiff brings this action on behalf of:

> All participants and beneficiaries in the New York Life Insurance Employee Progress Sharing Investment Plan and the New York Life Insurance Company Agents Progress Sharing Plan who held assets in the Plans' MainStay Income Builder Fund, MainStay Epoch U.S. All Cap Fund, MainStay Epoch U.S. Small Cap Fund, and/or Fixed Dollar Account on or after March 2, 2015. Members of the Boards of Trustees, and their beneficiaries and immediate families are excluded from the class.

34

122.    Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1) and/or (b)(3).

123.    The Class satisfies the numerosity requirement because it is composed of thousands of persons. The Plans together have more than 29,600 participants. The number of Class members is so large that joinder of all its members is impracticable.

124.    Common questions of law and fact include:

(a)  Whether the Trustees were and are ERISA fiduciaries responsible for selecting, retaining, removing and monitoring the Plans' investments;

(b)  Whether the Fixed Dollar Account is a Qualified Default Investment Alternative;

(c)  Whether the Fixed Dollar Account was a prudent and loyal default investment for the Plans;

(d)  Whether the Trustees breached their ERISA fiduciary duties in monitoring the investment options in the Plans;

(e)  Whether the Trustees caused the Plans to engage in multiple prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106, throughout the Class Period;

(f)  Whether the Plans and their participants suffered losses as a result of Defendants' fiduciary breaches and prohibited transactions.

125.    Plaintiffs' claims are typical of the claims of the Class because (a) both the New York Life Insurance Employee Progress Sharing Investment Plan and the New York Life Insurance Company Agents Progress Sharing Plan are invested in the same funds, both Plans' QDIA is the Fixed Dollar Account, and all assets of the Plans reside in the Master Trust, and to the extent Plaintiff seeks relief on behalf of the Plans pursuant to § 502(a)(2) of ERISA his claims are not only typical of, but the same as a claim under § 502(a)(2) brought by any other Class Member; (b) to the extent Plaintiff seeks equitable relief, that relief would affect all Class Members

35

equally; and (c) all of the Class members were injured and continue to be injured in the same manner by the alleged breaches of fiduciary duty. Plaintiff has no interests that are antagonistic to the claims of the Class. He understands that this matter cannot be settled without the Court's approval.

126.    Plaintiff will fairly and adequately protect the interests of the Class and is committed to the vigorous representation of the Class. Plaintiff's counsel is Cohen Milstein Sellers and Toll PLLC ("Cohen Milstein").  Cohen Milstein's Employee Benefits Practice Group has been devoted exclusively to litigating complex ERISA class actions for over 15 years. The group has played a significant role in the development of employee benefits law and maintains a leading ERISA practice that successfully represents ERISA participants throughout the country. Plaintiff has no interests antagonistic to or in conflict with the interests of the Class.

127.    Plaintiff's counsel has agreed to advance the costs of the litigation contingent upon the outcome. Counsel are aware that no fee can be awarded without the Court's approval.

128.    A class action is the superior method for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable. The losses suffered by some of the individual members of the Class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights.

129.    Moreover, Defendants, as fiduciaries to the 401(k) Plans, were and are obligated to treat all Class members similarly because ERISA imposes uniform standards of conduct on fiduciaries. Individual proceedings, therefore, would pose the risk of inconsistent adjudications. Plaintiff is unaware of any difficulty in the management of this action as a class action.

130.    The Class may be certified under Rule 23(b).

A.     **Rule 23(b)(1) requirements.**  As an ERISA breach of fiduciary duty action, this action is a classic 23(b)(1) class action.  Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants, or (B) adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

B.     **Rule 23(b)(3) requirements**.  This action is suitable to proceed as a class action under Rule 23(b)(3) because questions of law and fact common to the members of the Class predominate over individual questions, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter.

## VII.   CAUSES OF ACTION

### <u>COUNT I</u>
Breach of Fiduciary Duties for Failing to Prudently and Loyally Select and Monitor Investments
for the Plans in Violation of ERISA § 404, 29 U.S.C. § 1104
(Against Boards of Trustees and Trustee Defendants)

131.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

132.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plans and in their selection and monitoring of the Plans' investments.

133.    The scope of the fiduciary duties and responsibilities of the Trustees includes managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and

beneficiaries, and acting with the care, skill, diligence, and prudence required by ERISA. The Trustees are directly responsible for selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis, and eliminating imprudent ones. This duty includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

134.    As described throughout this Complaint, the Trustees employed an imprudent and disloyal process of maintaining the Fixed Dollar Account as the Plans' QDIA; investing participants' retirement assets into the Fixed Dollar Account, by default, despite the Fixed Dollar Account being inappropriate for these retirement savers' long-term investment horizons; and maintaining and monitoring the aforementioned MainStay Plan investment options during the Class Period. In doing so, the Trustees failed to make Plan investment decisions based solely on the merits and what was in the interest of participants, and instead made investment decisions that would benefit New York Life. The Trustees therefore failed to discharge their duties with respect to the Plans solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

135.    In so doing, the Trustees also failed to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

136.    Moreover, to reach a prudent investment decision with participants' defaulted investments, a fiduciary directing participants into the Fixed Dollar Account – without protection

from the Safe Harbor regulations – must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties" 29 C.F.R. § 2550.404a–1(b)(1). The Trustees invested participants' defaulted investments without giving appropriate consideration to relevant facts and circumstances.

137.     As a direct and proximate result of the above breaches of fiduciary duties, the Plans and their participants have suffered hundreds of millions of dollars of losses in retirement assets.

138.     Pursuant to ERISA, 29 U.S.C. § 1109(a), §1132(a)(2) and §1132 (a)(3), the Boards of Trustees are liable to restore all losses suffered by the Plans caused by the breaches of fiduciary duty, to restore to the Plans any profits New York Life made through the use of Plans' assets, and to restore to the Plans any profits resulting from the breaches of fiduciary duties alleged in this Count.

## COUNT II

Violations of ERISA § 406(a), 29 U.S.C. § 1106(a) for
Engaging in Prohibited Transactions
(Against NYL, Boards of Trustees and Trustee Defendants)

139.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

140.     As described throughout this Complaint, Defendant Boards of Trustees are fiduciaries with respect to the Plans, and NYL is a party in interest to the Plans because, among other things, it is an employer of employees and agents in the Plans. 29 U.S.C. § 1002(14)(C).

141.    ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits fiduciaries from causing plans to engage in transactions that they know or should know constitutes a direct or indirect sale or exchange, or leasing, of any property between the plan and a party in interest.

142.    ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), prohibits fiduciaries from causing plans to engage in transactions that that they know or should know constitute a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest.

143.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits fiduciaries from causing plans to engage in transactions that that they know or should know constitute direct or indirect transfers of the Plans' assets to, or use of the Plans' assets by or for the benefit of, parties in interest.

144.    The Trustee Defendants caused the Plans to engage in multiple party-in-interest transactions by causing the Plans to repeatedly transfer property (i.e., the Plans' assets) to NYL's general account through the inclusion of the Fixed Dollar Account as an investment option and QDIA for both Plans.

145.    The Trustee Defendants and Defendant NYL, by their actions and omissions, throughout the Class Period, in causing the 401(k) Plans to be invested in the MainStay proprietary funds, and in causing the 401(k) Plans to pay, directly or indirectly, on a monthly basis, investment management and other fees to NYL in connection therewith, also caused the 401(k) Plans to engage in transactions that these Defendants knew or should have known constituted sales or exchanges of property between the 401(k) Plans and parties in interest, furnishing of services between the Plans and a party in interest for more than reasonable compensation, and transferring of the Plans' assets to a party in interest, in violation of 29 U.S.C. §§1106(a)(1)(A), (C) and (D).

146.    In so doing, the Trustee Defendants caused the Plans to engage in multiple party-in-interest transactions, by causing the Plans to repeatedly benefit NYL because NYL used the Plans' assets to earn various forms of compensation and support its business operations.

147.    Each transfer by each Plan (and later in the Class Period, by the Master Trust) of that Plan's assets to NYL during the Class Period constituted a separate violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

148.    As an affiliate of the Boards of Trustees, a party-in-interest employer of the Plans, and a corporate insider, NYL had knowledge of all facts relevant to its transactions with the Plans.

149.    Upon information and belief, NYL keeps detailed financial records which would show the transfer of assets from the Plans to NYL and internal flows of money within its general account.

150.    Pursuant to ERISA, 29 U.S.C. §1109(a), §1132(a)(2) and (a)(3), these Defendants are liable to restore all losses suffered by the 401(k) Plans as a result of the prohibited transactions and disgorge all revenues received and/or earned from the fees paid out of the 401(k) Plans' assets, and the use of the Plans' assets in NYL's general account, as well as other appropriate equitable relief.

## COUNT III

Violations of ERISA §406(b), 29 U.S.C. § 1106(b)
(Against NYL, Boards of Trustees, and Trustee Defendants)

151.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

152.    As described throughout this Complaint, Defendants Boards of Trustees and NYL are both fiduciaries of the 401(k) Plans.

41

153.    ERISA § 406(b), 29 U.S.C. § 1106(b) prohibits fiduciary self-dealing.

154.    Subsection (1) provides that a fiduciary shall not "deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b), (b)(1).

155.    Subsection (3) provides that a fiduciary shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3).

156.    Defendants NYL and Boards of Trustees made decisions about the investment of the Plans' assets in ways that benefitted themselves or were in their own self-interest because : (a) NYL received many direct and indirect fees and other compensation from the Plans' investments in the in-house funds; (b) affiliates were provided assets that were used for business functions; and/or (c) upon information and belief, the Defendant Trustees were all executives of the Company whose compensation and promotion levels increased when they acted to increase revenue for NYL.

157.    Defendants NYL and Boards of Trustees' decisions were based on the Company's and their own self-interest and therefore violated ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

158.    Defendants NYL and Boards of Trustees' self-dealing between themselves as fiduciaries and the Plans also result in the receipt of Plan assets in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

159.    As a direct and proximate result of the above violations of ERISA §§ 406(b)(1), and (b)(3), 29 U.S.C. §§ 1106(b)(1) and (b)(3), the Plans and their participants suffered millions of dollars of losses in retirement assets, for which all Defendants named in this Count are jointly and severally liable.

160.    Pursuant to ERISA, 29 U.S.C. §1109(a), §1132(a)(2) and (a)(3), these Defendants are liable to restore all losses suffered by the 401(k) Plans as a result of the prohibited transactions

and disgorge all revenues received and/or earned from the fees paid out of the 401(k) Plans' assets, and the use of the Plans' assets in NYL's general account, as well as other appropriate equitable relief.

## COUNT IV

Violations of ERISA § 405(a), 29 U.S.C. § 1105(a) for
Breaches of Fiduciary Duty of Co-Fiduciaries
(Against NYL)

161.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

162.    New York Life is a Named Fiduciary to the Plan pursuant to the governing terms of the Plan.

163.    Section 405(a)(1) of ERISA, 29 U.S.C. § 1105(a)(1) imposes co-fiduciary liability on NYL for the knowing participation in a breach of fiduciary duty by other fiduciaries.

164.    Defendant NYL knew that the purchases of interests in the MainStay Funds and the Fixed Dollar Account constituted violations of 29 U.S.C. § 1106(a)(1)(A) because NYL is responsible for the Plan's Form 5500 disclosures which stated that the Plan's investments in the MainStay Funds and the Fixed Dollar Account were parties in interest transactions.

165.    Defendant NYL knowingly participated in the purchases of interests in the MainStay Funds and the Fixed Dollar Account, which constituted violations of 29 U.S.C. § 1106(a)(1)(A), because NYL sponsors and manages those investments and thus maintains records of the investors therein.

166.    Defendant NYL knew that the receipt of fees and expenses from Plan assets in connection with the Plan's investment in the MainStay Funds and the Fixed Dollar Accounts, constituted violations of 29 U.S.C. § 1106(a)(1)(D) because NYL is responsible for the Plan's

Form 5500 disclosures which indicate that the Plan's payment of fees to NYL were parties in interest transactions.

167.    Defendant NYL knowingly participated in the receipt of fees and expenses from Plan assets in connection with the Plan's investment in the MainStay Funds and the Fixed Dollar Accounts, which constituted violations of 29 U.S.C. § 1106(a)(1)(D), because NYL received those fees and expenses from the Plan's assets.

168.    Therefore, pursuant to ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), NYL has co-fiduciary responsibility for its knowing participation in the violations of 29 U.S.C. § 1106(a)(1)(A) and (D) caused by other Plan fiduciaries.

169.    Section 405(a)(3) of ERISA, 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary if he knows of a breach by a co-fiduciary and fails to make reasonable efforts to remedy it.

170.    As alleged above, Defendant NYL knew of all the facts and circumstances surrounding the violations of 29 U.S.C. § 1106(a)(1)(A) and (D) yet failed to make reasonable efforts under the circumstances to remedy the breach.

171.    NYL could have remedied the violations of 29 U.S.C. § 1106(a)(1)(A) and (D) by returning the Plan's investment of assets and restoring the fees and expenses it received from the Plan.

172.    Therefore, pursuant to ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), NYL has co-fiduciary responsibility for the violations of 29 U.S.C. § 1106(a)(1)(A) and (D) caused by other Plan fiduciaries.

### COUNT V

Violations of ERISA §403(c)(1), 29 U.S.C. § 1103(c)

(Against NYL and Board of Trustees)

173.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

174.    ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1) provides that the "assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

175.    NYL is an employer of employees and agents in the Plans.

176.    Plan assets were transferred out of the Plans' trusts and later the Plans' Master Trust to NYL and into the general account of NYL.

177.    NYL used the Plans' assets for its own purposes and to benefit itself, by, inter alia, (a) earning compensation from the Plans' assets; (b) retaining for their own uses returns earned with the Plans' assets in the Company's general account; and (c) expanding the Company's risk pool while exposing the Plans to credit risk of a single company.

178.    Pursuant ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek all available and appropriate equitable relief against all Defendants named in this Count to redress the violations of 29 U.S.C. § 1103 described herein, including, but not limited to the relief set forth below in the Prayer For Relief.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the 401(k) Plans and the Class, demands judgment against Defendants on each Count of the Complaint and the following relief:

1.      An order that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

2.     Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

3.     A declaration that NYL and the Defendant Trustees breached their fiduciary duties to the Class in the manner described herein;

4.     An order compelling each fiduciary found to have breached his/her/its fiduciary duty to the Plans to jointly and severally pay such amount or surcharge to the Plans as is necessary to make the Plans whole for any losses which resulted from said breaches, plus pre-judgement and post-judgment interest;

5.     An order that all Defendants disgorge and pay to the Plans' participants all revenues received and profits obtained from violations of 29 U.S.C. §§ 1103, 1104, or 1106;

6.     An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

7.     An order that Defendants provide all accountings necessary to determine the amounts Defendants must remit to the Plans under 29 U.S.C. § 1109(a) to restore losses and any profits fiduciaries obtained from the use of the Plans' assets or other violations of 29 U.S.C. §§ 1103, 1104, or 1106;

8.     To the extent necessary, an injunction or order creating a constructive trust into which all ill-gotten gains, fees and/or profits paid to any of the Defendants in violation of ERISA shall be placed for the sole benefit of the Plans and their participants and beneficiaries.  This includes, but is not limited to, the ill-gotten gains, fees and/or profits paid to any of the Defendants that have been wrongly obtained as a result of breaches of fiduciary duty or prohibited transactions or other violations of ERISA.

9.      An order removing the fiduciaries who have breached their fiduciary duties their roles as fiduciaries for the Plans, and an order appointing an independent fiduciary to manage the assets of the Plans;

10.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations and duties;

11.     An order removing the Fixed Dollar Account as the qualified default or investment alternative for the Plans;

12.     An award of pre-judgment interest;

13.     An award of attorneys' fees and costs pursuant to ERISA, 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

14.     An award of such other and further relief as the Court deems equitable and just.

47

Dated:  March 2, 2021                             Respectfully submitted,

*/s/ Michael Eisenkraft*

Michael Eisenkraft (NY. Bar No. 664737)
**Cohen Milstein Sellers & Toll PLLC**
88 Pine Street
14th Floor
New York, New York 10005
Tel: (212) 838-7797
Fax: (212) 838-7745
meisenkraft@cohenmilstein.com

Michelle C. Yau (*Pro Hac Vice* forthcoming)
Scott M. Lempert (*Pro Hac Vice* forthcoming)
Daniel R. Sutter (*Pro Hac Vice* forthcoming)
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
myau@cohenmilstein.com
slempert@cohenmilstein.com
dsutter@cohenmilstein.com