UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                 :
STUART KROHNENGOLD, et al.,                                       :
                                                                 :
                                    Plaintiffs,                  :
                                                                 :                  21-CV-1778 (JMF)
                     -v-                                          :
                                                                 :                  OPINION AND ORDER
NEW YORK LIFE INSURANCE COMPANY, et al.,                         :
                                                                 :
                                    Defendants.                  :
                                                                 :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        Former and current participants in certain 401(k) plans bring this putative class action

alleging violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §

1001 *et seq*.  More specifically, Plaintiffs allege that New York Life Insurance Company

("NYL"), its Fiduciary Investment Committee (the "Committee"), and the members thereof

breached their fiduciary duties, engaged in prohibited transactions, and violated ERSIA's anti-

inurement provision in connection with their management of two NYL 401(k) plans (the

"Plans").  Their allegations center on Defendants' use of NYL's Fixed Dollar Account as the

default investment option for the Plans, as well as their selection and retention of certain

proprietary funds (the "MainStay Funds") that allegedly cost more than similar investment

options and underperformed benchmarks chosen by NYL itself.  According to Plaintiffs,

Defendants' imprudent decisions with respect to these investments cost Plan participants

hundreds of millions of dollars in retirement assets from 2015 to the present.

        Defendants now move, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, to

dismiss Plaintiffs' claims.  ECF No. 41.  For the reasons that follow, Defendants' motion to

dismiss is GRANTED in part and DENIED in part.  In particular, the Court concludes that four

of the seven Plaintiffs lack standing to bring fiduciary-duty claims challenging Defendants'

designation of the Fixed Dollar Account as the default investment option; that the corresponding

claims of the other three Plaintiffs are time barred; and that Plaintiffs fail to allege a plausible

fiduciary-duty claim based on the MainStay MacKay International Equity Fund and a plausible

claim for violation of ERISA's anti-inurement provision.  Defendants' motion is otherwise

denied.  Moreover, the Court grants Plaintiffs leave to file another amended complaint.

## BACKGROUND

The following facts, drawn from the Amended Complaint, are presumed to be true for

purposes of this motion.  *See, e.g.*, *Karmely v. Wertheimer*, 737 F.3d 197, 199 (2d Cir. 2013).

### A.  The Plans

Plaintiffs Stuart Krohnengold, Wayne Antoine, Lee Webber, Anthony Medici, Joseph

Bendrihem, Larry Gilbert, and Rafael Musni are seven former and current participants in two

401(k) plans sponsored by NYL: the Employee Progress Sharing Investment Plan (the

"Employee Plan") and the Agents Progress Sharing Investment Plan (the "Agents Plan").  ECF

No. 38 ("Am. Compl."), ¶¶ 15-21, 48.  Krohnengold, Antoine, Webber, and Gilbert are

participants in the Employee Plan; Musni is a participant in the Agents Plan; and Medici and

Bendrihem are participants in both.  *Id.* ¶¶ 15-21.  The Plans are defined contribution plans, in

which "[t]he value of each participant's individual account in the 401(k) Plans depends on

contributions made on behalf of each employee or agent by his or her employer, deferrals of

employee compensation and employer matching contributions, plus the performance of

investment options and minus all fees and expenses."  *Id.* ¶¶ 48, 51.  As of the end of 2019, the

two Plans combined had more than $4.3 billion in assets and more than 29,600 participants.  *Id.* ¶

57.  The Plans provides participants with a menu of investment options, selected by the

Committee, from which to choose. *Id.* ¶ 52. During the proposed Class Period (from March 1, 2015, to the present), the Committee selected and retained various NYL proprietary funds as investment options, including, as relevant here, the Fixed Dollar Account and nine other proprietary mutual funds, known as the MainStay Funds. *Id.* ¶ 54.

### 1. The Fixed Dollar Account

The Fixed Dollar Account, a stable value fund offered through a group annuity contract between the Plans and NYL, is one of NYL's flagship products. *Id.* ¶ 5, 47, 70. Pursuant to the contract, participants' contributions to the Fixed Dollar Account are transferred to and maintained in NYL's general account. *Id.* ¶ 70. In exchange, NYL provides a guaranteed rate of return specified in the contract. *Id.* In total, the Fixed Dollar Account generated less than 5.1% in investment returns each year from 2015 to 2020. *Id.* ¶ 84. Participants retain the right to make withdrawals from the Fixed Dollar Account, but NYL charges the Plans' assets for such withdrawals in addition to other administrative expenses. *Id.* ¶ 70. Because NYL's general account assets are subject to claims by its creditors and liabilities arising from any of its businesses, there is a risk that NYL may default on its obligations to the Plans. *Id.* ¶ 72-73.

From 2003 to 2008, and from 2009 on, the Committee set the Fixed Dollar Account as the default investment option for the Plans. *Id.* ¶ 68. As a result, the contributions for all Plan participants during those years were automatically invested in the Fixed Dollar Account unless the participant affirmatively selected a different investment option. *Id.* By the end of 2019, nearly 60% of the Employee Plan and nearly 43% of the Agents Plan — more than $2.3 billion in total assets — were invested in the Fixed Dollar Account. *Id.* ¶ 59. These high rates of investment in a stable value product like the Fixed Dollar Account made the Plans an outlier among 401(k) plans. *Id.* ¶ 82. According to a study conducted by NYL, participants in other

401(k) plans allocated only 12% on average to stable value products; the weighted-average

stable value holdings in the "four largest private 401(k) plans" is under 17%.  *Id.*

Notably, the Department of Labor ("DOL") has determined that low-risk, low-return

stable value funds, such as the Fixed Dollar Account, do not satisfy the asset accumulation

requirements necessary to be deemed a Qualified Default Investment Alternative ("QDIA"), *id.*

¶ 47 — *i.e.*, a default investment option that is eligible for an ERISA safe harbor provision, *see*

29 U.S.C. § 1104(c), because, among other things, it is typically "designed to provide long-term

appreciation and capital preservation through a mix of equity and fixed income exposures

consistent with a target level of risk appropriate for participants," 29 C.F.R. § 2550.404c-

5(e)(4)(ii); *see also id.* §§ 2550.404c-5(e)(4)(i), (iii).  In making this determination, DOL

explained that "investments made on behalf of defaulted participants ought to and often will be

long-term investments."  Default Investment Alternatives Under Participant Directed Individual

Account Plans, 72 Fed. Reg. 60,452, 60,463 (Oct. 24, 2007).  "[O]ver the long-term," the DOL

continued, making such investments "in money market and stable value funds will not . . .

produce rates of return as favorable as those generated by products, portfolios and services

included as qualified default investment alternatives, thereby decreasing the likelihood that

participants invested in capital preservation products will have adequate retirement savings."  *Id.*

## 2.  The MainStay Funds

During the Class Period, the Committee also selected and retained NYL proprietary

mutual funds, known as the MainStay Funds, as investment options for the Plans.  *See* Am.

Compl. ¶¶ 54-55.  Nine such funds are relevant here: the Income Builder Fund, the Epoch U.S.

All Cap Fund, the Epoch U.S. Small Cap Fund, the MacKay International Equity Fund, the

Retirement 2010 Option Fund, the Retirement 2020 Option Fund, the Retirement 2030 Option

Fund, the Retirement 2040 Option Fund, and the Retirement 2050 Option Fund. *Id.* ¶¶ 53-54. These funds are managed for a fee by NYL. *Id.* ¶ 55.

According to Plaintiffs, eight of the nine MainStay Funds — all but the MacKay International Equity Fund — consistently underperformed performance benchmarks selected by NYL itself or other comparable funds. *Id.* ¶ 101. For instance, the Epoch U.S. All Cap Fund and the Epoch U.S. Small Cap Fund underperformed benchmarks selected by NYL, as well as Morningstar index benchmarks, over one-, three-, five- and ten-year trailing returns as of the end of 2020. *Id.* ¶¶ 102-06. And the Income Builder Fund underperformed those same benchmarks over one-, three-, and five-year trailing returns. *Id.* Meanwhile, the five MainStay Retirement Funds underperformed the Vanguard Target Retirement Funds, the funds which were later used to replace the MainStay Retirement Funds, on a trailing one-, three-, five-, and ten-year basis as of the end of 2018. *Id.* ¶¶ 127, 129, 131. According to Plaintiffs, "[t]he Vanguard Target Retirement Funds are appropriate comparators to evaluate the Mainstay Retirement Funds because they have similar asset allocation among the underlying asset classes." *Id.* ¶ 133. For instance, "at year end 2015, the Mainstay Retirement 2050 Fund's asset allocation was 89% equity, and 11% fixed income, while the Vanguard Target Retirement 2050 Fund had an asset allocation of 90% equity and 10% fixed income." *Id.*

Plaintiffs allege that the same eight MainStay Funds also had higher costs and fees than funds that were similar, if not identical, in terms of their investment strategy. *Id.* ¶¶ 110-14, 118, 120-21, 128. For instance, although the MainStay Epoch U.S. All Cap Fund has an expense ratio of eighty-nine basis points for the share class offered by the Plans, Epoch Investment Partners, Inc. manages a separate account that uses an identical strategy but has an expense ratio of only sixty basis points — approximately "33% cheaper than what [the Plans] pay for the same

strategy." *Id.* ¶ 112.  Additionally, three of the MainStay Funds — the Epoch U.S. All Cap Fund, the Income Builder Fund, and the MacKay International Equity Fund — each had expense ratios that were notably higher-than-average for funds of similar sizes.  *Id.* ¶¶ 112, 114, 118, 120, 123-24.  And the Plans were initially invested in more expensive share classes within those three funds.  *Id.* ¶¶ 113, 119, 125.  Some of the MainStay Funds, most notably the Epoch U.S. All Cap Fund, also experienced significant net outflows of investments during the Class Period.  *Id.* ¶ 116; *see also id.* ¶ 127 (noting that the MainStay Retirement Funds "had very little in accumulated assets from outside investors").

## B.  Plaintiffs' Claims

Plaintiffs challenge Defendants' use of the Fixed Dollar Account as the Plans' default investment option as well as their selection and retention of the MainStay Funds despite these funds' high costs and poor performance.  *Id*. ¶¶ 5-10.  More specifically, Plaintiffs bring five claims: (1) a claim against the Committee and its members (together, the "Committee Defendants") for breach of fiduciary duties under ERISA Section 404, 29 U.S.C. § 1104; (2) a claim against NYL and the Committee Defendants for engaging in prohibited transactions under Section 406(a), 29 U.S.C. § 1106(a); (3) a claim against NYL and the Committee Defendants for self-dealing in violation of Section 406(b), 29 U.S.C. § 1106(b); (4) a claim against NYL for co-fiduciary liability under Section 405(a), 29 U.S.C. § 1105(a); and, finally, (5) a claim against NYL and the Committee Defendants for violating ERISA's anti-inurement provision, Section 403(c)(1), 29 U.S.C. § 1103(c).  *Id.* ¶¶ 148-96.  Plaintiffs allege that, in total, Plan participants could have saved over $930 million more for retirement from 2015 to 2020 if the Committee Defendants had chosen a more appropriate default investment option for the Plan than the Fixed Dollar Account.  *Id.* ¶ 84.  Plaintiffs further claim that the Committee Defendants' decision to

6

include and retain the MainStay Funds as investment options "resulted in more than $68 million in losses to [P]lan participants compared to NYL's selected benchmarks." *Id.* ¶ 107.

## LEGAL STANDARDS

Defendants move to dismiss Plaintiffs' claims regarding the Fixed Dollar Account, pursuant to Rule 12(b)(1), for lack of Article III standing; and move to dismiss the entirety of the Amended Complaint, pursuant to Rule 12(b)(6), for failure to state a claim. *See* ECF No. 41; ECF No. 42 ("Defs.' Mem.").

"A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or fact-based." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). When a defendant "proffer[s] evidence beyond the [p]leading[s]," the motion is "fact-based." *Id.* at 57. "In opposition to such a motion, the plaintiffs . . . need to come forward with evidence of their own to controvert that presented by the defendant 'if the affidavits submitted . . . reveal the existence of factual problems' in the assertion of jurisdiction." *Id.* (quoting *Exch. Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)). But "if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing," then the plaintiff is "entitled to rely on the allegations in the [p]leading[s]," *id.*, which the Court must accept as true and construe in favor of the plaintiff, *see Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 357 (2d Cir. 2016). Additionally, in resolving a fact-based Rule 12(b)(1) motion, courts may only consider "non-conclusory, non-hearsay statements outside the pleadings." *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 443 n.6 (S.D.N.Y. 2019) (quoting *M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013)).

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008). A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

## DISCUSSION

As noted, Defendants contend that Plaintiffs lack Article III standing to bring their claims regarding the Fixed Dollar Account. In addition, they argue that each of Plaintiffs' claims related to the Fixed Dollar Account and the Mainstay Funds — for breach of fiduciary duties, prohibited transactions, self-dealing, co-fiduciary liability, and violation of ERISA's anti-inurement provision — fails to state a claim. The Court will address these arguments in turn, beginning, as it must, with Article III standing. *See Lance v. Coffman*, 549 U.S. 437, 439 (2007) ("Federal courts must determine that they have jurisdiction before proceeding to the merits.").

### A. Article III Standing

It is well established that "a plaintiff must demonstrate standing for each claim he [or she] seeks to press" against each defendant. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335

(2006); *see also Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 65-66 (2d Cir. 2012).  "In a class action, that means that at least one named plaintiff must have standing as to each defendant." *City of Providence, Rhode Island v. Bats Glob. Mkts., Inc.*, No. 14-CV-2811 (JMF), 2022 WL 902402, at *14 (S.D.N.Y. Mar. 28, 2022); *see also, e.g.*, *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019).  To establish standing, a plaintiff must plead and ultimately prove three elements: "(1) an injury in fact to a legally protected interest that is both (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical, (2) a causal connection between the injury and the conduct complained of, and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Crupar-Weinmann v. Paris Baguette Am., Inc.*, 861 F.3d 76, 79 (2d Cir. 2017) (internal quotation marks omitted).

Here, Defendants contend that Plaintiffs fail to plausibly allege injury-in-fact because "Plaintiffs *chose* to invest in the Fixed Dollar Account" — meaning that "the Plans' use of the Fixed Dollar Account as a default option could not have injured them."  Defs.' Mem. 5 (emphasis added).  In support of this argument, Defendants introduce evidence beyond the pleadings, which they claim shows that each Plaintiff affirmatively chose to invest in the Fixed Dollar Account.  *See* Defs.' Mem. 4-5; ECF No. 48 ("Defs.' Reply"), at 9-10.  In particular, they submit a declaration from an "administrator of the Plans," Maria Mauceri, averring that all seven of the named Plaintiffs "affirmatively selected the Fixed Dollar Account" under the Plans.  ECF No. 44 ("Mauceri Decl."), ¶¶ 2, 5.  Mauceri does not claim to have personal knowledge of Plaintiffs' investment decisions; instead, she relies on screenshots of records from another entity, "Alight," which, she alleges, "show[] . . . initial investment elections" for all Plaintiffs other than Krohnengold.  *See id.* ¶¶ 7-12.  As for Krohnengold, Mauceri simply asserts that he

"affirmatively elected to allocate a portion of his contributions . . . to the Fixed Dollar Account until 2012," without citing to any records or other evidentiary support.  *Id.* ¶ 6.

Defendants' arguments fail as to three of the seven Plaintiffs — Krohnengold, Antoine, and Webber — for two reasons.  First, Defendants' evidence that Krohnengold, Antoine, and Webber affirmatively chose to invest in the Fixed Dollar Account does not "contradict [Plaintiffs'] plausible allegations," which are "themselves sufficient to show standing."  *Carter*, 822 F.3d at 57.  That is plainly true as to Krohnengold, as Defendants offer only Mauceri's conclusory assertion that he "affirmatively elected to allocate a portion of his contributions . . . to the Fixed Dollar Account."  Mauceri Decl. ¶ 6; *see M.E.S., Inc.*, 712 F.3d at 671.  But it is true also as to Antoine and Webber, as Mauceri does not claim to have personal knowledge of their investment decisions and relies only on the "Alight" screenshots.  Mauceri Decl. ¶¶ 1, 7-8; *see* ECF Nos. 44-1, 44-2.  The screenshots, however, do not "contradict" Antoine's and Webber's plausible allegations.  *Carter*, 822 F.3d at 57.  The screenshots merely show that, when Antoine and Webber were first enrolled in the Plans, each had 100% of his investments allocated to the Fixed Dollar Account — which is, in fact, consistent with their having been defaulted into that investment option.  *See* ECF Nos. 44-1, 44-2; Am. Compl. ¶¶ 16-17.  Moreover, although the screenshots include the words "PSP Investment Elections" in the upper left-hand corner, neither the screenshots themselves nor Mauceri's declaration confirms that the records would look any different if Antoine and Webber's "[e]lections" had been made voluntarily, as opposed to by default.  *See* ECF Nos. 44-1, 44-2; Mauceri Decl. ¶¶ 7-8.  Conspicuously, Defendants do not dispute this point in their reply.  *See* ECF No. 46 ("Pls.' Opp'n"), at 6-7; Defs.' Reply 9-10.

Second, and in any event, Krohnengold, Antoine, and Webber have "come forward with evidence of their own to controvert that presented by" Defendants.  *Carter*, 822 F.3d at 57.

Krohnengold, Antoine, and Webber submitted affidavits in response to Defendants' motion in which they averred that they did not affirmatively select an investment option for their 401(k) accounts when they were first enrolled and that, as a result, their "contributions were automatically invested in the Plan's default investment option, the Fixed Dollar Account."  ECF No. 47-1 ("Antoine Aff."), ¶ 3; ECF No. 47-2 ("Webber Aff."), ¶ 3; ECF No. 47-3 ("Krohnengold Aff."), ¶ 3; *see also* Pls.' Opp'n 5.  That evidence would suffice at this stage of the litigation even if the Court were to consider Defendants' evidence to be non-conclusory and contradictory.  *See generally Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (noting that "each element" of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof," that is "with the manner and degree of evidence required at the successive stages of the litigation," and that, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" (cleaned up)).

By contrast, Defendants' motion must be and is granted as to Bendrihem, Gilbert, Medici, and Musni.  The Amended Complaint does not even allege that Bendrihem, Gilbert, and Medici were ever defaulted into the Fixed Dollar Account.  Am. Compl. ¶¶ 18-20.  Wisely, therefore, Plaintiffs do not contest Defendants' motion as to them.  *See* Pls.' Opp'n 4-7.  And while the Amended Complaint does allege that Musni "was defaulted into NYL's Fixed Dollar Account [via the Agents Plan] . . . for some time," Am. Compl. ¶ 21, Plaintiffs appear to abandon any such claim in their opposition, *see* Pls.' Opp'n 4-7.  Conspicuously, they do not dispute Defendants' assertion that Musni "affirmatively chose to allocate *all* of his contributions . . . to investments *other than* the Fixed Dollar Account" — as indicated by the Alight record screenshot — when he enrolled in the Agents Plan.  Mauceri Decl. ¶ 12 (emphases added); *see* ECF No. 44-6; Pls.' Opp'n 4-7.  Nor did they submit any affidavit from Musni

averring that his contributions were in fact defaulted into the Fixed Dollar Account.  *See* Pls.'
Opp'n 4-7; *see also* Defs.' Reply 10 n.15.  Accordingly, the Court deems abandoned the claims
of Bendrihem, Gilbert, Medici, and Musni regarding the Fixed Dollar Account.  *See, e.g.*,
*Martinez v. City of New York*, No. 11-CV-7461 JMF, 2012 WL 6062551, at *1 (S.D.N.Y. Dec. 6,
2012) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to
respond to a defendant's arguments that the claim should be dismissed." (internal quotation
marks omitted)); *see also Robinson v. Fischer*, No. 09-CV-8882 (LAK) (AJP), 2010 WL
5376204, at *10 (S.D.N.Y. Dec. 29, 2010) (collecting cases).

        In short, the claims of Bendrihem, Gilbert, Medici, and Musni with respect to the Fixed
Dollar Account must be and are dismissed without prejudice for lack of standing.  *See Carter*,
822 F.3d at 54; *see also Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco
Managed Care, LLC*, 433 F.3d 181, 198 (2d Cir. 2005).  Because the remaining Plaintiffs —
Krohnengold, Antoine, and Webber — were participants in the Employee Plan, not the Agents
Plan, the upshot is that Plaintiffs' claim related to the Fixed Dollar Account is limited to the
Employee Plan.  *See City of Providence*, 2022 WL 902402, at *14 ("In a class action, . . . at least
one named plaintiff must have standing as to each defendant [for each claim]." (citing *Frank*,
139 S. Ct. at 1046; *DaimlerChrysler Corp.*, 547 U.S. at 335; *Mahon*, 683 F.3d at 65-66).

## B.  The Merits

        With that, the Court turns to the merits of Plaintiffs' claims.  Defendants argue that each
of Plaintiffs' five claims — for breach of fiduciary duties, prohibited transactions, self-dealing,
co-fiduciary liability, and violation of ERISA's anti-inurement provision — fails to state a claim.
*See* Defs.' Mem. 6-25.  The Court will address each claim in turn.

**1.   Count One – Breach of Fiduciary Duties**

In Count One, Plaintiffs allege that the Committee Defendants breached their fiduciary duties under ERISA Section 404, 29 U.S.C. § 1104 ("Section 404"), by imprudently and disloyally: (1) selecting and retaining the Fixed Dollar Account as the default investment option for the Plans and (2) selecting and maintaining the MainStay Funds as investment options in the Plans. Am. Compl. ¶¶ 148-56. For the reasons that follow, the Court concludes that Plaintiffs fail to state a fiduciary-duty claim related to the Fixed Dollar Account for the Employee Plan. By contrast, Plaintiffs' claims related to eight of the nine MainStay Funds — all but the MacKay International Equity Fund — survive Defendants' motion to dismiss.

**a.   The Fixed Dollar Account**

Defendants argue that Plaintiffs' fiduciary-duty claims based on the Fixed Dollar Account are time-barred because "Plaintiffs were defaulted into [the Fixed Dollar Account] more than six years prior to the date each joined this lawsuit." Defs.' Mem. 7. Section 1113, ERISA's limitations provision states, in relevant part, that:

> No action may be commenced . . . with respect to a fiduciary's breach of any responsibility, duty, or obligation . . . after the earlier of — (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation.

29 U.S.C. § 1113. Section 1113(1)'s "six-year limitations period is a statute of repose." *Browe v. CTC Corp.*, 15 F.4th 175, 190 (2d Cir. 2021) (citing *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 774 (2020)). Thus, "in contrast" to the three-year statute of limitations, it is not an "affirmative defense." *Id.* Accordingly, Plaintiffs bear the burden of demonstrating their claims are not barred by the six-year limitations period. *See id.*; *see also P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 102 (2d Cir.

2004) ("[A] statute of repose is not a limitation of a plaintiff's remedy, but rather defines the right involved in terms of the time allowed to bring suit.").

Plaintiffs fail failed to satisfy that burden here. The gravamen of Plaintiffs' fiduciary-duty claim is that the Defendants breached their duties of loyalty and prudence by designating the Fixed Dollar Account as the default investment option for the Plan. Am. Compl. ¶¶ 5-6, 83, 149-54. But Plaintiffs do not dispute that Defendants designated the Fixed Dollar Account as the default investment option before March 2, 2015 — six years before the filing of the instant suit. *See* Pls.' Opp'n 7-8; ECF No. 1; *see also* Am. Compl. ¶¶ 68 (alleging that the Fixed Dollar Account was set as the default investment option for the Plans "beginning in at least 2003 until 2008," and then again in 2009). And it is undisputed that Krohnengold, Antoine, and Webber were each defaulted into the Fixed Dollar Account prior to that date. Thus, to the extent that Plaintiffs' claims are based on Defendants' designation of Fixed Dollar Account as the default investment option — and that appears to be all they are based on — they are barred by the statute of repose. *See, e.g.*, *Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*, No. 11-CV-5127 (HB), 2012 WL 701397, at *1 & n.3 (S.D.N.Y. Mar. 6, 2012).

Plaintiffs counter that, under *Tibble v. Edison International*, 575 U.S. 523 (2015), Defendants also had a "continuing duty to monitor . . . and replace the [Fixed Dollar Account] with an appropriate default investment," which Defendants failed to do within the relevant six-year period. Pls.' Opp'n 7 (citing *Tibble*, 575 U.S. at 529; Am. Compl. ¶¶ 85, 145-56). But there is a fundamental difference between *Tibble* and this case. In *Tibble*, the Supreme Court held that ERISA fiduciaries have a "continuing duty to monitor investments and remove imprudent ones." 575 U.S. at 530. Critically, there, the

plaintiffs challenged as imprudent the inclusion of certain investment options in their plan *altogether*. 575 U.S. at 525-26.  By contrast, Plaintiffs here do not allege (or at least do not clearly allege) that Defendants should have removed the Fixed Dollar Account as an investment option altogether; instead, as noted, they allege only that Defendants violated their fiduciary duties by designating the Fixed Dollar Account as the *default* investment option.  Am. Compl. ¶¶ 149-54.  Unlike the breach in *Tibble*, that breach (if it was a breach) was complete more than six years prior to the filing of suit.

In arguing otherwise, Plaintiffs assert that Defendants should have "reinvest[ed] the assets previously defaulted to the [Fixed Dollar Account] in an appropriate default investment."  Pls.' Opp'n 7.  But there are no allegations in the Amended Complaint suggesting that Defendants possessed authority to unilaterally reinvest those assets — particularly when the Fixed Dollar Account would have remained an investment option in the Plans.  *See id.* at 7-8.  Nor, given that *Tibble* is distinguishable, do Plaintiffs cite any legal authority for the proposition that Defendants had the duty to do so.  *Id.*  Similarly, Plaintiffs claim Defendants should have "replace[d the Fixed Dollar Account] with an appropriate default investment."  *Id.* at 7.  But it is not clear whether or how failing to do so would have breached a duty to Krohnengold, Antoine, and Webber within the relevant six years given that, as noted, they were defaulted into the Fixed Dollar Account well before March 2015.  *See* Am. Compl. ¶¶ 15-17.  Plaintiffs do assert that "Antoine's Plan contributions were automatically invested 100% in the FDA during the last six years," Pls.' Opp'n 7, but that assertion is based on Antoine's affidavit, which the Court may not consider in connection with Defendants' Rule 12(b)(6) motion.  If anything, Plaintiffs'

attempt to bolster their case with evidence outside the pleadings strongly suggests they themselves recognize the deficiency of the allegations in their Amended Complaint.

In short, Krohnengold, Antoine, and Webber do not plausibly allege that Defendants breached any ongoing duty to them in the six years prior to the filing of this action.  Accordingly, the Court concludes that their fiduciary-duty claims regarding the Fixed Dollar Account are time barred and must be dismissed.[1]

### b.  The MainStay Funds

In Count One, Plaintiffs also claim that Defendants breached their fiduciary duties of loyalty and prudence by selecting and retaining the nine MainStay Funds as investment options. Am. Compl. ¶¶ 151-53.  Defendants argue that Plaintiffs fail to state a claim because "the Plans' use of the MainStay Funds does not give rise to a reasonable inference of fiduciary breach." Defs.' Mem. 14 (capitalizations altered).  For the reasons that follow, the Court disagrees with respect to eight of the nine Mainstay Funds — all but the MacKay International Equity Fund.

"To state a claim for breach of a fiduciary duty" under ERISA Section 404(a), "a plaintiff must allege that (1) the defendant was acting as a fiduciary of the plan, (2) the defendant breached that duty, and (3) the breach caused harm to the plaintiff."  *Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*, 513 F. App'x 78, 79 (2d Cir. 2013) (summary order) (quoting *Pegram v. Herdrich,* 530 U.S. 211, 225-26 (2000)).  The question at issue here is whether Defendants breached any fiduciary duties imposed by ERISA — *i.e.*, the second element.  *See* Defs.' Mem. 14-20.  Section 404(a) "imposes both a duty of loyalty and a duty of care."  *Moreno v. Deutsche*

---

[1]     In light of that conclusion, the Court need not and does not reach Defendants' alternative argument that "the Plans' use of the Fixed Dollar Account as a default investment option does not give rise to a reasonable inference of fiduciary breach."  Defs.' Mem. 10 (capitalization altered).

*Bank Ams. Holding Corp.*, No. 15-CV-9936 (LGS), 2016 WL 5957307, at *5 (S.D.N.Y. Oct. 13, 2016); *accord Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 715-16 (2d Cir. 2013) ("*St. Vincent*").  The duty of loyalty requires a fiduciary to "act 'for the exclusive purpose of . . . providing benefits to participants and their beneficiaries[ ] and defraying reasonable expenses of administering the plan.'"  *St. Vincent*, 712 F.3d at 715 (quoting 29 U.S.C. § 1104(a)(1)(A)).

The duty of care requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  "The duty of prudence mandated by § 1104(a)(1)(B) 'is measured according to the objective prudent person standard developed in the common law of trusts.'"  *St. Vincent*, 712 F.3d at 716 (quoting *La Scala v. Scrufari,* 479 F.3d 213, 219 (2d Cir. 2007)). "Under that common-law standard, . . . [courts] judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight."  *Id.* (cleaned up).  Overall, this inquiry focuses on the "process by which the Plan was managed."  *Id.* at 718.  But, "[e]ven when the alleged facts do not 'directly address[ ] th[at] process . . . ,' a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'"  *Id.* (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)).

For eight of the nine funds — all but the MacKay International Equity Fund — Plaintiffs press three primary sets of allegations that together support a reasonable inference that the "process" used by the Committee Defendants was "flawed."  *St. Vincent*, 712 F.3d at 718.  First,

Plaintiffs allege that the funds consistently underperformed performance benchmarks selected by NYL itself or other comparable funds.  *See* Am. Compl. ¶¶ 101-06, 127, 129, 131, 133.  Second, Plaintiffs allege that the funds had higher costs and fees than funds with similar, if not identical, investment strategies.  *See id.* ¶¶ 110-14, 118, 120-21, 128; *see also id.* ¶¶ 113, 119.  And third, Plaintiffs allege the funds either had "very little in accumulated assets from outside investors" or experienced significant net outflows during the class period.  *Id.* ¶¶ 117, 127.  These allegations, combined with the benefits Defendants derived from funneling assets into the proprietary funds, plausibly state a fiduciary-duty claim.  *See, e.g.*, *Falberg v. Goldman Sachs Grp., Inc.*, No. 19-CV-9910 (ER), 2020 WL 3893285, at *8 (S.D.N.Y. July 9, 2020) ("Taken together, Plaintiff's allegations that the [funds at issue] underperformed and failed to warrant their elevated expense ratios as compared to similar funds sufficiently states a claim of imprudence."); *Cunningham v. Cornell Univ.*, No. 16-CV-6525 (PKC), 2017 WL 4358769, at *7 (S.D.N.Y. Sept. 29, 2017) ("Plaintiffs' allegations that specific funds underperformed over one, five and ten year periods and that lower-cost, higher performing investments were available plausibly states a claim."); *Leber v. Citigroup, Inc.*, No. 07-CV-9329 (SHS), 2010 WL 935442, at *13 (S.D.N.Y. Mar. 16, 2010) ("Plaintiffs' allegations that the committee defendants breached their duties to act prudently and in the best interests of the plan by selecting affiliated mutual funds that charged higher advisory fees than comparable unaffiliated funds is sufficiently concrete and supported by sufficient factual allegations to state a valid claim."); *see also, e.g.*, *Beach v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 17-CV-563 (JMF), ECF No. 80, at 4-5 (denying a motion to dismiss a fiduciary-duty claim based on similar allegations); *Moreno*, 2016 WL 5957307, at *6 (same).

  Defendants' counterarguments are unavailing.  For starters, the bulk of their arguments rely on evidence outside of the pleadings, *see* Defs.' Mem. 15-18, which the Court may not

consider at this stage of the litigation, *see, e.g.*, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).  For example, Defendants argue that, "on an annual basis, . . . three [of the] funds . . . outperformed at least one of [their] pleaded comparators almost 50% of the time during the putative class period."  Defs.' Mem. 15 (emphasis omitted).  But the data on which Defendants rely are drawn in large part from summary prospectuses filed with the SEC that are neither incorporated by reference into, nor integral to, the Amended Complaint.  *See id.* at 15 n.17.[2]  Defendants claim that "[c]ourts may consider publicly-filed documents like the . . . fund prospectuses and summary prospectuses . . . on a motion to dismiss."  Defs.' Mem. 2 n.3.  True enough.  But the Court may not do so for "the truth of their assertions."  *Chechele v. Scheetz*, 466 F. App'x 39, 40-41 (2d Cir. 2012) (summary order).  Along similar lines, Defendants' challenges to the appropriateness of the comparators selected by Plaintiffs, *see* Defs.' Mem. 17-19, are premature and best deferred until after discovery, *see, e.g.*, *Omnicom ERISA Litig.*, No. 20-CV-4141 (CM), 2021 WL 3292487, at *13 (S.D.N.Y. Aug. 2, 2021) ("[T]he overwhelming trend with district courts in this Circuit is to defer deciding the question of whether two funds are proper comparators until after discovery." (collecting cases)); *accord Leber*, 2010 WL 935442, at *13.[3]

---

[2]     The Amended Complaint does cite to three prospectuses, each dated February 28, 2020, for the MainStay Epoch U.S. All Cap Fund, the MainStay Income Builder Fund, and the MainStay Epoch U.S. Small Cap Fund, respectively.  Am. Compl. ¶¶ 104-06 nn.6-8.  But Defendants rely on fifteen prospectuses over a five-year period for those funds, as well as a performance report from an investment company's webpage, to create the analysis used to support their argument.  *See* Defs.' Mem. 15 n.17 (citing ECF Nos. 43-18 to 33, 43-48).

[3]     *Patterson v. Morgan Stanley*, No. 16-CV-6568 (RJS), 2019 WL 4934834, (S.D.N.Y. Oct. 7, 2019), on which Defendants rely, *see* Defs.' Mem. 15-17, 19, is distinguishable on this score.  There, the plaintiffs' comparator allegations were "impermissibly hindsight-based" and the "assertion[s] that the funds were similar [were] belied by the facts actually set forth in and incorporated into the [c]omplaint."  2019 WL 4934834, at *11-12.

Thus, the Court denies Defendants' motion to dismiss Plaintiffs' claims for breach of fiduciary duty regarding eight of the nine MainStay Funds: the Income Builder Fund, the Epoch U.S. All Cap Fund, the Epoch U.S. Small Cap Fund, the Retirement 2010 Option Fund, the Retirement 2020 Option Fund, the Retirement 2030 Option Fund, the Retirement 2040 Option Fund, and the Retirement 2050 Option Fund.  By contrast, the Court agrees with Defendants that Plaintiffs' allegations regarding the MacKay International Equity Fund are inadequate.  The Amended Complaint alleges only that (1) the MacKay International Equity Fund had a higher-than-average expense ratio for that type of fund and (2) "[u]ntil March 26, 2019, the Plans were invested in a more expensive share class of the [fund]," without any specifics with respect to how much "more expensive" that share class was.  Am. Compl. ¶¶ 123-25; *see also* Defs.' Mem. 16.  Those sparse allegations, without more, are insufficient to nudge Plaintiffs' claims regarding the MacKay International Equity Fund over the plausibility line.  *See, e.g.*, *Leber*, 2010 WL 935442, at *14; *cf. Moreno*, 2016 WL 5957307, at *6 (describing the "*specific* allegations regarding excessive fees from which Defendants stood to gain," including comparisons to other "similar investment products" with specified fee differentials (emphasis added)).

### 2.  Count Two – Prohibited Transactions

Defendants' challenges to Count Two, in which Plaintiffs claim that Defendants caused the Plans to engage in "prohibited transactions," Am. Compl. ¶¶ 157-68, can be swiftly rejected. Defendants contend that the claims fails because Defendants' actions qualify for two exemptions to ERISA's prohibited transaction provisions: Section 408(b)(5), 29 US.C. § 1108(b)(5), and PTE-77-3.  *See* Defs. Mem. 21-22.  But these exemptions are "affirmative defenses, and thus do not provide grounds for dismissal at this stage of the litigation unless they are clear from the face of the complaint."  *Beach*, No. 17-CV-563 (JMF), ECF No. 80, at 5-6 (internal citations

omitted); *see also, e.g.*, *Moreno*, 2016 WL 5957307, at *6 (citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).  Here, Defendants' own arguments belie any suggestion that it is clear from the face of the pleadings that the exemptions apply.  For example, Defendants argue that the Court should conclude the Section 408(b)(5) exemption bars Plaintiffs' claims because "*Plaintiffs do not allege* that more than adequate consideration was paid in connection with the Fixed Dollar Account."  Defs. Mem. 21 (emphasis added).  Similarly, with respect to PTE 77-3, the pleadings do not make clear that "[a]ll other dealings between the plan and [the affiliated fund] . . . are on a basis no less favorable to the plan than such dealings are with other shareholders" — one of the requirements for PTE 77-3 to apply.  Class Exemption for Certain Transactions Between Investment Companies and Employment Benefit Plans, 42 Fed. Reg. 18,732, 18,735 (Apr. 8, 1977); *see Falberg*, 2020 WL 3893285, at *14; Pls.' Opp'n 23. Thus, while Defendants' exemption arguments may well carry the day later, they do not provide a basis for dismissal of Plaintiffs' "prohibited transactions" claim at this stage of the litigation.

### 3.  Count Three – Self-Dealing

In Count Three, Plaintiffs allege that Defendants engaged in self-dealing in violation of ERISA Section 406(b), 29 U.S.C. § 1106(b).  "Section [406](b) 'protects beneficiaries by prohibiting transactions tainted by a conflict of interest and thus highly susceptible to self-dealing.'" *Falberg*, 2020 WL 3893285, at *14 (quoting *Lowen v. Tower Asset Mgmt, Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987)).  Specifically, to the extent relevant here, Section 406(b) provides that "[a] fiduciary with respect to a plan shall not . . . (1) deal with the assets of the plan in his own interest or for his own account" or "(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b)(1), (3).  Significantly, these provisions must "be

21

broadly construed" and their protections applied "even where there is no taint of scandal . . . [or] trace of bad faith." *Lowen*, 829 F.2d at 1213; *see also LaScala v. Scrufari*, 330 F. Supp. 2d 236, 254 (W.D.N.Y. 2004), *as amended on reconsideration* (July 23, 2004).

Here, Plaintiffs allege that Defendants violated Section 406(b)(1) and (3) by "ma[king] decisions about the investment of the Plans' assets . . . that benefitted themselves or were in their own self-interest" — most notably, by ensuring that "NYL [would] receive[] many direct and indirect fees and other compensation from the Plans' investments in the proprietary funds" and that "affiliates [would be] provided assets that were used to prop up the Mainstay Funds." Am. Compl. ¶ 174.  In addition, they allege that the individual Committee Defendants, "all executives of [NYL]," were motivated at least in part by the fact that their "compensation and promotion levels [would] increase[] when they acted to increase revenue for NYL." *Id.*  According to Plaintiffs, this self-dealing also "result[ed] in the receipt of Plan assets" by Defendants. *Id.* ¶ 176.  These allegations suffice to state Section 406(b)(1) and (b)(3) claims. *See, e.g.*, *Lowen*, 829 F.2d at 1214 (holding that plan fiduciaries violated Section 406(b)(1) by investing "assets of the [plan] in companies in which [the fiduciary] defendants owned a substantial equity interest"); *Falberg*, 2020 WL 3893285, at *14 (denying a motion to dismiss a Section 406(b)(3) claim where the plaintiffs alleged subsidiaries of a company collected fees from a plan "from which [the parent company] ultimately benefit[ed]"); *Khan v. Bd. of Dirs. of Pentegra Defined Contribution Plan,* No. 20-CV-07561 (PMH), 2022 WL 861640, at *9 (S.D.N.Y. Mar. 23, 2022) (denying a motion to dismiss Section 406(b)(1) and (b)(3) claims based on similar allegations).

Once again, Defendants' counterarguments fall short.  Here too, they invoke the exemptions set forth in Section 408(b)(5) and PTE 77-3, *see* Defs.' Mem. 21-22, but, as discussed, that does not provide grounds for dismissal.  Second, they argue that ERISA "permits

a corporate officer or employee to serve as a Plan fiduciary" and that fiduciaries may take actions that "'incidentally benefit[] the corporation, or indeed, [the fiduciaries] themselves.'"  *Id.* at 22 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)).  True enough.  But permission to serve as a plan fiduciary is not the same as permission to engage in self-dealing.  And the "incidental[] benefits" language that Defendants cite is from the Second Circuit's discussion of fiduciary duties under Section 404(a), not Section 406(b).  *See Donovan*, 680 F.2d at 271 (emphasis added).  In any event, drawing all inferences in Plaintiffs' favor, as the Court must, the Amended Complaint plausibly alleges that Defendants' decisions regarding the Plans were more than merely "incidentally benefi[cial]" to Defendants.  *Donovan*, 680 F.2d at 271; *see* Am. Compl. ¶¶ 5-8, 53-59, 68-85, 97-137.[4]  Accordingly, Count Three survives.

### 4.  Count Four – Co-Fiduciary Liability

Defendants' sole argument with respect to Count Four — Plaintiffs' co-fiduciary liability claim under ERISA Section 405(a), 29 U.S.C. § 1105(a) — is easily dispatched.  They argue that this claim fails "because Plaintiffs have not pled antecedent breaches."  Defs. Mem. 23 (capitalizations altered); *see also* Defs.' Reply 8; *In re Citigroup ERISA Litig.*, 104 F. Supp. 3d 599, 617 (S.D.N.Y. 2015), ("Claims for . . . co-fiduciary liability require antecedent breaches in order to be viable."), *aff'd on other grounds*, 649 F. App'x 110 (2d Cir. 2016) (summary order).  As the Court has concluded otherwise, Defendants' motion on that ground must be and is denied.

---

[4]     Notably, the full sentence from which the language Defendants quote is taken makes plain that, "[a]lthough officers of a corporation who are trustees of its pension plan do not violate their duties as trustees by taking action which, after careful and impartial investigation, they reasonably conclude best to promote the interests of participants and beneficiaries simply because it incidentally benefits the corporation or, indeed, themselves, *their decisions must be made with an eye single to the interests of the participants and beneficiaries*."  *Donovan*, 680 F.2d at 271 (emphasis added).

5.   **Count Five – Violation of the Anti-Inurement Provision**

That leaves Count Five, Plaintiffs' claim that Defendants violated ERISA's anti-inurement provision, Section 403(c)(1), 29 U.S.C. § 1103(c)(1).  That Section provides, in pertinent part, that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."  29 U.S.C. § 1103(c)(1).  "The purpose of the anti-inurement provision, in common with ERISA's other fiduciary responsibility provisions, is to apply the law of trusts to discourage abuses such as self-dealing, imprudent investment, and misappropriation of plan assets, by employers and others." *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 23 (2004).  Although there is "scant caselaw discussing the precise elements of a *prima facie* claim of violation of ERISA's anti-inurement provision," *Walsh v. Satori Grp., Inc.*, No. 20-CV-3906 (KSM), 2021 WL 2072237, at *4 (E.D. Pa. May 24, 2021), the Second Circuit has held that allegations of "indirect" benefits inuring to an employer are insufficient to state an anti-inurement claim under Section 403(c)(1).  *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 88 (2d Cir. 2001).  Moreover, Section 403(c)(1) claims typically involve allegations of improper "reversion [or] diversion" of plan assets to the employer.  *Maez v. Mountain States Tel. & Tel., Inc.*, 54 F.3d 1488, 1506 (10th Cir. 1995); *see, e.g.*, *Walsh*, 2021 WL 2072237, at *5 (claim based on the "fail[ure] to remit employee contributions to the Plan"); *Chao v. Stuart*, No. 04-CV-1115, 2005 WL 1693939, at *7 (S.D. Tex. July 20, 2005) (claim based on the use of "employee-contributed Plan assets to pay [the company's] debt"); *NYSA-ILA Med. & Clinical Servs. Fund v. Catucci*, 60 F. Supp. 2d 194, 203 (S.D.N.Y. 1999) (collecting Section 403(c)(1) cases involving allegations of diversions of fund assets to pay for "corporate expenses").

Here, Plaintiffs do not allege any such reversion or diversion of Plan assets to NYL.  *See* Pls.' Opp'n 24-25.  Instead, Plaintiffs' claims derive from the Plans' investment in the Fixed Dollar Account.  *See* Am. Compl. ¶¶ 191-95.  They allege that, by investing in the Fixed Dollar Account, the Plans entered into a "group annuity contract" with NYL, pursuant to which NYL "guaranteed [a specified] rate of return" and Plan assets were "transferred to and maintained in NYL's general account."  *Id.* ¶ 70; *see also id.* ¶¶ 194-95.  They also allege that, per the contract, the Plans were charged for participant withdrawals and administrative expenses.  *Id.* ¶ 70, 195.  But Plaintiffs do not cite, nor has the Court found, any authority to support their claim that such conduct is prohibited by ERISA's anti-inurement provision.  *See* Pls.' Opp'n 24-25.  Nor do they cite authority for the proposition that "commingling" of Plan assets, without more, constitutes a violation of Section 403(c)(1).  *Id.* at 25.  Notably, each case cited by Plaintiffs involved allegations of commingling *and* some improper use or withholding of plan assets that caused the plan to suffer losses.  *See* Pls.' Opp'n 24-25; *Walsh*, 2021 WL 2072237, at *5 (allegations that the "[d]efendants failed to remit employee contributions to the Plan, remitted some contributions late and without interest, and commingled contributions with the general assets of the company . . . and that as a result, the Plan suffered losses of at least $101,814.70"); *Acosta v. Finishing Pros., LLC*, No. 18-CV-00978 (RPM) (NYW), 2018 WL 6603641, at *5 (D. Colo. Nov. 20, 2018) (holding that default judgment was warranted where evidence showed "nearly $40,000 in employee contributions was never remitted to the Plan, but instead that sum was misappropriated to pay the operating expenses of the company itself"); *Chao*, 2005 WL 1693939, at *6-7 (evidence showing that the defendant "used [plan assets] to pay corporate

debts").[5]  Moreover, requiring something beyond mere commingling accords with the plain text of Section 403(c)(1), which indicates that some "benefit [to the] employer" or use for some "purpose[]" other than "providing benefits to participants in the plan" is necessary in order for liability to arise.  29 U.S.C. 1103(c)(1).  Accordingly, Defendants' motion to dismiss Plaintiffs' Section 403(c)(1) claim must be and is granted.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  In particular, the Court dismisses:

- The claims of Plaintiffs Musni, Bendrihem, Gilbert, and Medici with respect to the Fixed Dollar Account, without prejudice, for lack of standing;

- The claims of Plaintiffs Krohnengold, Antoine, and Webber for breach of fiduciary duties related to the Fixed Dollar Account;

- Plaintiffs' claims for breach of fiduciary duties in Count One based on the MacKay International Equity Fund; and

- Plaintiffs' claims for violation of ERISA's anti-inurement provision in Count Five, with leave to amend.

Otherwise, the Court denies Defendants' motion.

The Court is mindful that leave to amend a complaint should be "freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), and that it is "within the sound discretion of the district court to grant or deny leave to amend," *Ahmed v. GEO USA LLC*, No. 14-CV-7486

---

[5]    To be sure, *Chao* states, in dicta, that "it is the fiduciary's duty to make sure plan assets are kept separate from other business accounts."  2005 WL 1693939, at *7.  But neither *Chao* nor the Fifth Circuit case on which *Chao* relied, *Bannistor v. Ullman,* 287 F.3d 394 (5th Cir. 2002), held that commingling alone is sufficient to state an anti-inurement claim.  Indeed, *Bannistor*, like *Chao*, involved use of plan assets to "pay [corporate] creditors . . . to the detriment of the plan members," in addition to commingling of plan assets with corporate funds. *Id.* at 402 n.2; *see Chao*, 2005 WL 1693939, at *6-7.  In any event, the Court is not persuaded, for the reasons stated above, that allegations of commingling plan assets and corporate assets pursuant to a group annuity contract, without more, plausibly state a Section 403(c)(1) claim.

(JMF), 2015 WL 1408895, at *5 (S.D.N.Y. Mar. 27, 2015) (internal quotation marks omitted).

Here, Plaintiffs may well be able to cure some of the deficiencies identified above. (In

particular, Plaintiffs may be able to clarify that their fiduciary duty claims with respect to the

Fixed Dollar Account do implicate conduct within the relevant six-year period.) Accordingly,

the Court exercises its discretion to grant Plaintiffs leave to amend the claims that have been

dismissed. *See, e.g.*, *Moreira v. Societe Generale, S.A.*, 573 F. Supp. 3d 921, 934 (S.D.N.Y.

2021). Plaintiffs shall file any Second Amended Complaint **within four weeks of the date of

this Opinion and Order**. If Plaintiffs do so, Defendants shall answer or otherwise respond

**within three weeks of the date on which Plaintiffs' Second Amended Complaint is filed**. If

Plaintiffs fail to file a Second Amended Complaint, Defendants shall answer Plaintiffs'

remaining claims **within six weeks of the date of this Opinion and Order**. By separate Order

to be issued today, the Court will reschedule an initial pretrial conference.

      The Clerk of Court is directed to terminate ECF No. 41.

      SO ORDERED.

Dated: August 9, 2022
     New York, New York

                                      JESSE M. FURMAN
                                United States District Judge