UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------

Stuart Krohnengold, Wayne Antoine, Lee
Webber, Anthony Medici, Joseph Bendrihem,
Larry Gilbert, Rafael Musni, Thomas Lantz,
Sandra Scanni, and Claudia Gonzalez, as
representatives of a class of similarly situated
persons, and on behalf of the New York Life
Insurance Employee Progress Sharing
Investment Plan, and the New York Life
Insurance Company Agents Progress Sharing
Plan,

          Plaintiffs,

    v.

New York Life Insurance Company; the
Fiduciary Investment Committee; the Board
of Trustees; Katherine O'Brien; Anthony R.
Malloy; Yie-Hsin Hung; Arthur A. Seter;
Scott L. Lenz; Robert J. Hynes; and John and
Jane Does 1-20,

          Defendants.

------------------------------------

Case No 1:21-cv-01778 - JMF

**SECOND AMENDED COMPLAINT**

## I.     NATURE OF THE ACTION

1.     This is a class action brought by Stuart Krohnengold, Wayne Antoine, Lee Webber,

Anthony Medici, Joseph Bendrihem, Larry Gilbert, Rafael Musni, Thomas Lantz, Sandra Scanni,

and Claudia Gonzalez ("Plaintiffs") under the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1001 *et seq.*, on behalf of the New York Life Insurance Employee Progress

Sharing Investment Plan (the "Employee Plan") and the New York Life Insurance Company

Agents Progress Sharing Plan (the "Agents Plan") (collectively, the "Plans"), and as class

representatives of tens of thousands of current and former employees and insurance agents of New York Life Insurance Company ("New York Life," "NYL," or "the Company").

2.     This suit is about corporate self-dealing and the prohibited transfer of employees' retirement assets to New York Life and its affiliates at the expense of the retirement savings of NYL employees and agents.

3.     The fiduciaries who manage the Plans are all high-level executives, hand-picked by New York Life's CEO to select and monitor 401(k) investments which hold over $4 billion in retirement savings belonging to NYL employees. ERISA requires these fiduciary defendants to choose and manage the investments for the 401(k) Plans prudently and solely in the interest of the participants and beneficiaries. In addition, ERISA contains a strict prohibition on fiduciary self-dealing and transactions with related parties in interest. Yet, the fiduciary defendants improperly favored poorly performing and inferior NYL investment products, to the detriment of participant investors who lost tens of millions of dollars (by some metrics over $100 million dollars) of their hard-earned retirement savings.

4.     Plaintiffs bring this action to recover the losses caused by Defendants' fiduciary breaches and prohibited self-dealing, disgorge the profits earned by Defendants and their affiliates[1] as a result of these breaches and prohibited transactions, prevent further mismanagement of the Plans, and obtain equitable and other relief as provided by ERISA.

5.     ERISA fiduciaries are bound to act with an "eye single" to the interest of plan participants and beneficiaries, *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982), acting exclusively for their interest while exercising a prudent-expert standard of care. Rather than

---

[1] "Affiliate(s)" means any entity directly or indirectly owned or controlled by NYL in whole or substantial part.

fulfilling these fiduciary duties, Defendants favored the economic interests of New York Life over those of the Plans' participants and failed to employ a loyal and prudent process for monitoring the Plans' investments. Defendants did so in two principal ways during the Class Period (March 2, 2015 and thereafter).

6.     *First*, during the Class Period, the fiduciary defendants failed to monitor New York Life's own flagship product, the Fixed Dollar Account ("FDA"), as the default investment for the Plans, and imprudently approved ongoing deposits of millions of dollars of Plan contributions into New York Life's FDA product, and ongoing investment of Plan assets in the FDA by default, instead of an appropriate default investment. The FDA is a stable value fund (i.e., a capital preservation investment). It does not provide employees with sufficient assets for retirement because it generates minimal investment returns each year.  In fact, the Department of Labor ("DOL") has expressly stated that "money market and stable value funds will not over the long-term produce rates of return as favorable as those generated by products, portfolios and services included as qualified default investment alternatives, thereby decreasing the likelihood that participants invested in capital preservation products will have adequate retirement savings." Default Investment Alternatives Under Participant Directed Individual Account Plans, 72 FR 60452-01 (emphasis added).

7.     Because Defendants retained the Fixed Dollar Account as the Plans' default investment during the Class Period and approved ongoing deposits of Plan contributions into that fund and ongoing investment of Plan assets in that fund by default during the Class Period, approximately 54% of the Plans' retirement assets were invested in the Fixed Dollar Account as of year-end 2019, totaling approximately $2.36 billion. This massive investment by the Plans in NYL's flagship product provides the Company with enormous profits and billions of dollars to be

used for its own business purposes. However, it is detrimental to the long-term retirement savings of Plan participants, and inconsistent with a loyal and prudent fiduciary process designed to serve the best interest of Plan participants.  In addition, this ongoing self-dealing constitutes a clear violation of ERISA's prohibited transaction provisions.

8.    Few (if any) other retirement plans in the country have the majority of their retirement assets invested in a low-return capital preservation product.  In fact, virtually all ERISA-governed 401(k) plans choose to retain a "qualified default investment alternative" ("QDIA") as the default option for plan participants who do not select their own investments, and will deposit plan contributions into a QDIA and make ongoing investments into a QDIA by default instead of a capital preservation product. Here, Defendants do not dispute that the Fixed Dollar Account they retained as the Plan's default investment during the Class Period, and in which they deposited Plan contributions and invested Plan assets by default during the Class Period, is ***not*** a qualified default investment consistent with the Department of Labor's QDIA regulations.

9.    *Second*, Defendants selected and retained other New York Life proprietary funds (specifically, several MainStay Funds as detailed below) as investment options for the Plans during the Class Period, which generated additional revenue and windfall profits for NYL while eroding the retirement savings of New York Life employees and agents. Defendants selected and retained these proprietary funds in the Plans without a prudent or loyal process that considered non-proprietary fund alternatives and whether those alternatives would better serve the Plans' participants through lower cost and better performance. Instead, because of the financial benefit to New York Life, Defendants reflexively retained the NYL proprietary funds for the Plan.  This also breached of ERISA's fiduciary duties of loyalty and prudence under 29 U.S.C. § 1104, and ERISA's prohibited transaction rules under 29 U.S.C. § 1106.

4

10.     Defendants further failed to loyally and prudently monitor the fees and performance of the at-issue proprietary investment options, instead retaining the NYL proprietary funds to enrich New York Life and/or its affiliates.

11.     Defendants' fiduciary breaches and prohibited transactions caused the Plans' participants substantial losses in retirement earnings. For example, if Defendants had properly monitored the Plans' default investment during the Class Period and had utilized a prudent default investment (such as a diversified suite of target-date funds) instead of the FDA for making ongoing Plan contributions and investments by default, the Plan and Plan participants would have earned millions of dollars more in retirement savings. Similarly, if better investment funds had been offered in the Plans rather than the at-issue MainStay funds, Plan participants would have at least $68 million *more* in retirement savings in the 401(k) Plans.

## II.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

13.     This Court has personal jurisdiction over New York Life Insurance Company because it transacts business in, employs people in, and has significant contacts with this District, and because ERISA provides for nationwide service of process.

14.     This Court has personal jurisdiction over the Fiduciary Committee Defendants[2] because they transact business in and have significant contacts with this District, and because ERISA provides for nationwide service of process.

---

[2] The Plans' Fiduciary Investment Committee, its predecessor Board of Trustees, and the individual members of those entities are collectively referred to as the "Fiduciary Committee Defendants."

15.     Venue is proper in this District pursuant to ERISA, 29 U.S.C. § 1132(e)(2), because many of the breaches complained of occurred in this District, New York Life's headquarters are located in this District, the Plans are administered in this District, Plaintiff Krohnengold resides in this District, and one or more of the Defendants reside or may be found in this District.

### III.     PARTIES

### A.     Plaintiffs

***Stuart Krohengold***

16.     Plaintiff Stuart Krohnengold is a resident of Scarsdale, New York and is a participant in the Employee Plan.

17.     Krohnengold worked for New York Life from 1988 through 2012. He has been a participant in the Employee Plan for several decades. He has maintained an active account in the Employee Plan, and invested in the MainStay Income Builder Fund and the MainStay Epoch U.S. All Cap Fund during the Class Period (among various other funds).

18.     Krohnengold, like substantially all other participants in the Plans, was never provided any information regarding the substance of deliberations, if any, of the Fiduciary Committee Defendants concerning the Plans' menu of investment options or default investment, and otherwise has no knowledge of the substance of the deliberations. Krohnengold discovered his claims shortly before commencing this action.

19.     Krohnengold has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. In turn, New York Life has been unjustly enriched from the various fees and expenses generated as a result of Plaintiff Krohnengold's Employee Plan investments.

*Wayne Antoine*

20.     Plaintiff Wayne Antoine is a resident of Bayonne, New Jersey and is a former participant in the Employee Plan.

21.     Antoine is a former NYL employee and started working for the company in 2013. He became an active participant in the Employee Plan in or around 2014 and was a participant in the Plan during the Class Period.

22.     Antoine's Employee Plan account is defaulted into NYL's Fixed Dollar Account. He never voluntarily selected the FDA as an investment for his individual account in the Employee Plan. Throughout the Class Period, Defendants deposited and invested his individual account contributions (including company contributions) in the Fixed Dollar Account by default.

23.     Between March 2, 2015 (the beginning of the class period) and the filing of this Second Amended Complaint, Antoine has made numerous bi-weekly Employee Plan contributions from his earnings, which were invested by default into the FDA. During the same period, NYL also made numerous company contributions to Antoine's Employee Plan account that were also defaulted into the FDA.

24.     Antoine is also invested in (among other things) the MainStay Income Builder Fund through rollovers from a previous employer's 401(k) plan.

25.     Antoine, like substantially all other participants in the Plans, was not provided any information regarding the substance of deliberations, if any, of the Fiduciary Committee Defendants concerning the Plans' menu of investment options or default investment, and otherwise has no knowledge of the substance of the deliberations. Antoine discovered his claims shortly before commencing this action.

7

26.    Antoine has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. In turn, New York Life has been unjustly enriched from the various fees and expenses generated as a result of Antoine's Employee Plan investments.

*Lee Webber*

27.    Plaintiff Lee Webber is a resident of Santa Rosa, California and is a former participant in the Employee Plan.

28.    Webber worked for New York Life from 2013 through 2016. Webber's individual account in the Employee Plan was invested in (among other things) the MainStay Epoch U.S. All Cap Fund during the Class Period.

29.    Webber, like substantially all other participants in the Plans, was not provided any information regarding the substance of deliberations, if any, of the Fiduciary Committee Defendants concerning the Plans' menu of investment options or default investment, and otherwise has no knowledge of the substance of the deliberations. Webber discovered his claims shortly before commencing this action.

30.    Webber has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. In turn, New York Life has been unjustly enriched from the various fees and expenses generated as a result of Plaintiff Webber's Employee Plan investments.

*Anthony Medici*

31.    Plaintiff Anthony Medici is a resident of Ballston Lake, New York, has served as both an agent and employee for New York Life, and is a former participant in both the Agents Plan and the Employee Plan during the Class Period.

32.    Medici worked for New York Life from 2010 through 2020. Medici's individual account in the Employee Plan was invested in (among other things) the MainStay Income Builder

8

Fund, MainStay Epoch U.S. All Cap Fund, MainStay Epoch U.S Small Cap Fund, and MainStay Retirement Funds during the Class Period. On information and belief, Medici's individual account in the Agents Plan was invested in (among other things) the MainStay Income Builder Fund and the MainStay Retirement Funds during the Class Period.

33.      Medici, like substantially all other participants in the Plans, was not provided any information regarding the substance of deliberations, if any, of the Fiduciary Committee Defendants concerning the Plans' menu of investment options or default investment, and otherwise has no knowledge of the substance of the deliberations. Medici discovered his claims shortly before commencing this action.

34.      Medici has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. In turn, New York Life has been unjustly enriched from the various fees and expenses generated as a result of Plaintiff Medici's Agents Plan and Employee Plan investments.

***Joseph Bendrihem***

35.      Plaintiff Joseph Bendrihem is a resident of Great Neck, New York, has served as both an agent and employee for New York Life, and is a former participant in both the Agents Plan and the Employee Plan.

36.      Bendrihem worked for New York Life from 2008 through 2017. Bendrihem's individual account in the Employee Plan was invested in (among other things) the MainStay Epoch U.S. All Cap Fund during the Class Period.

37.      Bendrihem, like substantially all other participants in the Plans, was not provided any information regarding the substance of deliberations, if any, of the Fiduciary Committee Defendants concerning the Plans' menu of investment options or default investment, and otherwise

has no knowledge of the substance of the deliberations. Bendrihem discovered his claims shortly before commencing this action.

38.     Bendrihem has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. In turn, New York Life has been unjustly enriched from the various fees and expenses generated as a result of Plaintiff Bendrihem's Agents Plan and Employee 401(k) Plan investments.

**Larry Gilbert**

39.     Plaintiff Larry Gilbert is a resident of Highland Park, Illinois and is a participant in the Employee Plan.

40.     Gilbert worked for New York Life from 2006 through 2017. Gilbert's individual account in the Employee Plan was invested in (among other things) the MainStay Epoch U.S. All Cap Fund during the Class Period.

41.     Gilbert, like substantially all other participants in the Plans, was not provided any information regarding the substance of deliberations, if any, of the Fiduciary Committee Defendants concerning the Plans' menu of investment options or default investment, and otherwise has no knowledge of the substance of the deliberations. Gilbert discovered his claims shortly before commencing this action.

42.     Gilbert has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. In turn, New York Life has been unjustly enriched from the various fees and expenses generated as a result of Gilbert's Employee Plan investments.

**Rafael Musni**

43.     Plaintiff Rafael Musni is a resident of San Francisco, California and is a participant in the Agents Plan.

44.     Musni worked as an agent for New York Life from 2014 through 2019. Musni's individual account in the Agents Plan was invested in (among other things) the MainStay Income Builder Fund and the MainStay Epoch U.S Small Cap Fund during the Class Period.

45.     Musni, like substantially all other participants in the Plans, was not provided any information regarding the substance of deliberations, if any, of the Fiduciary Committee Defendants concerning the Plans' menu of investment options or default investment, and otherwise has no knowledge of the substance of the deliberations. Musni discovered his claims shortly before commencing this action.

46.     Musni has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. In turn, New York Life has been unjustly enriched from the various fees and expenses generated as a result of Musni's Agents Plan investments.

***Thomas Lantz***

47.     Plaintiff Thomas Lantz is a resident of Niskayuna, New York and is a former participant in the Agents Plan.

48.     Lantz worked as an agent for New York Life from 2014 to 2019. Lantz's individual account in the Agents Plan was defaulted into NYL's Fixed Dollar Account. He never voluntarily selected the FDA (or any other fund) as an investment for his individual account in the Agents Plan. During the Class Period, Defendants deposited and invested all of his individual account contributions (the majority or all of which were company contributions) into the Fixed Dollar Account.

49.     Lantz, like substantially all other participants in the Plans, was not provided any information regarding the substance of deliberations, if any, of the Fiduciary Committee Defendants concerning the Plans' menu of investment options or default investment, and otherwise

has no knowledge of the substance of the deliberations. Lantz discovered his claims after this action was commenced.

50.    Lantz has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. In turn, New York Life has been unjustly enriched from the various fees and expenses generated as a result of Lantz's Agents Plan investments.

***Sandra Scanni***

51.    Plaintiff Sandra Scanni is a resident of St. James, New York and is a former participant in the Agents Plan.

52.    Scanni worked as a financial services professional and agent for New York Life from 2013 through 2019. Scanni's individual account in the Agents Plan was invested in the MainStay Income Builder Fund, MainStay Retirement Funds, and the Fixed Dollar Account during the Class Period. On information and belief, company contributions to Scanni's individual account in the Agents Plan were defaulted into the FDA in mid-March of both 2015 and 2016.

53.    Scanni, like substantially all other participants in the Plans, was not provided any information regarding the substance of deliberations, if any, of the Fiduciary Committee Defendants concerning the Plans' menu of investment options or default investment, and otherwise has no knowledge of the substance of the deliberations. Scanni discovered her claims after this action was commenced.

54.    Scanni has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. In turn, New York Life has been unjustly enriched from the various fees and expenses generated as a result of Scanni's Agents Plan investments.

*Claudia Gonzalez*

55.     Plaintiff Claudia Gonzalez is a resident of Springfield Gardens, New York and is a former participant in the Agents Plan.

56.     Gonzalez worked as an agent for New York Life from 2018 through 2021. Gonzalez's individual account in the Agents Plan was defaulted into NYL's Fixed Dollar Account when she began participating in the Agents Plan. She never voluntarily selected the FDA (or any other fund) as an investment for her individual account in the Agents Plan. During the Class Period, Defendants deposited and invested all of her individual account contributions (the majority or all of which were company contributions) into the Fixed Dollar Account.

57.     Gonzalez, like substantially all other participants in the Plans, was not provided any information regarding the substance of deliberations, if any, of the Fiduciary Committee Defendants concerning the Plans' menu of investment options or default investment, and otherwise has no knowledge of the substance of the deliberations. Gonzalez discovered her claims after this action was commenced.

58.     Gonzalez has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. In turn, New York Life has been unjustly enriched from the various fees and expenses generated as a result of Gonzalez's Agents Plan investments.

## B.     <u>Defendants</u>

59.     Every employee benefit plan must provide for one or more named fiduciaries that jointly or severally possess the authority to control and manage the operation and administration of the plan. 29 U.S.C. § 1102(a)(1). Further, a person who functions as a fiduciary is a fiduciary, even if he or she is not named as such, so long as the person exercises any discretionary authority

or control over the administration of the plan or any authority or control over the disposition of plan assets. 29 U.S.C. §1001(21)(A).

### New York Life (NYL)

60.     Defendant New York Life, headquartered in New York, New York, is a mutual life insurance company organized under the laws of the State of New York. Through a network of related entities, it markets to the public (and its own employees and agents) mutual funds, life insurance policies, annuity contracts, financial contracts, retirement contracts, and other money management services.

61.     Pursuant to the terms governing the Plans, NYL is one of the Named Fiduciaries to the Plans. NYL serves as the Plan Administrator for purposes of the reporting and disclosure requirements under ERISA. Additionally, NYL is responsible for appointing and monitoring other Plan fiduciaries, including the Fiduciary Investment Committee members, and through this appointment power over other fiduciaries, NYL is also fiduciary of each of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

62.     NYL is the sponsor of the Plans and a party in interest to the Plans within the meaning of 29 U.S.C. §1002(14) because, among other things, it is a Named Fiduciary to the Plans and an employer whose employees and agents are covered by the Plans.

### The Fiduciary Investment Committee

63.     Defendant Fiduciary Investment Committee has been a Named Fiduciary of the Plan since January 1, 2019. At that time, the Fiduciary Investment Committee took over the responsibilities of the Board of Trustees for ongoing investment, control, and management of the Plans' assets. The Fiduciary Investment Committee and its members are also fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), with respect to each of the Plans by virtue of exercising authority or control over the disposition of the assets of each of the Plans.

***Committee Members***

64.     The members of the Fiduciary Investment Committee are appointed by the Chief Executive Officer ("CEO") of NYL, and the CEO may remove or replace any Committee member at any time. If a Committee member leaves their employment with NYL, they automatically cease to be a member of the Fiduciary Investment Committee. In that instance or if a Committee member resigns, the CEO must authorize the appointment of a replacement member.

65.     The members of the Fiduciary Investment Committee are all high-level corporate executives at New York Life, and their compensation arrangements were/are tied directly or indirectly to NYL's and/or its affiliates' revenues, profitability, and/or growth in assets under management.   In addition, on information and belief, the compensation of some individual members of the Fiduciary Investment Committee was/is tied to the revenue, profits, size and/or performance of the MainStay Funds and Fixed Dollar Account.

66.     According to documents provided to Plan participants, the following individuals became members of the Fiduciary Investment Committee as of January 1, 2019. These individuals were all previously members of the Board of Trustees for all relevant times up to the creation of the Fiduciary Investment Committee as of January 1, 2019:

        a)  **Defendant Katherine O'Brien** is/was Chairperson of the Fiduciary Investment Committee and previously served as the Chairperson of the Board of Trustees during all relevant times. She has also been a Senior Vice President & Chief Human Resources Officer of New York Life, first joining the Company in 1995.

b)  **Defendant Anthony R. Malloy** is/was a member of the Fiduciary Investment Committee and previously was a member of the Board of Trustees of the Plans during all relevant times. He has also been an Executive Vice President and Chief Investment Officer for New York Life, first joining the Company in 1999.

c)  **Defendant Yie-Hsin Hung** is/was a member of the Fiduciary Investment Committee and previously was a member of the Board of Trustees of the Plans during all relevant times. He has also been a Senior Vice President of New York Life and Chief Executive Officer of New York Life Investment Management LLC (NYLIM), New York Life's global multi-boutique third party asset management business, first joining the Company in 2010.

d)  **Defendant Arthur A. Seter** is/was a member of the Fiduciary Investment Committee and previously was a member of the Board of Trustees of the Plans during all relevant times.  He has also been a Senior Vice President and Managing Director for New York Life, first joining the Company in 1989.

e)  **Defendant Scott L. Lenz** is/was a member of the Fiduciary Investment Committee and previously was a member of the Board of Trustees of the Plans during all relevant times. He has also been a Senior Vice President, Deputy General Counsel and Chief Tax Counsel for New York Life, first joining the Company in 2004.

f)  **Defendant Robert J. Hynes**, upon information and belief, was a member of the Fiduciary Investment Committee and previously was a member of the Board of Trustees of the Plans during all relevant times. He has also been a Vice

President for New York Life. He first joined the Company in 1975 and retired in January 2021.

67.     **John and Jane Does 1-20.** The names of any potential additional members of the Fiduciary Investment Committee and the Board of Trustees during the class period are currently unknown to Plaintiffs. Parties to whom NYL's or the Fiduciary Investment Committee's or Board of Trustees' fiduciary authority was delegated are similarly unknown to Plaintiffs. Those Defendants are therefore collectively named as John and Jane Does 1–20.

*Board of Trustees*

68.     Prior to January 1, 2019, the Defendant Board of Trustees and their individual members were Named Fiduciaries pursuant to the terms governing the Plans. The Board of Trustees and their members, prior to January 1, 2019, controlled and managed the assets of the Plans under the terms of the Plans, and were Named Fiduciaries of the Plans under ERISA § 402(a)(2), 29 U.S.C § 1102(a)(2). Additionally, the Board of Trustees and its members were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), with respect to each of the Plans by virtue of exercising authority or control over the disposition of the assets of each of the Plans.

69.     According to documents provided to Plan participants, Defendants O'Brien, Malloy, Hung, Seter, Lenz, and Hynes all served as members of the Board of Trustees during all relevant times prior to January 1, 2019.

## IV.     LEGAL BACKGROUND

### A.     ERISA Fiduciary Duties

70.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans, which are "the highest known to the law." *Bierwirth*, 680 F.2d at 272 n.8.

17

71.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000); *Bierwirth*, 680 F.2d at 271. "Perhaps the most fundamental duty of a [fiduciary] is that he must display complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram,* 530 U.S. at 224 (quotation marks and citations omitted).

72.     ERISA allows corporate officers and high-level employees to serve as fiduciaries of the corporation's employee benefit plans—basically allowing them to wear two hats. However, ERISA requires them to disregard their corporate interests (take off their corporate hat) and "wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225.

73.     "[A]n ERISA fiduciary must 'act for the exclusive purpose' of providing benefits to plan beneficiaries." *Bierwirth,* 680 F.2d at 271. Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

74.     ERISA also imposes a duty of prudence on all persons managing ERISA-protected retirement assets. The "Prudent Man Standard of Care" requires a fiduciary to "discharge his duties with respect to a plan … with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1), ERISA § 404(a)(1).

75.     In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted).

76.     The fact that participants exercise "independent control" over the assets in their defined contribution plan accounts "does not serve to relieve a fiduciary from its duty to prudently select and monitor any… designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d)(1)(iv).

77.     Additionally, because the Fiduciary Committee Defendants invested thousands of participants into the Fixed Dollar Account without their consent or direction, they retained fiduciary responsibility for their investment of participant accounts in the Fixed Dollar Account by default, which was not appropriate for the reasons stated herein, and all resulting investment losses.

**B.      Qualified Default Investment Alternatives (QDIAs)**

78.     Generally speaking, ERISA § 404(c), 29 U.S.C. § 1104(c) offers a "safe harbor" for plan fiduciaries to avoid liability for investment losses suffered by plan participants who self-direct their investments. In other words, while plan fiduciaries, as alleged here, still have liability for the selection and retention of particular funds for the Plans' fund menu, they will not be responsible when participants make poor selections from the plan menu *if* and only if the participants pick an option from the plan menu *and* the plan meets all of ERISA § 404(c) requirements which are explained in detail in 29 C.F.R. § 2550.404c-5.

79.     Before the Pension Protection Act of 2006 (the "Pension Protection Act"), which created the QDIA safe harbor for plan fiduciaries, studies showed that employer-sponsored defined contribution plans that automatically enrolled employees in their plans had higher rates of participation. Whether to automatically enroll participants in a 401(k) plan is an employer/sponsor decision. Many employers were reluctant to automatically enroll employees in the plan before the QDIA safe harbor was promulgated because, if participants did not elect an investment option for their plan accounts, the plan fiduciaries would be forced to make that investment selection for them—exposing the fiduciaries to greater liability because the participants would not be picking an investment from the plan menu as required to come within ERISA's safe harbor provision at 29 U.S.C. § 1104(c).

80.     The Pension Protection Act addressed this concern by extending 404(c)'s safe harbor protection, which previously only applied to instances where participants chose their own investments, to instances where plan fiduciaries directed participants' account holdings or contributions into the default investment they chose for the plan. The "Qualified Default Investment Alternative" regulations identified the specific types of investments that the DOL found produced long-term capital appreciation sufficient to provide participants adequate savings in retirement. 29 C.F.R. 2550.404c-5(e)(1)-(3) (discussed *infra*). And the DOL explained that the default investment chosen for 401(k) plans "often will be long-term investments" and thus there are unique issues to consider when plan fiduciaries review a default investment for an ERISA-governed plan.

81.     Importantly, a plan fiduciary must engage in a prudent and loyal process to evaluate all relevant considerations regarding plan investments, including the unique issues related to default investments that the DOL discussed in the preamble to the QDIA regulation. These

considerations include, but are not limited to, whether the default investment provides a mix of asset classes consistent with capital preservation, long-term capital appreciation, or a blend of both. Pension Prot. Act of 2006, Pub. L. No. 109-280, 120 Stat. 780 (2006).

82.     The DOL further explained that, for a diverse participant population, the default investment should be "designed to provide long-term appreciation and capital preservation through a mix of equity and fixed income exposures" such as a target-date fund, balanced fund, or managed account product. 29 C.F.R. § 2550.404c-5(e)(4)(i)-(iii). For this reason, the QDIA regulation only allows for these specific types of investments, which offer a blend of asset classes and provide sufficient appreciation or investment returns to provide participants with retirement security. 72 Fed. Reg. 60452-01.

83.     In contrast, the DOL determined that low-risk, low-return, capital preservation products, like the stable value Fixed Dollar Account that served as the Plans' default option, did not satisfy the asset accumulation requirements necessary to be deemed a QDIA. 72 Fed. Reg. 60452-01. This outcome makes sense because by defaulting plan participants into such funds, fiduciaries fail to protect the most vulnerable of their participants by directing those participants' retirement savings into an investment option that will not provide them with investment income adequate to save for retirement.

## V.     FACTS

### A.     <u>The Plans</u>

84.     The Employee Plan and the Agents Plan are both "defined contribution plan[s]" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).  New York Life is the sponsor of the Plans. As the Plans' sponsor, New York Life intends for the Plans to encourage savings and

provide retirement income for New York Life employees and insurance agents, former employees and insurance agents, and their beneficiaries.

85.     In 2019, the Plans' assets were consolidated into a single Master Trust, effectively merging the Employee Plan with the Agents Plan. Effective January 1, 2019, State Street Bank and Trust Company became the directed trustee of the New York Life Progress-Sharing Investment Program Trust (the "Master Trust"), a trust established to hold and invest the commingled assets of both Plans.

86.     The Plans at issue here are both 401(k) plans (i.e. as described in Section 401(k) of the Internal Revenue Code of 1986), in which each participant is credited with an individual account funded through a combination of participant contributions, deducted from their salaries, and employer contributions.

87.     The value of each participant's individual account in the Plans depends on contributions made on behalf of each employee or agent by his or her employer, deferrals of employee compensation and employer matching contributions, plus the performance of investment options and minus all fees and expenses. Participants pay fees and expenses (both direct and indirect) based on the fund options chosen and maintained by the fiduciaries of the Plans. Ultimately, Plan participants' retirement income is limited to the value of their own investment accounts.

88.     Participants in the Plans can only invest in fund options chosen and maintained for the Plans by the Fiduciary Committee Defendants. The potential for disloyalty and imprudence is much greater in 401(k) plans than in traditional pension plans. In a traditional pension plan (i.e. defined benefit plan), the plan sponsor bears the risk associated with plan investments, but in a 401(k) plan participants' retirement benefits are directly related to the investment gains or losses

associated with the plan's investments and can be eroded by fees and expenses associated with those investments.

89.    At one time the NYL Plans relevant here only invested in New York Life proprietary funds (i.e., funds managed, for a fee, by New York Life or its affiliates). Over time, certain NYL proprietary funds were replaced, but many of them have been retained even though they are excessively expensive and/or poor-performing funds.

90.    The at-issue New York Life proprietary funds that were offered in the Plans during the Class Period include: the "Fixed Dollar Account" (which was not a prudent and loyal default option), the MainStay Income Builder Fund, the MainStay Epoch U.S. All Cap Fund, the MainStay Epoch U.S. Small Cap Fund, the MainStay Retirement 2010 Option Fund, the MainStay Retirement 2020 Option Fund, the MainStay Retirement 2030 Option Fund, the MainStay Retirement 2040 Option Fund, and the MainStay Retirement 2050 Option Fund.

91.    The at-issue MainStay Funds are proprietary mutual funds managed for a fee by New York Life, are more expensive than comparable funds, and underperformed comparable funds and/or the very benchmarks that NYL itself chose as appropriate fund benchmarks. The Fixed Dollar Account is also a NYL proprietary product that generates income for NYL.

92.    The Fiduciary Committee Defendants have at all relevant times had exclusive discretion and control over (i) the selection, monitoring, and retention of the fund options that the Plans offered on the investment menu for the Plans; and (ii) the ongoing determination of which of the Plans' fund options would be the default investment for participants who did not submit direction to the Plans for how to invest their 401(k) account.

93.    As of the end of 2019, the Employee Plan had approximately $3.5 billion in assets and 15,132 participants. The Agents Plan had approximately $846 million in assets and 14,532

participants. The two Plans had a combined total of approximately $4.35 billion in assets in the Master Trust covering over 29,600 participants.

94.    The Plans' Master Trust holds one of the largest amounts of defined contribution plan assets in the country, thus giving the Fiduciary Committee Defendants enormous bargaining power to receive superior investment products and services at extraordinarily low cost for the Plans' participants.

95.    By the end of 2019, nearly 60% of the Employee Plan's assets—over two billion dollars—was invested in NYL's proprietary Fixed Dollar Account. By the end of 2019, nearly 43% of the Agents Plan's assets—nearly $362 million—was invested in NYL's proprietary Fixed Dollar Account. In total, of the $4.35 billion in the Master Trust, more than 54%, or more than $2.36 billion, was invested in this single NYL proprietary fund designated by the Fiduciary Committee Defendants as the Plans' default option for all participants who did not elect an investment option. Of the remaining assets in the Master Trust, a substantial amount of the Plans' assets has been invested in the at-issue MainStay funds during the Class Period.

**B.    The Fiduciary Committee Defendants Violated their ERISA Fiduciary Duties to the Plans' Participants**

96.    ERISA strictly regulates the manner in which retirement plan fiduciaries must manage and administer the retirement assets under their management and/or control. Among other things, ERISA requires that fiduciaries act: a) prudently; b) solely in the interest of participants and beneficiaries; c) for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of administering the plan; and d) in avoidance of prohibited transactions.

97.    ERISA's duty of prudence required the Fiduciary Committee Defendants to follow reasonable standards of investment due diligence by giving appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should

24

have known were relevant to the investment of the Plans' assets, and then to act accordingly. 29 C.F.R. § 2550.404a-1. For example, when evaluating whether to select and maintain a particular investment option, a fiduciary must consider whether alternative investment options better serve the interest of the plan participants given the plan population as a whole. 29 C.F.R. § 2550.404a–1(b)(2).

98.     ERISA's duty of loyalty also required the Fiduciary Committee Defendants to ensure that New York Life's business interests did not, in any way, influence how the Plans' assets would be invested, which funds were selected and retained for the Plans' investment lineup, how those funds were monitored, which investment was designated as the Plan's default investment and whether it would retain that status, and how the Plan's default investment was monitored.

99.     These duties of prudence and loyalty required the Fiduciary Committee Defendants to (among other things): (1) ensure that the Plans' default investment was likely to serve the long-term asset accumulation needs of the participant population as a whole before depositing monies into that investment by default; (2) ensure that it remained an appropriate default investment while Plan assets were invested in that investment by default; (3) ensure that the other investment options available under the Plans were appropriate for the Plans' investment menus; and (4) adequately consider non-proprietary funds that could be included on the Plans' investment menus or utilized as a default investment, as well as to carefully avoid conflicts of interests arising from profiting from the Plans' investments.

100.     The Fiduciary Committee Defendants also had and have ongoing monitoring duties with respect to the Plans' assets. These monitoring duties include: reviewing and re-evaluating throughout the Class Period whether the Plans' default investment offers an appropriate mix of asset classes for a default investment that provides adequate opportunity for long-term capital

appreciation based on a prudent and objective investment analysis and contemporary DOL guidance; reviewing and re-evaluating the Plans' other investment fund options on a regular and frequent basis (at least as frequently as every quarter) to ensure that they continue to be prudent investments for the Plans based on performance metrics and cost/fee structure; avoiding giving preferential treatment to New York Life proprietary funds; removing investment options that either alone, or in the context of the Plans' entire portfolios, are imprudent; and making changes to the Plans' default investment as appropriate and making any necessary adjustments to the manner in which monies are contributed to or invested in the Plans by default.

101.    As part of their monitoring duties, the Fiduciary Committee Defendants had a duty to remove imprudent or disloyal Plan investments; investments that underperformed and/or were more expensive relative to available alternatives; investments that constituted prohibited transactions because they involved proscribed compensation to fiduciaries or parties in interest; and investments that were adopted and/or maintained based on preferential treatment for proprietary funds. In addition, the Fiduciary Committee Defendants had an ongoing duty (throughout the Class Period) to ensure that the Plans' default investment was appropriate for its intended purpose, designate a different investment as the Plan's default investment if a different investment would have been better suited to that purpose, only deposit monies into the default investment and maintain assets in that investment by default where warranted by a prudent and objective investment analysis; and avoid conflicts of interest and prohibited transactions in connection with the Plans' default investment.

102.    Contrary to these duties, the Fiduciary Committee Defendants made investment decisions for the Plans during the Class Period in a manner that benefited New York Life (and its affiliates and executives) rather than prudently and objectively monitoring the Plans' investments

(including the Plans' default investment) with an eye single to the interests of the Plans and their participants and beneficiaries. This breached ERISA's fiduciary duties and caused the Plans to engage in prohibited transactions, in numerous respects, as described in further detail below.

  i.  The Fiduciary Committee Defendants Retained the Fixed Dollar Account as the Plans' Default Investment During the Class Period, and Deposited and Invested Monies in the Fixed Dollar Account by Default, in Breach of Their Ongoing Fiduciary Duties and Statutory Responsibilities Under ERISA.

103. Both the Employee Plan and the Agents Plan have a default investment option.[3]

104. At all times during the Class Period, the contributions for all participants in the Plans who have not selected an investment option have been automatically invested in the default option maintained by the Fiduciary Committee Defendants—the Fixed Dollar Account.

105. To the best of Plaintiffs' knowledge based on the available information, approximately $375 million of the Master Trust's assets were transferred to the Fixed Dollar Account in the six years preceding the filing of this action.

106. The Fixed Dollar Account is offered through a "group annuity contract" ("GAC"). This GAC is a benefit-responsive group annuity contract between the Plans and NYL, providing a guaranteed rate of return as specified in the contract, and allowing contributions and withdrawals by the participant. Through this group annuity contract, participants' contributions to the Fixed Dollar Account are transferred to and maintained in NYL's general account. The Plans' assets invested in NYL's general account are credited a periodic rate of return as determined by NYL and charged for participant withdrawals and administrative expenses.

---

[3] Employees of New York Life are automatically enrolled in the Employee Plan and have 5% of their pre-tax salaries deducted from their paycheck and contributed to the Plan, resulting in an immediate, fully vested, nonforfeitable interest in the monies in their accounts.

107.    Each year, NYL credits interest to Fixed Dollar Account investors based on a crediting rate set by NYL.

108.    NYL's general account assets are subject to claims by its creditors and are subject to the liabilities arising from any of its businesses.

109.    NYL's ability to satisfy its obligation to the Plans is subject to its financial strength and claims-paying ability. There is a risk that NYL may default on its obligations to the Plans.

110.    When monitoring the default investment option for the Plans during the Class Period, and before making periodic deposits into the default investment, a prudent and loyal fiduciary would have taken into consideration that most Plan participants who are invested in the Fixed Dollar Account by default are likely to remain in that investment option for a long time, and thus the default investment must produce long-term capital appreciation sufficient to provide participants with adequate savings in retirement.

111.    Under basic investment principles, retirement savings should consist of a mix of asset classes, including substantial exposure to stocks and bonds as well as principal preserving cash equivalents. *See, e.g.*, U.S. Sec. & Exchange Comm'n, Beginners' Guide to Asset Allocation, Diversification, and Rebalancing (Aug. 28, 2009), *available at* https://www.sec.gov/reportspubs/investor-publications/investorpubsassetallocationhtm.html.

112.    Thus, when monitoring the default investment for the Plans, and before making periodic deposits into the default investment, a prudent and loyal fiduciary would have considered options that provide a mix of asset classes, such as stocks and bonds, to ensure that participants' retirement savings were invested according to generally accepted investment theories and prevailing investment industry standards, including the Modern Portfolio Theory, and that

participants' retirement savings had sufficient opportunity to grow into a meaningful nest egg over the long term.

113.    The Fixed Dollar Account is not a prudent default investment because it does not provide a mix of asset classes, such as stocks and bonds, that would ensure that a participant's retirement savings are invested according to generally accepted investment theories and prevailing investment industry standards, including the Modern Portfolio Theory, and that a participant's retirement savings have sufficient opportunity to grow over time.

114.    Because principal-protecting investment products provide the lowest return of the three major asset categories, the disadvantage of investing in a stable value product is that an individual will not grow their retirement savings to create a sufficient "nest egg" to retire comfortably. In addition, some amount of return is necessary just to mitigate inflation risk, which is the risk that inflation will outpace and erode investment returns over time, meaning a dollar today is worth much less than a dollar at retirement.

115.    Based on these basic asset allocation principles, the DOL excluded stable value products, like the Fixed Dollar Account, from the category of investments deemed QDIAs based on its determination that stable value products do not provide sufficient asset accumulation for participants and should be discouraged as a primary source of investment returns:

> It is the view of the Department that investments made on behalf of defaulted participants ought to and often will be long-term investments and that investment of defaulted participants' contributions and earnings in money market and stable value funds will not over the long-term produce rates of return as favorable as those generated by products, portfolios and services included as qualified default investment alternatives, ***thereby decreasing the likelihood that participants invested in capital preservation products will have adequate retirement savings.***

Default Investment Alternatives Under Participant Directed Individual Account Plans, 72 FR 60452-01 (emphasis added).

116.    Confirming the DOL's articulated concerns, the Fiduciary Committee Defendants' retention of the Fixed Dollar Account as the Plans' default investment has resulted in participants' retirement savings being highly concentrated in an investment product that does not provide exposure to a mix of asset classes and lacks suitable potential for growth to secure sufficient retirement savings.

117.    The Fixed Dollar Account is the single largest investment in the Plans. As of December 31, 2019, more than $2.36 billion or 54% of the Plans' assets (all commingled in the Master Trust) were invested in the Fixed Dollar Account.

118.    The investment of the majority of the Plans' assets into a stable value product like the Fixed Dollar Account made the Plans stark outliers among 401(k) plans. According to a study by NYL itself, participants in other 401(k) plans allocated just 12% on average into stable value products. Furthermore, surveying large defined contribution plans, like NYL's Plans, shows that weighted-average stable value holdings in the four largest private 401(k) plans is under 17%.

119.    The Fiduciary Committee Defendants' decision to continue to direct and invest the assets of thousands of the Plans' participants into the Fixed Dollar Account during the Class Period, which did not provide the long-term capital appreciation necessary for retirement, was imprudent and disloyal and impaired the retirement security of Plan participants while providing NYL enormous profits and billions of dollars to be used for its own business purposes.

120.    As the following table illustrates, this violation of fiduciary duties has had a severe detrimental effect on participants' ability to adequately save for retirement:

| Annual Returns and Gains (Losses) of Fixed Dollar Account vs. TDF and Balanced Fund | | | | | |
|---|---|---|---|---|---|
| Year | TDF | Balanced | Fixed Dollar | TDF | Balanced |
| 2020 | 13.74% | 16.41% | 4.300% | ($229,813,859.78) | ($294,708,977.44) |
| 2019 | 20.46% | 21.79% | 4.550% | ($363,910,890.48) | ($394,219,839.20) |
| 2018 | -5.49% | -2.82% | 4.375% | $219,412,025.24 | $160,056,228.60 |
| 2017 | 16.90% | 13.86% | 4.280% | ($276,021,329.58) | ($209,505,317.65) |
| 2016 | 7.72% | 8.81% | 4.510% | ($64,054,950.37) | ($85,920,533.58) |
| 2015 | -0.89% | 0.52% | 5.05% | $111,198,822.07 | $84,813,196.80 |
| Total Loss[4] | | | | ($933,801,030.21) | ($984,354,667.87) |

121.    At all times during the Class Period, the Fiduciary Committee Defendants' fiduciary duty to monitor investments required them to remove the Fixed Dollar Account as the Plans' default investment, replace it with a default investment that included a mix of asset classes (including stocks and bonds) that provided an adequate opportunity for growth over the long-term, and change the manner in which monies were deposited into the Plans and invested in the Plans by default. Had they done so, the Plans' participants would have gained hundreds of millions of dollars more for their retirement throughout the Class Period.

---

[4] The Target-Date Fund (TDF) comparator is the Vanguard Target Retirement Trust Plus suite of TDFs, and is a weighted average of the rate of returns from the 2020, 2030, 2040, 2050, and 2060 retirement funds within that suite of funds. The Balanced Fund comparator is the Vanguard Balanced Index Fund, Institutional Shares. These Vanguard funds are appropriate comparators because they are widely used as plan options in defined contribution plans similar in size to the 401(k) Plans offered by NYL, and indeed the Vanguard TDF was selected for the NYL Plans in 2019.

ii.    <u>The Fixed Dollar Account Is Not a Qualified Default Investment Alternative.</u>

122.    As noted above, the Fixed Dollar Account is not a permissible QDIA under 29 C.F.R. § 2550.404c–5(e) because it does not offer a blend of asset classes, such as a target-date fund,[5] balanced fund, or managed account. 29 C.F.R. § 2550.404c–5(e)(iv)(i)-(iii).

123.    Additionally, the DOL's regulation provides that capital preservation funds like the Fixed Dollar Account cannot be a QDIA after December 24, 2007 unless plan contributions are held in such a fund for "not more than 120 days after the date of the participant's first elective contribution," and can only remain a QDIA for money invested before that date ("grandfathered money") if the investment "provide[s] a rate of return generally consistent with that earned on intermediate investment grade bonds." *Id.*

124.    The Plans' terms do not provide for any other default investment into which participants' first elective (i.e., payroll) contribution will be directed within 120 days. As such, all of the Plans' participants who are defaulted into the Fixed Dollar Account remain invested in the default for longer than 120 days after the first payroll contribution.

125.    Furthermore, the massive Plan allocation in the Fixed Dollar Account (54%) provides additional evidence that participants who are defaulted into this non-QDIA investment remain invested in the Fixed Dollar Account for longer than 120 days after the participants' first payroll contribution.

---

[5] A target-date fund is a class of funds (often mutual funds) that periodically rebalances asset class weights to optimize risk and returns for a predetermined time frame. The asset allocation of a target-date fund is typically designed to gradually shift to a more conservative profile as the plan participant moves closer to retirement age.

126.    Accordingly, when used as a default investment, the Fixed Dollar Account's use is not limited to 120 days after the date of the participants' first elective contribution, and thus the Fixed Dollar Account is not a Qualified Default Investment Alternative for this reason as well.

127.    Further, as the following table illustrates, the rate of return credited through the Fixed Dollar Account is substantially below that earned on intermediate investment grade bonds, and therefore the "grandfathered money" likewise cannot be considered properly invested in a QDIA. Namely, when compared to the Bloomberg Barclays U.S. 5-10 Yr. Government/Credit Float Adjusted Index, which is a commonly recognized intermediate investment grade bond index, the Fixed Dollar Account has had materially lower returns:

| Intermediate Bond Index vs. Approximate Fixed Dollar Account Average Annual Returns (as of 12/31/2020) | | | |
|---|---|---|---|
| **Period** | **Index** | **Fixed Dollar Account** | **Underperformance** |
| 1 Year | 9.73% | 4.30% | -65% |
| 3 Years | 6.57% | 4.41% | -33% |
| 5 Years | 5.31% | 4.40% | -17% |

128.    By directing participant retirement savings into the Fixed Dollar Account, which is not a valid QDIA, the Fiduciary Committee Defendants retained fiduciary responsibility for any losses suffered by participant accounts as a result of being invested in the Fixed Dollar Account vis-à-vis prudent alternative investments, or lack of diversification of their retirement account holdings.

iii.    <u>The Fiduciary Committee Defendants Imprudently and Disloyally Disregarded Fiduciary Norms to Select and Retain Proprietary MainStay Investments for the Plans.</u>

129.    ERISA also requires the Fiduciary Committee Defendants to engage in a thorough, unbiased deliberative process when selecting and monitoring other investment options in the Plans. This process must always be scrupulous.

130.    Here, because New York Life is a financial services company that offers investment products to retirement plans, the potential for conflicted decisions by the New York Life executives who controlled the Plans' investments is especially high. Specifically, the Fiduciary Committee Defendants were in a position to use the Plans' $4.3 billion of assets to benefit New York Life through investing employees' retirement savings in New York Life investment products, such as the MainStay Funds and the Fixed Dollar Account.

131.    Research studies in reputable finance journals show that where a mutual fund manager controls the plan menu for a 401(k) plan, the plan's menu may display "significant favoritism toward affiliated funds." Veronika K. Pool et al., *It Pays to Set the Menu: Mutual Fund Investment Options in 401(k) Plans*, 71 J. Fin. 1779, 1779-81 (2016). As one research paper explained:

> Fund families involved in a plan's design can face conflicting incentives. While they work with plan sponsors to create menus that serve the interest of plan participants, they also have an incentive to promote their own proprietary funds, even when more suitable options are available from other fund families.... We further hypothesize that, due to this provider influence, fund addition and deletion decision may be less sensitive to prior performance of affiliated funds as mutual fund families have an incentive to smooth money flows across their funds with differential past performance… Our results reveal significant favoritism toward affiliated funds [which] are significantly less likely to be removed from the plan's menu than unaffiliated funds. The biggest relative difference between how affiliated and unaffiliated funds are treated arises among the worst-performing funds, which have been shown to exhibit significant performance persistence… These results suggest that decisions to change the composition of 401(k) plan menus are driven not simply by meritocracy, but also by favoritism. Protecting poorly performing funds by keeping them or adding them to plan menus helps mutual fund families smooth the money flows into their various offerings.

These problems manifested themselves here in the retention of the at-issue proprietary funds for the Plans.

132.    The Department of Labor has provided guidance to plan fiduciaries explaining that the "decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988). That principle also extends to the decision to retain an investment option.

133.    Due to their conflicted loyalties between promoting New York Life's investment products and acting solely for the benefit of the Plans' participants, the Fiduciary Committee Defendants were required to use the utmost care and unbiased procedures as a check against their conflict.

134.    The Fiduciary Committee Defendants should have taken actions or implemented procedures to mitigate the conflicts they suffered and to avoid acting in New York Life's business interest. There were several measures that the Fiduciary Committee Defendants could have taken to mitigate their conflicts but did not. For example, they could have appointed an independent fiduciary who had full power and authority to select and monitor the Plans' investments and who was not a high-level New York Life executive. The Fiduciary Committee Defendants also could have created an administrative wall between the Fiduciary Committee Defendants and New York Life's business personnel.

135.    The Fiduciary Committee Defendants had a duty to monitor the Plans' investments and remove funds that suffered from sustained underperformance and that could not meet their own self-identified performance benchmarks. A disinterested plan fiduciary would have avoided or removed the underperforming and expensive MainStay Funds.

136.    Instead, the Fiduciary Committee Defendants failed to satisfy threshold procedural norms needed for a non-conflicted fiduciary to satisfy their duties of loyalty and prudence under ERISA.

137.    Specifically, the Fiduciary Committee Defendants added the MainStay Epoch U.S. All Cap Fund during the Class Period, and retained the underperforming and expensive MainStay Epoch U.S. All Cap Fund, the MainStay Income Builder Fund, and the five MainStay Retirement Funds throughout the Class Period. In addition, the Fiduciary Committee Defendants failed to remove the MainStay Epoch U.S. Small Cap Fund until March 26, 2019.

a.    *The MainStay Funds underperformed the benchmarks that NYL itself chose to evaluate the performance of its funds.*

138.    The following tables show that MainStay Funds continuously failed to meet the performance benchmarks that NYL itself selected as well as their Morningstar index benchmarks over 1-, 3-, 5- and 10-year trailing returns[6]:

| Ticker | Fund Name | Avg. Annual Trailing Returns as of 12/31/2020 | | | |
|--------|-----------|------|------|------|-------|
| | | **1-yr** | **3-yr** | **5-yr** | **10-yr** |
| MAWDX | **MAINSTAY EPOCH U.S. ALL CAP FUND** | **10.4** | **9.0** | **11.7** | **11.3** |
| | Russell 3000 | 20.9 | 14.5 | 15.4 | 13.8 |
| | Russell 1000 (Morningstar[6]) | 21.0 | 14.8 | 15.6 | 14.0 |
| MTODX | **MAINSTAY INCOME BUILDER FUND** | **7.3** | **6.4** | **8.2** | **8.1** |
| | Blended Benchmark Index | 12.5 | 8.4 | 8.6 | 7.1 |
| | Global Allocation (Morningstar) | 13.6 | 8.4 | 10.3 | 8.2 |
| MOPIX | **MAINSTAY EPOCH U.S. SMALL CAP FUND** | **10.0** | **2.7** | **7.8** | **8.4** |
| | Russell 2000 | 20.0 | 10.3 | 13.3 | 11.2 |
| | Russell 2500 | 20.0 | 11.3 | 13.6 | 12.0 |

---

[6] Morningstar is a highly respected provider of mutual fund data to a broad range of investors. Its database includes relevant information on mutual funds past and present.

| Ticker | Benchmark Comparator | Average Annual -Under/Outperformance of Fund versus Benchmarks as of 12/31/2020 | | | |
|---|---|---|---|---|---|
| | | 1-yr | 3-yr | 5-yr | 10-yr |
| MAWDX | vs. R3000 | -10.50% | -5.48% | -3.77% | -2.45% |
| | vs. R1000 | -10.56% | -5.81% | -3.93% | -2.66% |
| MTODX | vs. Blended Benchmark Index | -5.20% | -1.97% | -0.39% | 1.04% |
| | vs. Global Alloc. Index | -6.26% | -1.99% | -2.11% | -0.03% |
| MOPIX | vs. Russell 2000 | -9.92% | -7.56% | -5.51% | -2.80% |
| | vs. Russell 2500 | -9.95% | -8.64% | -5.89% | -3.57% |

139.   According to the Securities and Exchange Commission, all registered mutual funds must file a prospectus that must include performance information (i.e., the average annual returns for 1-, 5-, and 10-year periods) compared with the returns of an appropriate index.[7] In addition, the Department of Labor's disclosure regulation, 29 C.F.R. 2550.404a-5(d)(1)(iii), requires plan fiduciaries to disclose for each investment option the investment returns compared to a "Benchmark", defined as an "appropriate broad-based securities market index."

140.   The prospectus for the **MainStay Epoch U.S. All Cap Fund** reports that "the fund has selected the Russell 3000 Index as its primary benchmark." And the Plan discloses the Russell 3000 Index as an appropriate benchmark for evaluation of the performance of the MainStay Epoch U.S. All Cap Fund. Thus, according to New York Life itself, the Russell 3000 Index is an appropriate benchmark, and therefore provides a meaningful evaluation of whether the MainStay Epoch U.S. All Cap Fund is underperforming.[8]

141.   The prospectus for the **MainStay Income Builder Fund** discloses a "Blended Benchmark Index, [which is] a composite representation prepared by the Manager [New York Life

---

[7] See SEC's Form N-1A disclosure rules, *available at* https://www.sec.gov/files/formn-1a.pdf.

[8] MainStay Epoch U.S. All Cap Fund, Summary Prospectus (Feb. 28, 2020), *available at* https://www.newyorklifeinvestments.com/assets/documents/summarypro/mainstay-epoch-us-all-cap-fund-spro.pdf

Investment Management] of the performance of the Fund's asset classes weighted according to their respective weightings in the Fund's target range. The Blended Benchmark Index is comprised of the MSCI World Index and the Bloomberg Barclays U.S. Aggregate Bond Index weighted 50%/50%." Given this disclosure to fund investors that the Blended Benchmark Index is weighted according to the respective weightings in the Fund's target range, it provides a meaningful comparison from which to evaluate the performance of the MainStay Income Builder Fund.[9]

142.    The prospectus for the **MainStay Epoch U.S. Small Cap Fund** identifies the Russell 2000 Index as its primary benchmark and the Russell 2500 Index as its secondary benchmark for which investors should evaluate the Fund's performance. As such, both the Russell 2000 Index and the Russell 2500 Index are appropriate benchmarks and provide a meaningful evaluation of the performance of the MainStay Epoch U.S. Small Cap Fund.[10] Likewise, based on the best available information, the Plan disclosed to participants that the Russell 2000 Index was an appropriate benchmark for the MainStay Epoch U.S. All Cap Fund.

143.    In sum, inclusion and retention of these poor-performing MainStay funds resulted in more than $68 million in losses to plan participants compared to NYL's selected benchmarks and more than $78 million compared to the Morningstar Index Benchmarks:

---

[9]  MainStay Income Builder Fund, Summary Prospectus (Feb. 28, 2020), *available at* https://www.newyorklifeinvestments.com/assets/documents/summarypro/mainstay-income-builder-fund-spro.pdf

[10]   MainStay Epoch U.S. Small Cap Fund (Feb. 28, 2020), *available at* https://www.newyorklifeinvestments.com/assets/documents/summarypro/mainstay-mackay-small-cap-core-fund-spro.pdf

| Fund Name | Losses (Present Value) | |
| --- | --- | --- |
| | Versus NYL Prospectus Benchmark | Versus Morningstar Index Benchmark |
| MainStay Epoch U.S. All Cap Fund | ($45,981,770.57) | ($49,532,561.02) |
| MainStay Income Builder Fund | ($11,557,648.82) | ($18,343,965.40) |
| MainStay Epoch U.S. Small Cap Fund[11] | ($10,900,179.00) | ($10,900,179.00) |

> b.    *The MainStay Funds were excessively expensive and would have been avoided by a non-conflicted plan fiduciary.*

144.    The Fiduciary Committee Defendants' improper bias towards NYL proprietary funds as investments for the Plans harmed participants while benefitting New York Life by providing corporate revenue from the fund fees and supporting NYL's asset management business.

145.    Defendant New York Life Investment Management LLC, an indirect wholly owned subsidiary of New York Life, established and manages the MainStay Funds. It receives fees for managing the MainStay Funds.

146.    The fees for the MainStay proprietary funds far exceeded the average fee paid by similarly situated plan investors for similar funds and sometimes for effectively the same fund.

147.    The Fiduciary Committee Defendants selected and failed to remove the MainStay Funds from the Plan's lineup even though they were more expensive than virtually identical funds and could not match the performance benchmarks that New York Life itself chose to evaluate performance of these funds.

148.    **The MainStay Epoch U.S. All Cap Fund** has an expense ratio of 89 basis points for the share class offered by the Plans.[12]   Epoch Investment Partners, Inc. manages a separate

---

[11] Losses incurred through the selection and retention of the Epoch U.S. Small Cap Fund are computed through March 31, 2019.

[12] One basis point is the equivalent of one one-hundredth of one percent.

account that uses an identical strategy as the MainStay Epoch U.S. All Cap Fund, but has an expense ratio of only 60 basis points, 33% cheaper than what the Plans pay for the same strategy.

149.   Until June 26, 2018, the Plans were invested in a more expensive share class of the MainStay Epoch U.S. All Cap Fund, which had an expense ratio of at least 92 basis points.

150.   The Investment Company Institute has reported publicly that the average expense ratio that 401(k) plans with assets over $1 billion paid for domestic equity funds was 36 basis points and its reported findings show that, on average, plans with greater assets pay less in fees for domestic equity funds.[13] Thus, the average domestic equity fund expense ratio for 401(k) plans of the same size as the Master Trust here that holds the Plan's assets of $4.3 billion would be substantially lower than 36 basis points in 2016.

151.   Additionally, given the Fund's inability to beat its benchmark, the Russell 3000, the Plans could have paid just 8 basis points, or 91% less, to invest in a Russell 3000 index fund. As shown above, had Defendants replaced the MainStay Epoch U.S. All Cap Fund with a Russell 3000 index fund at the start of the Class Period, the Plans' participants would have earned nearly $46 million more.

152.   Outside investors (i.e., plans not controlled by the Fiduciary Committee Defendants) lost confidence in the MainStay Epoch U.S. All Cap Fund during the Class Period and divested. Based on the best information available to Plaintiff, the Fund experienced approximately $275 million in net outflows during the Class Period—almost half of the Fund's total assets under management.

---

[13] The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016 (June 2019), *available at* https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

153.    The Fiduciary Committee Defendants should never have chosen and retained the MainStay Epoch U.S. All Cap Fund because it charged 89 basis points[14] when the weighted average fee for plans with assets greater than $1 billion is 36 basis points, and it substantially underperformed the benchmark that NYL itself chose to evaluate the Fund's performance for the 1, 3, 5 and 10-year historical periods (as discussed above). Very few other plan investors chose the MainStay Epoch U.S. All Cap Fund, the assets of which were substantially attributable to the two NYL 401(k) Plans.

154.    **The MainStay Income Builder Fund** has an expense ratio of 67 basis points for the share class offered by the Plans. Many reputable managers offer funds in the same World Allocation Morningstar Category as the MainStay Income Builder Fund that are less expensive and have performed better. For instance, the American Funds Global Balanced Fund is 27% cheaper than the MainStay alternative and has garnered 1,400% more assets than the MainStay Income Builder Fund. Similarly, the Vanguard Global Wellington has an expense ratio of just 34 basis points, or 49% that of the MainStay Income Builder Fund.

155.    Until June 26, 2018, the Plans were invested in a more expensive share class of the MainStay Income Builder Fund, which had an expense ratio of at least 76 basis points.

156.    Based on the Investment Company Institute publicly available report, for Balanced Funds, the average expense ratio for 401(k) plans with assets over $1 billion paid was 31 basis points in 2016 (and was decreasing over time).[15] Thus, the average expense ratio for 401(k) plans of the same size as the Master Trust here that holds the Plans' assets of $4.3 billion would likely

---

[14] One basis point is the equivalent of one one-hundredth of one percent meaning 1% is equal to 100 basis points. This is the most common metric for reporting fund fees.

[15] The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016 (June 2019) *available at* https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

be lower than 31 basis points in 2016 and substantially lower now. The substantially greater fees the Plans paid for the MainStay Income Builder Fund were not justified given the Fund's substantial underperformance compared to its own self-identified benchmark.

157.   **The MainStay Epoch U.S. Small Cap Fund** has an expense ratio of 98 basis points for the share class that was offered by the Plans. The fund that belatedly replaced the MainStay Epoch U.S. Small Cap Fund, the Fidelity Small Cap Index Fund, has an expense ratio of only 2.6 basis points, or 97% cheaper than what the Plans paid for the lagging proprietary Fund.

158.   The substantially greater fees the Plans paid for the MainStay Epoch U.S. Small Cap Fund were not justified given the Fund's substantial underperformance compared to its own self-identified benchmark and the substantially cheaper Fidelity fund that replaced it.

159.   **The MainStay Retirement Funds.** The Fiduciary Committee Defendants selected five NYL proprietary target-date funds for the Plans' fund menu in 2013: the MainStay Retirement 2010 Option Fund, MainStay Retirement 2020 Option Fund, MainStay Retirement 2030 Option Fund, MainStay Retirement 2040 Option Fund, and the MainStay Retirement 2050 Option Fund (together referred to as the "Mainstay Retirement Funds)."[16]

160.   At the time the Fiduciary Committee Defendants selected the five MainStay Retirement Funds for the Plans, these NYL proprietary funds had very little in accumulated assets from outside investors with just $0.36 billion in assets under management in 2012. By comparison, Vanguard, the target-date manager the Plans later used to replace the underperforming MainStay Retirement Funds, managed $124 billion in its target-date strategy, which means that NYL's

---

[16] The Fiduciary Investment Committee's predecessor, the Board of Trustees, selected and retained the MainStay Retirement Funds on the Plans' investment menu at all relevant times until January 1, 2019, when the Fiduciary Investment Committee was created and populated with all the members of the Board of Trustees.

proprietary target-date presence (assets under management) in the market was just 0.3% of Vanguard's target-date presence at the time the Fiduciary Committee Defendants self-servingly selected the proprietary MainStay Retirement Funds for the Plans' investment lineups.

161.    In fact, since 2014 the Vanguard Target Retirement Funds[17] have been and continue to be the most popular target-date funds in the marketplace. As Morningstar explained in its 2014 Target-Date Series Research Paper, "Vanguard's [target-date] series remains one of the strongest examples of how a low-cost model—its weighted average fees are the second-lowest in the industry—translates to better results in the long run." As Morningstar reported, Vanguard's success and strong performance were in large part due to its reasonable fee of 15 basis points in 2012 (the asset weighted expense ratio for Vanguard's Target Retirement Funds). By contrast, Morningstar reported that MainStay Retirement Funds charged an asset-weighted expense ratio of 114 basis points, and SEC reports likewise show that the lowest-cost share class for the MainStay Retirement Funds was over 100 basis points. Public reporting shows that in 2016, the lowest-cost share class offered by the MainStay Retirement Funds was 83 basis points.

162.    Morningstar's analysis was indeed borne out by the comparative returns of the expensive MainStay Retirement Funds, which underperformed the Vanguard Target Retirement Funds on a trailing 1-year, 3-year, 5-year and 10-year basis as of 12/31/2018.[18]

163.    In fact, at the time the Vanguard Target Retirement Funds replaced the MainStay Retirement Funds (early 2019), Vanguard's Funds managed $649 billion in target-date assets, compared to the MainStay Funds which managed only $0.64 billion based on public reporting.

---

[17] For a list of the Vanguard Target Retirement Funds, see ¶ 164 below.
[18] This is true for all the MainStay Retirement Funds *except* the MainStay Retirement 2010 Fund, which underperformed the Vanguard Inst'l Target Retirement Income Fund on a 1-year, 3-year and 5-year historical basis.

This means that from the time the Fiduciary Committee Defendants selected their own proprietary funds for the Plans until they corrected their error in 2019, NYL's comparative size continued to decline, such that NYL's target-date assets were just 0.099% of Vanguard's target-date assets.

164.    Belatedly, in March of 2019 the Fiduciary Committee Defendants replaced the MainStay Retirement Funds with a suite of Vanguard target-date funds: namely the Vanguard Institutional Target Retirement Income Fund, Vanguard Institutional Target Retirement 2020 Fund, Vanguard Institutional Target Retirement 2030 Fund, Vanguard Institutional Target Retirement 2040 Fund, and the Vanguard Institutional Target Retirement 2050 Fund (collectively the "Vanguard Target Retirement Funds"). However, given the excessive fees and the sustained poor performance of the MainStay Retirement Funds, these proprietary funds never should have selected, much less retained.

165.    In fact, when Defendants finally replaced the expensive MainStay Retirement Funds, they were able to secure the market-leader Vanguard Target Retirement Funds for just 9 basis points in fees compared to the 83 basis points the MainStay Retirement Funds charged.[19] In other words, the Plans' participants paid just 1/9 of the previous fees after Defendants finally recognized that the Vanguard Target Retirement Funds were superior target-date funds and much cheaper than the MainStay Retirement Funds.

166.    The Vanguard Target Retirement Funds are appropriate comparators to evaluate the MainStay Retirement Funds because they have similar asset allocation among the underlying asset classes. For example, at year end 2015, the MainStay Retirement 2050 Fund's asset allocation

---

[19] Plaintiffs must rely on public information for the fees charged by the MainStay Retirement Funds because when Plaintiff Krohnengold sought fee information from NYL as the Plan Administrator for the last six years, NYL declined to provide this fee information.

was 89% equity and 11% fixed income, while the Vanguard Target Retirement 2050 Fund had an asset allocation of 90% equity and 10% fixed income.

167.    In addition, the participant holdings in the MainStay Retirement Funds were mapped into the Vanguard Retirement Funds in March of 2019, and thus Defendants themselves have shown their view that the Vanguard Retirement Funds are reasonably similar to the MainStay Retirement Funds.

168.    In total, the Plans' participants were required to pay in excess of tens of millions of dollars in fees to NYL due to the Fiduciary Committee Defendants' retention of the at-issue MainStay proprietary funds during the Class Period. Plaintiffs have determined that if alternative comparable funds such as those listed above had been used in the Plans rather than the at-issue proprietary MainStay Funds, the Plans' participants would have paid millions less in fees during the Class Period.

169.    Additionally, the Plans' investments in the at-issue MainStay Funds in some instances consisted of a disproportionate percentage of assets under management. For example, the Plans' holdings in the MainStay Epoch U.S. All Cap Fund amounted to nearly one-third of all assets under management for that fund.

170.    The Fiduciary Committee Defendants failed to divest because it would severely impair the marketability and profitability of the NYL proprietary funds. In retaining these underperforming funds—even when other investors, including institutional investors, saw the imprudence of continuing to invest in them—the Fiduciary Committee Defendants chose NYL's business interests over the interests of the Plans' participants. As shown above, in so doing, the Fiduciary Committee Defendants caused the Plans' participants to conservatively lose more than $46 million on the MainStay Epoch U.S. All Cap Fund alone.

## VI.    CLASS ACTION ALLEGATIONS

171.    Plaintiffs bring this action derivatively on behalf of the Plans pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3).

172.    Plaintiffs also bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following class:[20]

> All participants and beneficiaries in the New York Life Insurance Employee Progress Sharing Investment Plan and the New York Life Insurance Company Agents Progress Sharing Plan who held assets in the Plans' MainStay Income Builder Fund, MainStay Epoch U.S. All Cap Fund, MainStay Epoch U.S. Small Cap Fund, MainStay Retirement 2010 Option Fund, MainStay Retirement 2020 Option Fund, MainStay Retirement 2030 Option Fund, MainStay Retirement 2040 Option Fund, and/or MainStay Retirement 2050 Option Fund, or who had assets that were defaulted into the Plans' Fixed Income Account option, on or after March 2, 2015. The Fiduciary Committee Defendants and their beneficiaries and immediate families are excluded from the class.

173.    Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1) and/or (b)(3).

174.    The Class satisfies the numerosity requirement because it is composed of thousands of persons. The Plans together have more than 29,600 participants. The number of Class members is so large that joinder of all its members is impracticable.

175.    Common questions of law and fact include (among other things):

    a)    Whether the Fiduciary Committee Defendants were and are ERISA fiduciaries responsible for selecting, monitoring, retaining, and removing (where appropriate) the Plans' investment options;

---

[20] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

b)  Whether the Fiduciary Committee Defendants were and are ERISA fiduciaries responsible for determining, monitoring, retaining, and changing (if necessary) the Plans' default investment designation during the Class Period, and for depositing and investing monies in the Plans by default where participants have not chosen an investment option;

c)  Whether the Fixed Dollar Account is a Qualified Default Investment Alternative;

d)  Whether the Fiduciary Committee Defendants had a prudent and loyal investment review and monitoring process during the Class Period;

e)  Whether a prudent and loyal fiduciary would have maintained the Fixed Dollar Account as the Plans' designated default investment during the Class Period, and deposited and invested Plan assets in that fund by default;

f)  Whether a prudent and loyal fiduciary would have selected and retained the at-issue MainStay Funds as investment options the during the Class Period;

g)  Whether the Fiduciary Committee Defendants breached their ERISA fiduciary duties;

h)  Whether Defendants caused the Plans to engage in prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106, during the Class Period;

i)  Whether NYL is subject to liability as a co-fiduciary pursuant to 29 U.S.C. § 1105;

j)  The amount of losses suffered by the Plans as a result of Defendants' fiduciary breaches and prohibited transactions; and

k) The proper form of equitable and injunctive relief.

176.    Plaintiffs' claims are typical of the claims of the Class because (a) they participated one or more of the Plans during the Class Period, they invested in one or more of the at-issue funds during the Class Period, they were treated consistently with other Class members, and the Plans' fiduciaries were obligated to treat all Class members similarly because ERISA imposes uniform standards of conduct on fiduciaries; (b) both the Employee Plan and Agents Plan are invested in the same funds, both Plans' default investment is the Fixed Dollar Account, all assets of the Plans reside in the Master Trust, and, to the extent Plaintiffs seek relief on behalf of the Plans pursuant to § 502(a)(2) of ERISA, their claims are not only typical of, but the same as a claim under § 502(a)(2) brought by any other Class member; (c) to the extent Plaintiffs seek equitable relief, that relief would affect all Class members equally; and (d) all of the Class members were injured and continue to be injured in the same manner by the alleged breaches of fiduciary duty.

177.    Plaintiffs will fairly and adequately protect the interests of the Class and are committed to the vigorous representation of the Class. Plaintiffs' counsel is Cohen Milstein Sellers and Toll PLLC ("Cohen Milstein"). Cohen Milstein's Employee Benefits Practice Group has been devoted exclusively to litigating complex ERISA class actions for over 20 years. The group has played a significant role in the development of employee benefits law and maintains a leading ERISA practice that successfully represents ERISA participants throughout the country. Plaintiffs have no interests antagonistic to or in conflict with the interests of the Class. They understand that this matter cannot be settled without the Court's approval.

178.    Plaintiffs' counsel has agreed to advance the costs of the litigation contingent upon the outcome. Counsel are aware that no fee can be awarded without the Court's approval.

179.    The Class may be certified under Rule 23(b).

a) **Rule 23(b)(1) requirements.** As an ERISA breach of fiduciary duty action, this action is a classic 23(b)(1) class action. Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants, or (B) adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

b) **Rule 23(b)(3) requirements**. This action is also suitable to proceed as a class action under Rule 23(b)(3) because questions of law and fact common to the members of the Class predominate over individual questions, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter. Moreover, the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices, and management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

49

## VII.   CAUSES OF ACTION

### <u>COUNT I</u>

**Breaches of Fiduciary Duties of Loyalty and Prudence in Violation of ERISA § 404, 29 U.S.C. § 1104**
**(Against Fiduciary Committee Defendants)**

180.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs of this Second Amended Complaint as if fully set forth herein.

181.    The Fiduciary Committee Defendants were fiduciaries of the Plans during the Class Period, and were subject to ERISA's fiduciary duties of loyalty and prudence under 29 U.S.C. § 1104(a)(1)(A) and (B) with respect to their decisions relating to the Plans' investments.

182.    The Fiduciary Committee Defendants breached their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A) and (B) by engaging in the conduct described in this Second Amended Complaint with respect to the Fixed Dollar Account, including:

  a)  Failing to prudently and loyally monitor the FDA, and whether it was an appropriate default investment for the Plans, during the Class Period;

  b)  Retaining the FDA as the Plans' designated default investment during the Class Period;

  c)  Periodically depositing Plan contributions in the FDA by default during the Class Period without appropriate investigation;

  d)  Continuing to invest Plan assets in the FDA by default during the Class Period without appropriate investigation;

  e)  Failing to give appropriate consideration to potential alternative default investments during the Class Period;

f)  Giving an improper preference to the FDA over potential alternative default investments during the Class Period in order to benefit New York Life and its affiliates, and the Fiduciary Committee Defendants themselves;

g)  Failing to replace the FDA with an appropriate alternative default investment during the Class Period that met Department of Labor Guidelines and included an appropriate mix of asset classes;

h)  Defaulting new participants into the FDA during the Class Period;

i)  Failing to prudently and loyally reassess whether the FDA was an appropriate default investment option for existing Plan participants during the Class Period;

j)  Maintaining the FDA as the Plans' default investment during the Class Period despite the fact that DOL Regulations and standard practice amongst other fiduciaries called for transitioning to a target-date fund, balanced fund, or managed account product with a mix of asset classes that offered better returns over the long term; and

k)  Engaging in prohibited transactions with respect to monies invested in the FDA by default during the Class Period.

183.   The Fiduciary Committee Defendants also breached their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A) and (B) by engaging in the conduct described in this Second Amended Complaint and the Court's prior order denying Defendants' motion to dismiss with respect to the at-issue MainStay funds, including:

a)  Failing to prudently select the MainStay Epoch U.S. All Cap Fund for the Plans' investment menus during the Class Period;

b)  Failing to prudently monitor the at-issue MainStay Funds during the Class Period;

c)  Failing to give due consideration during the Class Period to the at-issue MainStay Funds' performance relative to benchmarks (including NYL's own chosen benchmarks) and other comparable funds;

d)  Failing to give due consideration during the Class Period to the at-issue MainStay Funds' costs relative to funds with similar, if not identical, investment strategies;

e)  Retaining the at-issue MainStay Funds as investment options during the Class Period;

f)  Maintaining the at-issue MainStay Funds despite the fact that they had very little in accumulated assts from outside investors or were experiencing significant net outflows during the Class Period;

g)  Failing to give appropriate consideration to potential alternative investment options during the Class Period;

h)  Giving an improper preference to the at-issue MainStay Funds over potential alternative investment options during the Class Period in order to benefit New York Life and its affiliates, and the Fiduciary Committee Defendants themselves; and

i)  Failing to replace (or timely replace) the at-issue MainStay funds with better performing and/or less costly alternative investment options during the Class Period that would have better served the Plans and their participants; and

j) Engaging in prohibited transactions with respect to the at-issue MainStay Funds during the Class Period.

184.   As a direct and proximate result of the above breaches of fiduciary duties, the Plans and their participants and beneficiaries have suffered millions of dollars of losses in retirement assets.

185.   Pursuant to ERISA, 29 U.S.C. § 1109(a), §1132(a)(2) and §1132(a)(3), the Fiduciary Committee Defendants are liable to restore all losses to the Plans caused by these breaches of fiduciary duty, to restore to the Plans any profits New York Life made through the use of the Plans' assets, and to restore to the Plans any profits resulting from the breaches of fiduciary duties alleged in this Count.

## COUNT II

### Violations of ERISA § 406(a), 29 U.S.C. § 1106(a) for
### Engaging in Prohibited Transactions
### (Against NYL and the Fiduciary Committee Defendants)

186.   Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs of this Second Amended Complaint as if fully set forth herein.

187.   As described throughout this Second Amended Complaint, the Fiduciary Committee Defendants are fiduciaries with respect to the Plans, and NYL is a party in interest to the Plans because, among other things, it is an employer of employees and agents in the Plans. 29 U.S.C. § 1002(14)(C).

188.   ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits fiduciaries from causing plans to engage in transactions that they know or should know constitute a direct or indirect sale or exchange, or leasing, of any property between the plan and a party in interest.

189.     ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), prohibits fiduciaries from causing plans to engage in transactions that that they know or should know constitute a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest.

190.     ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits fiduciaries from causing plans to engage in transactions that that they know or should know constitute direct or indirect transfers of the Plans' assets to, or use of the Plans' assets by or for the benefit of, parties in interest.

191.     The Fiduciary Committee Defendants caused the Plans to engage in multiple party-in-interest transactions by causing the Plans to repeatedly transfer property (i.e., the Plans' assets) to NYL's general account through the inclusion of the Fixed Dollar Account as an investment option and the default investment option for both Plans.

192.     The Fiduciary Committee Defendants and Defendant NYL, by their actions and omissions, caused the Plans to: (1) exchange the Plans' assets in exchange for shares of the MainStay proprietary funds; (2) obtain services from NYL; and (3) pay, directly or indirectly, on a monthly basis, investment management and other fees to NYL in connection with the Plans' investment in the MainStay proprietary funds. These transactions constituted sales or exchanges of property between the 401(k) Plans and parties in interest, furnishing of services between the Plans and a party in interest for more than reasonable compensation, and transferring of the Plans' assets to a party in interest, in violation of 29 U.S.C. §§1106(a)(1)(A), (C) and (D).

193.     In so doing, the Fiduciary Committee Defendants caused the Plans to engage in multiple party-in-interest transactions, by causing the Plans to repeatedly benefit NYL because NYL used the Plans' assets to earn various forms of compensation and exchange the Plans' assets for shares in the MainStay Funds.

54

194.    Each exchange of interest and transfer of the Plans' assets to NYL during the Class Period constituted a separate violation of ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D).

195.    As an affiliate of the Fiduciary Committee Defendants, a party-in-interest employer of the Plans, and a corporate insider, NYL had knowledge of all facts relevant to its transactions with the Plans.

196.    Upon information and belief, NYL keeps detailed financial records which would show the transfer of assets from the Plans to NYL and internal flows of money within its general account.

197.    Pursuant to ERISA, 29 U.S.C. §1109(a), §1132(a)(2) and (a)(3), these Defendants are liable to restore all losses suffered by the Plans as a result of the prohibited transactions and disgorge all revenues received and/or earned from the fees paid out of the Plans' assets, and the use of the Plans' assets in NYL's general account, as well as other appropriate equitable relief.

## COUNT III

**Violations of ERISA §406(b), 29 U.S.C. § 1106(b)**
**(Against NYL and Fiduciary Committee Defendants)**

198.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs of this Second Amended Complaint as if fully set forth herein.

199.    As described throughout this Second Amended Complaint, Fiduciary Committee Defendants and NYL are both fiduciaries of the Plans.

200.    ERISA § 406(b), 29 U.S.C. § 1106(b) prohibits fiduciary self-dealing.

201.    Subsection (1) provides that a fiduciary shall not "deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b).

202.    Subsection (3) provides that a fiduciary shall not "receive any consideration for his

own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3).

203.   Defendants NYL and the Fiduciary Committee Defendants made decisions about the investment of the Plans' assets in ways that benefitted themselves or were in their own self-interest because: (a) NYL received many direct and indirect fees and other compensation from the Plans' investments in the proprietary funds; (b) affiliates were provided assets that were used to prop up the MainStay Funds; and/or (c) upon information and belief, the Fiduciary Committee Defendants were all executives of the Company whose compensation and promotion levels increased when they acted to increase revenue for NYL.

204.   Defendants NYL and the Fiduciary Committee Defendants' decisions were based on the Company's and their own self-interest and therefore violated ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

205.   Defendants NYL and the Fiduciary Committee Defendants' self-dealing between themselves as fiduciaries and the Plans also resulted in the receipt of Plan assets in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

206.   As a direct and proximate result of the above violations of ERISA §§ 406(b)(1), and (b)(3), 29 U.S.C. §§ 1106(b)(1) and (b)(3), the Plans and their participants suffered millions of dollars of losses in retirement assets, for which all Defendants named in this Count are jointly and severally liable.

207.   Pursuant to ERISA, 29 U.S.C. §1109(a), §1132(a)(2) and (a)(3), these Defendants are liable to restore all losses suffered by the Plans as a result of the prohibited transactions and disgorge all revenues received and/or earned from the fees paid out of the Plans' assets, and the use of the Plans' assets in NYL's general account, as well as other appropriate equitable relief.

## COUNT IV

### Violations of ERISA § 405(a), 29 U.S.C. § 1105(a) for
### Breaches of Fiduciary Duty of Co-Fiduciaries
### (Against NYL)

208.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs of this Second Amended Complaint as if fully set forth herein.

209.    New York Life is a Named Fiduciary to the Plan pursuant to the governing terms of the Plan.

210.    Section 405(a)(1) of ERISA, 29 U.S.C. § 1105(a)(1) imposes co-fiduciary liability on NYL for the knowing participation in a breach of fiduciary duty by other fiduciaries.

211.    Defendant NYL knew that the purchases of interests in the MainStay Funds and the Fixed Dollar Account constituted violations of 29 U.S.C. § 1106(a)(1)(A) because NYL is responsible for the Plan's Form 5500 disclosures which stated that the Plan's investments in the MainStay Funds and the Fixed Dollar Account were party-in-interest transactions.

212.    Defendant NYL knowingly participated in purchases of interests in the MainStay Funds and the Fixed Dollar Account, which constituted violations of 29 U.S.C. § 1106(a)(1)(A), because NYL sponsors and manages those investments and thus maintains records of the investors therein.

213.    Defendant NYL knew that the receipt of fees and expenses from Plan assets in connection with the Plan's investment in the MainStay Funds and the Fixed Dollar Accounts, constituted violations of 29 U.S.C. § 1106(a)(1)(D) because NYL is responsible for the Plan's Form 5500 disclosures which indicate that the Plans' payment of fees to NYL constituted party in interest transactions.

214.     Defendant NYL knowingly participated in the receipt of fees and expenses from Plan assets in connection with the Plan's investment in the MainStay Funds and the Fixed Dollar Accounts, which constituted violations of 29 U.S.C. § 1106(a)(1)(D), because NYL received those fees and expenses from the Plan's assets.

215.     Therefore, pursuant to ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), NYL has co-fiduciary responsibility for its knowing participation in the violations of 29 U.S.C. § 1106(a)(1)(A) and (D) caused by other Plan fiduciaries.

216.     Section 405(a)(3) of ERISA, 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary if he knows of a breach by a co-fiduciary and fails to make reasonable efforts to remedy it.

217.     As alleged above, Defendant NYL knew of all the facts and circumstances surrounding the violations of 29 U.S.C. § 1106(a)(1)(A) and (D) yet failed to make reasonable efforts under the circumstances to remedy the breach.

218.     NYL could have remedied the violations of 29 U.S.C. § 1106(a)(1)(A) and (D) by returning the Plan's investment of assets and restoring the fees and expenses it received from the Plan.

219.     Therefore, pursuant to ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), NYL has co-fiduciary responsibility for the violations of 29 U.S.C. § 1106(a)(1)(A) and (D) caused by other Plan fiduciaries.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of the Plans and the Class, demand judgment against Defendants on each Count of the Second Amended Complaint and the following relief:

a) An order that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

b) Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

c) A declaration that the Fixed Dollar Account is not a Qualified Default Investment Option and the Fiduciary Committee Defendants are not afforded protection from liability for their decision to direct the accounts of Plan participants into the Fixed Dollar Account by default;

d) A declaration that Defendants breached their fiduciary duties and/or engaged in prohibited transactions in the manner described herein;

e) An order compelling each fiduciary found to have breached his/her/its fiduciary duty to the Plans to jointly and severally pay such amount or surcharge to the Plans as is necessary to make the Plans whole for any losses which resulted from said breaches, plus pre-judgement and post-judgment interest;

f) An order that all Defendants disgorge and pay to the Plans all profits obtained from violations of 29 U.S.C. §§ 1104, 1105, or 1106;

g) An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

h) An order that Defendants provide all accountings necessary to determine the amounts Defendants must remit to the Plans under 29 U.S.C. § 1109(a) to restore the Plans' losses and any profits Defendants obtained from the use of the Plans' assets in connection with violations of 29 U.S.C. §§ 1104, 1105, or 1106;

i)   To the extent necessary, an injunction or order creating a constructive trust into which all ill-gotten gains, fees and/or profits paid to any of the Defendants in violation of ERISA shall be placed for the sole benefit of the Plans and their participants and beneficiaries. This includes, but is not limited to, the ill-gotten gains, fees and/or profits paid to any of the Defendants that have been wrongly obtained as a result of breaches of fiduciary duty or prohibited transactions or other violations of ERISA described herein;

j)   An order removing the fiduciaries who have breached their fiduciary duties their roles as fiduciaries for the Plans, and an order appointing an independent fiduciary to manage the assets of the Plans;

k)   An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

l)   An order removing the Fixed Dollar Account as the designated default investment for the Plans;

m)  An award of pre-judgment interest;

n)   An award of attorneys' fees and costs pursuant to ERISA, 29 U.S.C. § 1132(g), the common fund doctrine, and/or Federal Rule of Civil Procedure 54; and

o)   An award of such other and further relief as the Court deems equitable and just.

Dated:  September 7, 2022                     Respectfully submitted,

*/s/ Kai H. Richter*
_____
Michelle C. Yau (admitted *Pro Hac Vice*)
Kai H. Richter (admitted *Pro Hac Vice*)
Daniel R. Sutter (admitted *Pro Hac Vice*)
Eleanor Frisch (*Pro Hac Vice* forthcoming)
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
myau@cohenmilstein.com
krichter@cohenmilstein.com
dsutter@cohenmilstein.com
efrisch@cohenmilstein.com

Michael Eisenkraft (NY. Bar No. 664737)
**Cohen Milstein Sellers & Toll PLLC**
88 Pine Street
14th Floor
New York, New York 10005
Tel: (212) 838-7797
Fax: (212) 838-7745
meisenkraft@cohenmilstein.com