## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STUART KROHNENGOLD, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:21-cv-01778 |
| NEW YORK LIFE INSURANCE CO., et al. | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 1

I. The Plans and the Committees................................................................ 1

II. The FDA ................................................................................................. 3

III. The At-Issue MainStay Funds ............................................................... 8

IV. The Plaintiffs......................................................................................... 11

ARGUMENT ........................................................................................................... 12

I. Plaintiffs Lack Standing to Represent Defaulted EPSI Plan Participants or Beneficiaries in the FDA Default Subclass. ...................................................... 12

II. Plaintiffs Have Not Satisfied Their Evidentiary Burden of Proving that Rule 23's Requirements Are Met. ...................................................... 13

A. Plaintiffs Have Not Satisfied Their Burden of Proving Typicality as to the FDA Default Subclass or MainStay Funds Class...................... 13

1. Some FDA Default Subclass members did not remain defaulted and/or chose to remain invested in the FDA................ 14

2. The FDA is a particularly appropriate default for certain individuals................................................................................... 16

3. Some FDA and At-Issue MainStay Funds investors achieved higher returns due to the Plans' use of those funds............................................................................................ 18

B. Plaintiffs Have Not Satisfied Their Burden of Proving Commonality............................................................................................ 20

1. The FDA Class requires year-by-year inquiries. ........................ 21

2. The MainStay Funds Class requires fund-by-fund inquiries. ...... 22

C. Plaintiffs Have Not Satisfied Their Burden of Proving Ascertainability as to the FDA Default Subclass.................................... 23

CONCLUSION......................................................................................................... 25

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allen v. City of N.Y.*,
  No. 19-3786, 2023 WL 171402 (S.D.N.Y. Jan. 12, 2023) .....................................................13

*Appiah v. Home Depot U.S.A., Inc.*,
  No. 20-489, 2021 WL 5847150 (D. Conn. Dec. 9, 2021) ....................................................25

*B&R Supermarket, Inc. v. Mastercard Int'l Inc.*,
  No. 17-02738, 2018 WL 1335355 (E.D.N.Y. Mar. 14, 2018)..............................................15

*Beach v. JPMorgan Chase Bank, Nat'l Assoc.*,
  No. 17-563, 2019 WL 2428631 (S.D.N.Y. June 11, 2019) ..................................14, 19, 23, 25

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)...............................................................................................................15

*Cunningham v. Cornell Univ.*,
  No. 16-6525-PKC, 2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) ........................................17

*Cunningham v. Cornell Univ.*,
  No. 16-6525-PKC, 2019 WL 275827 (S.D.N.Y. Jan. 22, 2019) ...........................................14

*In re Digit. Music Antitrust Litig.*,
  321 F.R.D. 64 (S.D.N.Y. 2017) ...........................................................................................16

*Ebin v. Kangadis Food Inc.*,
  297 F.R.D. 561 (S.D.N.Y. 2014) .........................................................................................25

*Falberg v. Goldman Sachs Grp., Inc.*,
  No. 19-9910-ER, 2022 WL 538146 (S.D.N.Y. Feb. 14, 2022) ............................................25

*Gates v. United Health Grp. Inc.*,
  No. 11-3487-KBF, 2012 WL 2953050 (S.D.N.Y. July 16, 2012).........................................13

*Gatto v. Sentry Servs., Inc.*,
  No. 13-5721, 2014 WL 7338721 (S.D.N.Y. Dec. 19, 2014) .................................................23

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982).............................................................................................................14

*Haley v. Tchrs. Ins. and Annuity Ass'n*,
  54 F.4th 115 (2d Cir. 2022) .................................................................................................21

*Haley v. Tchrs. Ins. and Annuity Ass'n*,
    No. 17-855-JPO, 2023 WL 4198746 (S.D.N.Y. June 27, 2023) ...........................................21

*Hasemann v. Gerber Prods. Co.*,
    No. 15-2995, 2019 WL 2250687 (E.D.N.Y. Feb. 20, 2019) ...................................................20

*Henry v. Champlain Enters.*,
    445 F.3d 610 (2d Cir. 2006)...................................................................................................22

*Hubert v. Med. Info. Tech., Inc.*,
    No. 05-10269, 2007 WL 9797660 (D. Mass. Mar. 20, 2007) ...............................................19

*Jacobs v. Verizon Commc'ns Inc.*,
    No. 16-1082, 2020 WL 4601243-RWL (S.D.N.Y. June 1, 2020)..........................................25

*Kindle v. Dejana*,
    315 F.R.D. 7 (E.D.N.Y. 2016)...............................................................................................23

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
    323 F.R.D. 145 (S.D.N.Y. 2017) ...............................................................................14, 21, 23

*Leyse v. Lifetime Ent. Servs., LLC*,
    679 F. App'x 44 (2d Cir. 2017) .............................................................................................25

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) ....................................................................................14, 23

*Moreno v. Deutsche Bank Ams. Holding Corp.*,
    No. 15-9936-LGS, 2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017)....................................14, 23

*O'Shea v. Littleton*,
    414 U.S. 488 (1974)...............................................................................................................12

*In re Principal U.S. Prop. Acct. ERISA Litig.*,
    No. 10-00198, 2013 WL 7218827 (S.D. Iowa Sept. 30, 2013) ........................................14, 19

*Ret. Bd. of the Policemen's Annuity and Benefit Fund of the City of Chi. v. Bank
    of N.Y. Mellon*,
    775 F.3d 154 (2d Cir. 2014)...................................................................................................13

*Ruggles v. WellPoint, Inc.*,
    272 F.R.D. 320 (N.D.N.Y. Feb. 22, 2011) ............................................................................12

*Saleem v. Corp. Transp. Grp., Ltd.*,
    No. 12-8450, 2013 WL 6061340 (S.D.N.Y. Nov. 15, 2013) ......................................13, 20, 21

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).........................................................................................................20, 21

**Statutes**

29 U.S.C. § 1108(b)(5), ERISA § 408(b)(5)......................................................................22

**Other Authorities**

29 C.F.R.§ 2550.404c–5(e)(4)(iv)(B) (2008) ................................................................16

Class Exemption Involving Mutual Fund In-House Plans Requested by the
    Investment Company Institute, 42 Fed. Reg. 18734 (Apr. 8, 1977)......................................23

Fed. R. Civ. P. 23(b)(3)......................................................................................................21

**INTRODUCTION**

Plaintiffs' Motion for Class Certification[1] should be denied.  Plaintiffs have not shown that determining breach or loss in this case can be determined in one fell swoop across all the at-issue funds at once; instead, their own brief and the declaration of their expert demonstrate that, in this ERISA case, a fund-by-fund analysis with facts and evidence specific to each fund will be required, regardless of how other plaintiffs have presented other ERISA cases.  Moreover, the unique nature of the central claim here—that the nearly risk-free, high-performing FDA should not have been used as a default during the Putative Class Period—places that claim, too, well outside any other ERISA case that Plaintiffs identify.  No Plaintiff has standing to represent members of the FDA Default Subclass as it relates to one of the Plans, and Plaintiffs have otherwise failed to meet their burden to demonstrate that such subclass could be certified at all.  For these and the other reasons set forth below, Plaintiffs' Motion should be denied.

**BACKGROUND**

**I.    The Plans and the Committees**

Over 20,000 individuals have participated in the two NY Life retirement plans at issue in this case during the Putative Class Period:  the EPSI Plan, offered to eligible employees, and the APSI Plan, offered to eligible full-time agents.[2]  The agents in the APSI Plan include sophisticated individuals:  many have licenses to sell investment and insurance products, which are obtained after passing examinations regarding topics such as how to make investment

---

[1] The "Motion."  Plaintiffs' memorandum is the "Pls.' Br."  This suit concerns the New York Life Insurance Company Employee Progress Sharing Investment Plan ("EPSI Plan") and the New York Life Insurance Company Agents Progress Sharing Investment Plan ("APSI Plan") (collectively, the "Plans," and each a "Plan").  Plaintiffs challenge the use in the Plans of the Fixed Dollar Account ("FDA"), as well as the MainStay Income Builder Fund ("Income Builder Fund"), MainStay Epoch U.S. All Cap Fund ("All Cap Fund"), MainStay Epoch U.S. Small Cap Fund ("Small Cap Fund"), and the MainStay Retirement Funds ("Retirement Funds") (collectively, the "At-Issue MainStay Funds").  The "Putative Class Period" is March 2, 2015 to the present.  Mot. at 2.

[2] EPSI Plan governing document ("Plan Document") at NYL-KROHNENGOLD-00005817–19, 5822, Declaration of David Rosenberg ("Rosenberg Decl.") Ex. 10; APSI Plan Document at NYL-KROHNENGOLD-00006024–25, 6034, Rosenberg Decl. Ex. 11; Expert Declaration of Bruce Strombom ("Strombom Decl.") Ex. 1.

recommendations for clients.[3]

      The Plans are separate legal entities and have separate governing Plan Documents, setting forth different rules.[4]  For example, the EPSI Plan enrolls employees who have not yet joined the plan automatically after their sixtieth day of employment, and invests a portion of their compensation in the EPSI Plan's default investment option unless the individual opts out.[5]  By contrast, the APSI Plan has no automatic enrollment feature.[6]  Agents may receive an annual APSI Plan contribution from NY Life, which is currently based on a specified percentage of net renewal commissions, net renewal premiums and cash values for certain policies that were sold by the agent, regardless of whether that individual already had an APSI Plan account, but do not receive a matching contribution; by contrast, EPSI participants receive a match but not a contribution based on their performance.[7]  Individuals may not participate in both Plans at the same time.[8]

      The Plans' investment options are selected, monitored, and, where appropriate, removed or replaced by the Plans' Fiduciary Investment Committees (together with their predecessor entities, the "Committees").[9]  The Committees have met at least quarterly throughout the Putative Class Period to conduct this work.[10]  The Committees have been assisted by independent investment consultants throughout the Putative Class Period:  LCG Associates, Inc.

---

[3] *E.g.*, Tr. of the Dep. of Joseph Bendrihem ("Bendrihem Tr.") 18:2–41:9, Rosenberg Decl. Ex. 4.
[4] *See generally* EPSI Plan Document, Rosenberg Decl. Ex. 10; APSI Plan Document, Rosenberg Decl. Ex. 11.
[5] EPSI Plan Document at NYL-KROHNENGOLD-00005834–35, Rosenberg Decl. Ex. 10; EPSI Plan Enrollment Kit at NYL-KROHNENGOLD-00101058, Rosenberg Decl. Ex. 41.
[6] *See generally* APSI Plan Document, Rosenberg Decl. Ex. 11.
[7] 2020 APSI Plan Company Contribution Communication at NYL-KROHNENGOLD-0038972–73, Rosenberg Decl. Ex. 39; EPSI Plan Document at NYL-KROHNENGOLD-00005842–43, Rosenberg Decl. Ex. 10.  *See generally* APSI Plan Document, Rosenberg Decl. Ex. 11.
[8] EPSI Plan Document at NYL-KROHNENGOLD-00005833–34, Rosenberg Decl. Ex. 10; APSI Plan Document at NYL-KROHNENGOLD-00006046–47, Rosenberg Decl. Ex. 11.
[9] EPSI Plan Document at NYL-KROHNENGOLD-00005912–14, Rosenberg Decl. Ex. 10; APSI Plan Document at NYL-KROHNENGOLD-00006123–24, Rosenberg Decl. Ex. 11.
[10] *E.g.*, Minutes (Apr. 20, 2018), Rosenberg Decl. Ex. 25.

("LCG") until approximately September 19, 2019, and then NEPC (together with LCG, the "Consultants").[11] The Consultants provided data and delivered reports and recommendations to the Committees at nearly all of the Committees' meetings regarding the Plans' investment options, which the Committees considered in monitoring the Plans' investment options.[12]

During the Putative Class Period, 21 investment options have been made available under the Plans, 12 of which are investments managed by unaffiliated managers like Vanguard, Fidelity, and Blackrock, and others have been managed by NY Life or its affiliate, New York Life Investment Management LLC.[13] The Second Amended Complaint (ECF No. 62, the "SAC") challenges five of those investments: the FDA, the All Cap Fund, the Small Cap Fund, the Income Builder Fund, and the Retirement Funds. SAC ¶ 90.

## II.   **The FDA**

The FDA is a contract issued to the Plans by NY Life, which provides a general account investment offering a virtually risk-free return exceeding those of stable value funds in the market, and competitive with (or even exceeding) fixed-income alternatives.[14]

The FDA's crediting rate is set in advance annually for the next year, and each year the Committees evaluate the proposed rate and determine whether the FDA remains an appropriate choice for the Plans given the rate to be used for the upcoming year.[15] The specifics of the rate and the review—and the market as a whole—varied year-to-year. For example, in 2016 the Committees felt the proposed rate was too low, and they negotiated with NY Life to raise the rate

---

[11] Minutes (Sept. 19, 2019) at NYL-KROHNENGOLD-00012084, 12087, Rosenberg Decl. Ex. 27.

[12] *See generally* Minutes (Apr. 20, 2018), Rosenberg Decl. Ex. 25.

[13] Strombom Decl. Ex. 2A.1.

[14] 2022 Annual Fee Disclosure at NYL-KROHNENGOLD-00101054, Rosenberg Decl. Ex. 37. *See generally* FDA Contract, Rosenberg Decl. Ex. 14. The only risk to investors is the risk of default by NY Life, a mutual life insurance company that has operated for over 175 years without defaulting and which has the highest rankings currently awarded by ratings agencies. *E.g.*, AM Best's Company Report at NYL-KROHNENGOLD-00070386 (A++ rating), Rosenberg Decl. Ex. 42.

[15] *E.g.*, Minutes (Dec. 2, 2016) at NYL-KROHNENGOLD-00038173, 38176, Rosenberg Decl. Ex. 22.

3

from 4.30% to 4.40% and therefore increase the return for FDA investors that year, determining that this negotiated rate was appropriate for the Plans.[16]  By contrast, in other years, including 2020, the Committees accepted the proposed rate because they believed it to be appropriate without further negotiation.[17]  In 2017, NY Life informed the Committees that it would alter the methodology used to calculate the FDA's rate of return to better reflect its expenses from managing the FDA.[18]  As part of their evaluation of the rate that year, and to determine whether the resulting crediting rate in 2018 would allow the Plans to participate for no more than adequate consideration, the Committees received a tailored recommendation from LCG regarding the change in expenses and resulting rate.[19]  LCG recommended retaining the FDA because the "resulting crediting rate" under the change "would remain competitive."[20]

As a result of various market factors and oversight (and, at times negotiation) by the Committees, the FDA's rate of return for the Plans has varied each year:

| Year | FDA Rate of Return[21] |
|------|------------------------|
| 2015 | 5.05% |
| 2016 | 4.80% |
| 2017 | 4.40% |
| 2018 | 4.35% |
| 2019 | 4.55% |
| 2020 | 4.30% |
| 2021 | 3.80% |
| 2022 | 3.90% |

Because of its guaranteed rate, the FDA has prevented losses to participants in the Plans, even during economic downturns.  Given its favorable rate of return, it has exceeded the rate of

---

[16] *Id.*

[17] Minutes (Dec. 10, 2020) at NYL-KROHNENGOLD-00035233, 35236, Rosenberg Decl. Ex. 30.

[18] Memorandum (Dec. 14, 2017) at NYL-KROHNENGOLD-00038854, 38859, Rosenberg Decl. Ex. 23.

[19] *Id.* at NYL-KROHNENGOLD-00038862, 38870.

[20] *Id.* at NYL-KROHNENGOLD-00038863, 38871.

[21] 2016 Annual Fee Disclosure at NYL-KROHNENGOLD-00006588, Rosenberg Decl. Ex. 34; 2018 Annual Fee Disclosure at NYL-KROHNENGOLD-00006605, Rosenberg Decl. Ex. 35; 2020 Annual Fee Disclosure at NYL-KROHNENGOLD-00006627, Rosenberg Decl. Ex. 36; 2022 Annual Fee Disclosure at NYL-KROHNENGOLD-00101054, Rosenberg Decl. Ex. 37.

volatile products available in the market.  For example, in 2015, 2018, and 2022, the FDA outperformed by wide margins the target-date funds managed by Vanguard to which Plaintiffs and their expert compare the FDA (the "Vanguard TDFs"):  5.05% to -1.02% (2015), 4.35% to -5.40 % (2018), and 3.90% to -15.48% (2022).[22]

The FDA is a "very popular choice" among the Plans' participants.[23]  Many of these individuals, including some of NY Life's senior executives, have affirmatively elected to invest all or portions of their Plan accounts in the FDA.[24]  In the years when it has been selected as the Plans' default (including the Putative Class Period), the Committees believed that the FDA was appropriate for all investors due to its risk-free and generous rate of return.[25]  Indeed, when the Committees replaced the Income Builder Fund (f/k/a Income Manager) with the FDA as the Plans' default in 2009, LCG advised that it would be "prudent" to utilize the FDA as the default because it allows participants "to get the benefit of a competitive yield with no exposure to the loss of invested capital" and the Committees further received a memorandum from an ERISA law firm that opined that the Committees had "follow[ed] the correct process . . . in determining to designate the [FDA] as the Plans' default option." [26]  Even Plaintiffs have agreed that the FDA could be an appropriate default for "elderly participant[s]" "with ample retirement assets."  Pls.' Opp. to Defs.' Partial Mot. to Dismiss ("MTD Opp.") at 14 n.3, ECF No. 75.

Although both Plans use the FDA as a default, the circumstances in which individuals may be defaulted vary, given the Plans' different structures.  Individuals in the EPSI Plan are defaulted into the FDA if they (i) are auto-enrolled into the EPSI Plan; (ii) roll money into the

---

[22] Strombom Decl. ¶ 38 & Ex. 11C.
[23] Tr. of the Dep. of Katherine O'Brien ("O'Brien Tr.") 122:3–123:5, Rosenberg Decl. Ex. 2.
[24] Tr. of the Dep. of Arthur Seter ("Seter Tr.") 245:17–246:20, Rosenberg Decl. Ex. 3; Strombom Decl. ¶ 29.
[25] Seter Tr. 238:24–240:8, 245:17–246:20, Rosenberg Decl. Ex. 3.
[26] Groom Memorandum (Dec. 18, 2009) at NYL-KROHNENGOLD-00150397, Rosenberg Decl. Ex. 16; LCG Memorandum (Dec. 15, 2009) at NYL-KROHNENGOLD-00150410, Rosenberg Decl. Ex. 17.

EPSI Plan without an investment election on file; or (iii) are certain types of beneficiaries or alternative payees.[27]  Individuals in the APSI Plan are similarly defaulted under (ii) and (iii); while they are not auto-enrolled, they could be defaulted if they receive the APSI Plan company contribution without an investment election on file.[28]  If a participant enrolls through either the phone or the internet, the participant must make an affirmative investment election.[29]

The Plans' independent recordkeeper, Alight, does not maintain any record indicating whether a person has been defaulted, nor does NY Life systematically maintain such data.[30] Because that data field is not contained in either Alight's or NY Life's records, identifying with certainty who was defaulted would require a "a look at every single person individually and . . . at their interaction with the [P]lan to determine if they were defaulted or not"; it is a "one-by-one" analysis requiring a "deep" review.[31]  In 2009, Ms. Mauceri, the Plans' administrator, estimated that 662 participants had been defaulted.[32]  In 2022, when NEPC sought information about the number of individuals defaulted, NY Life estimated that a larger number of participants had been defaulted.[33]  However, these were only estimates given the lack of precise data.[34]

Participants in the Plans receive disclosures informing them that the FDA is the Plans' default investment option, including in:  (i) the Plans' summary plan descriptions ("SPDs"), which are available upon request and also posted on the NY Life company intranet sites for

---

[27] Declaration of Maria Mauceri in Support of Defs.' Opp. to the Motion ("Mauceri Decl.") ¶ 7.

[28] *Id.* ¶ 8.

[29] *Id.* ¶ 5.

[30] *Id.* ¶ 9.

[31] Tr. of the Dep. of Maria Mauceri ("Mauceri Tr.") 107:23–110:12, Rosenberg Decl. Ex. 1.

[32] Minutes (Dec. 21, 2009) at NYL-KROHNENGOLD-00150403, 150407, Rosenberg Decl. Ex. 15.

[33] Email (Nov. 8, 2022) at NYL-KROHNENGOLD-00044166, Rosenberg Decl. Ex. 33.

[34] The 2022 analysis estimated (i) the number of EPSI participants defaulted because they were auto-enrolled and (ii) the number of APSI participants defaulted because they did not have an investment election on file when they received their APSI Plan company contribution.  Mauceri Decl. ¶ 10.

employees and agents, as well as on the NY Life benefits resources website; (ii) communications sent annually to all participants in the Plans; (iii) communications sent annually to agents when the annual APSI Plan company contribution is made; and (iv) enrollment guides provided to NY Life employees when they join NY Life.[35]  Through these disclosures, NY Life "strongly urge[s]" participants "to make *affirmative* investment elections that fit their personal risk tolerance and investment philosophy and not rely on the [FDA]."[36]  Defaulted participants also receive quarterly account statements regarding their Plan accounts informing them that their contributions were invested in the FDA.[37]

Ms. Mauceri is aware from her interactions with participants that certain of them chose to default into the FDA with knowledge that the FDA is the Plans' default and did so because they wished to have 100% of their Plan account invested in the FDA, or became aware of the Plans' default investment after being defaulted and chose not to change their Plan investments for the same reason.[38]  But only a person-by-person inquiry, including by asking each person questions regarding their knowledge of the FDA and the Plans' default rules and preference to invest in the FDA, could conclusively identify which of these and other individuals did so.  For example, Defendants only learned by deposing Plaintiff Thomas Lantz that during the time he participated in the APSI Plan he became aware that he had been defaulted, likely though review of his account statements, and then chose to remain in the FDA.[39]

---

[35] *E.g.*, 2019 EPSI Plan SPD at NYL-KROHNENGOLD-00007348, Rosenberg Decl. Ex. 13; 2019 APSI Plan SPD at NYL-KROHNENGOLD-00007196, Rosenberg Decl. Ex. 13; 2020 Annual EPSI Plan Communication at NYL-KROHNENGOLD-00037087, Rosenberg Decl. Ex. 38; 2020 Annual APSI Plan Communication at NYL-KROHNENGOLD-00037067, Rosenberg Decl. Ex. 39; 2022 APSI Plan Company Contribution Communication at NYL-KROHNENGOLD-00038973, Rosenberg Decl. Ex. 40; EPSI Plan Enrollment Kit at NYL-KROHNENGOLD-00101058, Rosenberg Decl. Ex. 41.
[36] *E.g.*, 2020 Annual EPSI Plan Communication at NYL-KROHNENGOLD-00037088, Rosenberg Decl. Ex. 40.
[37] Tr. of the Dep. of Claudia Gonzalez 107:9–109:22, Rosenberg Decl. Ex. 6.
[38] Mauceri Tr. 110:3–9, 111:19–22, Rosenberg Decl. Ex. 1.
[39] Tr. of the Dep. of Thomas Lantz 66:24–69:8, Rosenberg Decl. Ex. 9.

III.    **The At-Issue MainStay Funds**

The four At-Issue MainStay Funds challenged in the SAC—out of a total of eight MainStay funds that have been available under the Plans during the Putative Class Period—each offered exposure to different amounts of risk and potential return to the Plans' participants:  the All Cap Fund primarily invested in the equities of U.S. companies of all types of capitalization, the Small Cap Fund primarily invested in equities of small U.S. companies, the Income Builder Fund invested in a mix of bonds and equities, and the Retirement Funds were a suite of target-date funds that each offered exposure to a different mix of U.S. and international bonds and equities, with each vintage of the series holding a different mix, from larger concentrations of equities (*i.e.*, 2050), to a lower concentration of equities (*i.e.*, 2020).[40]  Due to their differences, each of the At-Issue MainStay Funds outperformed or underperformed their benchmarks or peers in different periods, and were removed from the Plans at different times.

*All Cap Fund.*  Plaintiffs identify the All Cap Fund as having underperformed as of December 31, 2015, and state that it next underperformed as of January 2019.  Pls.' Br. at 5–6. This gap is telling; due to its strong performance the All Cap Fund received the highest rating possible from the Consultants—Satisfactory—in all but two quarters from October 15, 2015 to September 19, 2019.[41]  And as Defendants' expert Dr. Strombom sets forth, the All Cap Fund outperformed the comparators Plaintiffs' expert uses to calculate purported damages for that fund in several quarters across 2016, 2017, and 2020.[42]  Although Plaintiffs describe a discussion of the All Cap Fund at the Committees' April 3, 2020 meeting (Pls.' Br. at 6), Plaintiffs omit that at this meeting NEPC advised the Committees that "[it] does not have any long term concerns

---

[40] Strombom Decl. ¶¶ 23–26.
[41] *Id.* App. C.
[42] *Id.* ¶ 55 & Ex. 18.

regarding [the manager]'s investment process, and does not recommend any action at this time."[43]  NEPC ultimately recommended on September 14, 2020 that the Committees remove the All Cap Fund from the Plans and the Committees voted at that meeting to do so.[44]

**Small Cap Fund.**  Plaintiffs identify underperformance of the Small Cap Fund first in March 2015 and then not again until January 2018.  Pls.' Br. at 7.  During the time period Plaintiffs bypass, the Small Cap Fund at times outperformed its peers and benchmarks.  For example, as of September 30, 2015, the Small Cap Fund had outperformed its benchmark and 75% of its peers over the prior three years.[45]  And it outperformed Plaintiffs' chosen comparators in two of four quarters in 2017, among others.[46]  On January 30, 2019, LCG recommended that the Committees remove the Small Cap Fund, and the Committees voted to do so.[47]

**Income Builder Fund.**  Plaintiffs first state that the Income Builder Fund underperformed as of the fourth quarter of 2021, nine months *after* Plaintiffs brought suit.  Pls.' Br. at 8.  Indeed, the Income Builder Fund performed very strongly over the Putative Class Period.  For example, as of March 31, 2016, the fund had beaten its benchmark over the prior three and five years, and its performance net of fees was in the top 9% of all of its peers over the preceding three and five years.[48]  Moreover, it received a Satisfactory score from the Consultants from the start of the Putative Class Period until June 11, 2020, and outperformed Plaintiffs' chosen comparators in roughly half of the quarters during the Putative Class Period.[49]  On June 30, 2022, NEPC recommended that the Income Builder Fund be removed from the Plans and the

---

[43] Minutes (Apr. 3, 2020) at NYL-KROHNENGOLD-00007409–10, 7412–13, Rosenberg Decl. Ex. 28.
[44] Minutes (Sept. 14, 2020) at NYL-KROHNENGOLD-00008379–80, 8383–84, Rosenberg Decl. Ex. 29.
[45] Minutes (Dec. 7, 2015) at NYL-KROHNENGOLD-00038621, Rosenberg Decl. Ex. 20.
[46] Strombom Decl. ¶ 55 & Ex. 19.
[47] Minutes (Jan. 30, 2019) at NYL-KROHNENGOLD-00011058–59, 11064–65, Rosenberg Decl. Ex. 26.
[48] Minutes (June 30, 2016) at NYL-KROHNENGOLD-00017411, Rosenberg Decl. Ex. 21.
[49] Strombom Decl. Decl. ¶ 55 & Ex. 19; *see also id*. App. C.

Committees discussed the recommendation.[50]  NEPC then supplemented its recommendation and the Committees voted to remove the fund from the Plans on September 19, 2022.[51]

     ***Retirement Funds.***  Unlike the other At-Issue MainStay Funds, which were added to the Plans significantly before the start of the Putative Class Period, the Committees voted to add the Retirement Funds to the Plans on May 7, 2012, after being advised by LCG that they "would be a prudent choice" for the Plans.[52]  As of June 30, 2015, all of the MainStay Retirement Funds had outperformed or matched the performance of their benchmarks over the prior year.[53] Plaintiffs first identify underperformance by the Retirement Funds in October 2016, and describe an October 2018 review of the Retirement Funds performed by LCG.  Pls.' Br. at 9–10.  But just a few months before that October 2018 review, LCG's representative advised the Committees that, due to the funds' performance, "there is no current reason to consider replacing the [Retirement Funds]."[54]  Plaintiffs' own exhibit demonstrates that performance against benchmarks varied even amongst vintages, with the 2010 vintage outperforming against benchmark for the year prior to March 31, 2017, but underperforming for the quarter, and the 2020–2050 vintages outperforming for the quarter, but not the year.[55]  Overall, the Retirement Funds outperformed Plaintiffs' chosen comparators during approximately half of the Putative Class Period.[56]  Ultimately, on January 30, 2019, LCG recommended that the Committees remove the Retirement Funds from the Plans and the Committees voted to do so.[57]

---

[50] Minutes (June 30, 2022) at NYL-KROHNENGOLD-00023251, 23253, Rosenberg Decl. Ex. 31.
[51] *See generally* Consent (Sept. 19, 2022), Rosenberg Decl. Ex. 32.
[52] Minutes (May 7, 2012), at NYL-KROHNENGOLD-00150285–86, 150289–90, Rosenberg Decl. Ex. 18.
[53] Minutes (Oct. 15, 2015) at NYL-KROHNENGOLD-00020156–60, Rosenberg Decl. Ex. 19.
[54] Minutes (Jan. 17, 2018) at NYL-KROHNENGOLD-00014211–12, 14214–15, Rosenberg Decl. Ex. 24.
[55] Investment Review (Mar. 31, 2017) at NYL-KROHNENGOLD-000016672–76, Richter Declaration Ex. 34 (ECF No. 117-34).
[56] Strombom Decl. ¶ 55 & Ex. 21.
[57] Minutes (Jan. 30, 2019) at NYL-KROHNENGOLD-00011056–57, 11062–63, Rosenberg Decl. Ex. 26.

IV.   **The Plaintiffs**

Plaintiffs are ten current and former participants in the Plans.  Pls.' Br. at 3–4.  Eight chose to invest in At-Issue MainStay Funds, and all ten invested in the FDA.  *Id.*  Of those ten, six admit they chose to invest in the FDA.  *Id.*  Of the four who claim they were invested by default, one, Wayne Antoine, participated in the EPSI Plan, and the other three in the APSI Plan. *Id.*

However, Mr. Antoine's assertions are contradicted by NY Life's and Alight's records. Mr. Antoine claims he was defaulted because he "was automatically enrolled in the [EPSI Plan]."[58]  But under the EPSI Plan's rules, he could not have been auto-enrolled, and therefore could not have been defaulted.  Auto-enrollment occurs no earlier than sixty days of employment commencing.[59]  Mr. Antoine was hired on December 9, 2013, his investment elections were recorded as of December 26 or 27, 2013, he rolled over money into the EPSI Plan on January 2, 2014—none of which was invested in the FDA—and he made his first new 401(k) contribution on January 10, 2014—all of which occurred within 60 days of hire.[60]  Further, Alight's records do not have an entry in the data field used to indicate auto-enrollment, and Mr. Antoine's Plan account was always invested in at least eight investments during the Putative Class Period.[61]

All ten Plaintiffs seek to represent a class of the Plans' participants and beneficiaries invested in the FDA (FDA Class) and the At-Issue MainStay Funds (MainStay Funds Class) during the Putative Class Period, and to represent a subclass of individuals who were defaulted into the FDA during the Putative Class Period (FDA Default Subclass).  Pls.' Br. at 4–5.

---

[58] Decl. of Wayne Antoine ¶ 3, ECF No. 47-1; *see also* Decl. of Wayne Antoine ¶ 3, ECF No. 120 (stating only that he "was invested in the Fixed Dollar Account by default").
[59] Mauceri Decl. ¶ 7.
[60] *Id.* ¶ 12.  Mr. Antoine was not defaulted into the FDA under any of the other EPSI Plan rules governing defaults. *Id.* ¶ 13.
[61] Mauceri Decl. ¶ 12; Strombom Decl. Ex. 8J.

## ARGUMENT

### I.   Plaintiffs Lack Standing to Represent Defaulted EPSI Plan Participants or Beneficiaries in the FDA Default Subclass.

The Court should deny certification of Plaintiffs' claims regarding defaulted EPSI Plan participants and beneficiaries because no Plaintiff was defaulted in the EPSI Plan.  Plaintiffs therefore lack standing to bring such claims, and may not represent a class of such individuals.

"[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."  *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).  Therefore, courts deny motions to certify classes where the named plaintiffs lack standing to sue regarding some or all of the claims.  *E.g.*, *Ruggles v. WellPoint, Inc.*, 272 F.R.D. 320, 333 (N.D.N.Y. Feb. 22, 2011) (denying motion to certify where the plaintiff was not part of the class).

Only Mr. Antoine claims he was defaulted in the EPSI Plan.  Pls.' Br. at 3–4.  While this assertion sufficed at the motion to dismiss stage (Opinion and Order at 10–11, ECF No. 58 ("Dismissal Order")), discovery has now confirmed that Mr. Antoine was not defaulted.  *Supra* p. 11.  While Mr. Antoine testified that he had a general practice of not making investment elections when enrolling in new employers' 401(k) plans, he also admitted that due to the passage of time he could not recall specifics of what happened here,[62] and his roll-over contributions—which were not invested at all in the FDA—preceded his subsequent investment in the FDA (*supra* p. 11).  His declaration and testimony therefore do not control over the evidence that he was not defaulted.  Indeed, this very discrepancy demonstrates the inherently individualized, factual inquiry inherent in trying to identify who was defaulted.

Nor do the supposedly defaulted APSI Plan Plaintiffs have class standing to represent

---

[62] Tr. of the Dep. of Wayne Antoine 44:6–23, 48:4–15, 50:20–51:17, Rosenberg Decl. Ex. 7.

defaulted EPSI Plan participants.  Class standing requires that Plaintiffs demonstrate that the conduct that allegedly caused them personal injury "implicates the same set of concerns[,]" and requires similar proof, "as the conduct alleged to have caused injury to other members of the putative class . . . ." *Ret. Bd. of the Policemen's Annuity and Benefit Fund of the City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 161–62 (2d Cir. 2014) (internal quotations omitted).  This is not the case where the Plans are distinct legal entities with different rules regarding defaults. *Supra* pp. 2, 5–6.  Indeed, the Court previously "limit[ed]" Plaintiffs' claims challenging the Plans' default investment option to the EPSI Plan where no then-present plaintiffs had standing to sue regarding APSI Plan defaults.  Dismissal Order at 12; *see also Gates v. United Health Grp. Inc.*, No. 11-3487-KBF, 2012 WL 2953050, at *9 (S.D.N.Y. July 16, 2012) (standing must be analyzed plan-by-plan).  The same logic applies here, requiring the denial of certification of any FDA Default Subclass regarding the EPSI Plan.

## II.   Plaintiffs Have Not Satisfied Their Evidentiary Burden of Proving that Rule 23's Requirements Are Met.

Plaintiffs also have not met their burden to satisfy Rule 23.  "[T]he party seeking certification must demonstrate by a preponderance of the evidence that all the requirements of [Rule 23] have been met."  *Saleem v. Corp. Transp. Grp., Ltd.*, No. 12-8450, 2013 WL 6061340, at *3 (S.D.N.Y. Nov. 15, 2013) (Furman, J.) (denying certification motion).  Courts may not "accept allegations in [plaintiffs'] pleadings as true," but must conduct a "rigorous analysis" of the evidence, "resolve factual disputes" and "weigh the totality of the relevant facts to ensure that Rule 23 is met."  *Allen v. City of N.Y.*, No. 19-3786, 2023 WL 171402, at *2 (S.D.N.Y. Jan. 12, 2023) (Furman, J.) (citations omitted) (denying motion to reconsider denial of certification).

### A.   Plaintiffs Have Not Satisfied Their Burden of Proving Typicality as to the FDA Default Subclass or MainStay Funds Class.

Plaintiffs have not satisfied their burden as to typicality in connection with the FDA

Default Subclass or MainStay Funds Class.  Typicality requires a "common thread linking the proposed class members[.]"  *Beach v. JPMorgan Chase Bank, Nat'l Assoc.*, No. 17-563, 2019 WL 2428631, at *7 (S.D.N.Y. June 11, 2019) (Furman, J.) (citation omitted).  This common thread is only present where the plaintiffs and potential class members were all harmed in the same way.  *Id.*  Indeed, as the Supreme Court has "repeatedly held," "a class representative must . . . possess the same interest and suffer the same injury as the class members."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (internal citation omitted).

Plaintiffs cannot demonstrate typicality where these classes include individuals that were not harmed.  Unlike in *Beach*, where the Court could narrow the class to only include those that invested in certain funds before their fees were lowered (2019 WL 2428631, at *7), here certification should be denied because identifying those who share a "common thread" would require individualized determinations into potential class members' investments and circumstances.  Where "individualized analys[e]s" would be required of "[i]ndividualized investment decisions," including whether proposed class members were harmed, certification is improper in an ERISA case.  *In re Principal U.S. Prop. Acct. ERISA Litig.*, No. 10-00198, 2013 WL 7218827, at *27, *32 (S.D. Iowa Sept. 30, 2013) (denying class certification).[63]

> *1.   Some FDA Default Subclass members did not remain defaulted and/or chose to remain invested in the FDA.*

FDA Default Subclass members lack a common thread because some members (i) made

---

[63] Plaintiffs' cases (Pls. Br. at 18–19) do not contradict *Beach*.  One, like this Court, only certified an ERISA class limited to individuals who "suffered losses;" as in *Beach*, this limitation was straightforward because it did not turn on individual circumstances of each class member, but rather only on whether each invested in any of the challenged funds or paid certain recordkeeping fees.  *Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15-9936-LGS, 2017 WL 3868803, at *10–11 (S.D.N.Y. Sept. 5, 2017).  Another similarly certified an ERISA class only where the alleged breaches "affected all proposed members of the class."  *Cunningham v. Cornell Univ.*, No. 16-6525-PKC, 2019 WL 275827, at *7 (S.D.N.Y. Jan. 22, 2019).  Of the remaining two ERISA cases Plaintiffs cite, one concerned an unopposed settlement class and in the other defendants argued only that typicality was not met because the plaintiffs did not invest in all of the at-issue funds.  *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 130 (S.D.N.Y. 2010); *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 162–63 (S.D.N.Y. 2017).

some investment election after initially being defaulted, and others (ii) consented to or ratified the use of the FDA as a default.

"The class definition . . . must be consistent with the alleged liability theory." *B&R Supermarket, Inc. v. Mastercard Int'l Inc.*, No. 17-02738, 2018 WL 1335355, at *12–13 (E.D.N.Y. Mar. 14, 2018); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013) (requiring alignment of the liability theory and the methodology for damages). Where the class includes individuals that did not suffer harm under the alleged theories of liability, a motion to certify should be denied. *B&R Supermarket, Inc.*, 2018 WL 1335355, at *12–13 (denying motion to certify a class where the class period was inconsistent with the liability theory).

*First*, the FDA Default Subclass includes individuals who were defaulted at some point in time, but then later made an affirmative investment election and decided to maintain all or some of their Plan accounts invested in the FDA.[64]  Although Plaintiffs' expert has not set forth damages calculations concerning the FDA Default Subclass, the methodology he would use to calculate damages is apparently not limited to just the portion of accounts associated with potential class members' defaulted contributions.[65]  But once a person affirmatively chose to maintain assets in the FDA, they no longer suffered any harm under the theory alleged as to the FDA, which is that the Defendants defaulted the Plans' participants into the FDA "without their consent or direction."  SAC ¶ 77.  For example, Plaintiff Sandra Scanni has attested that, although she was "initially" defaulted, she later "elected to invest in . . . the [FDA]."[66]

Additionally, Plaintiffs' own stated theory of liability about use of the FDA as a default would preclude class membership to any participant who changed their investment elections

---

[64] Strombom Decl. ¶ 32.
[65] Expert Decl. of Steve Pomerantz, Ph.D. ¶ 60, ECF No. 118 ("Pomerantz Decl.").
[66] Decl. of Sandra Scanni in Support of Pls.' Mot. for Class Certification ¶ 3, ECF No. 127.

within 120 days of default.  Plaintiffs assert that the FDA is not an appropriate default because it is not a qualified default investment alternative ("QDIA").  *See* Pls.' Br. at 4.  Plaintiffs assert that QDIAs are generally target-date funds, balanced funds, and managed accounts.  SAC ¶ 82.  But under federal law, stable value funds do qualify as QDIAs for the first 120 days of an individual's participation in a plan.  29 C.F.R.§ 2550.404c–5(e)(4)(iv)(B) (2008).  The FDA Default Subclass is therefore overbroad because it includes individuals who were defaulted into the FDA in circumstances in which the FDA could be a QDIA.

      ***Second***, some individuals were defaulted with knowledge that the FDA would be used as the Plans' default investment option and therefore consented to their accounts being fully invested in the FDA, or were defaulted and then ratified the default by not changing their elections due to a similar preference.  *Supra* p. 7.  It is thus unreasonable to assume, as Plaintiffs do, that all individuals defaulted into the FDA did not make a choice to do so, particularly in light of Mr. Lantz's admission that he chose to remain defaulted.

      Those individuals who chose to be defaulted did not suffer harm under theory alleged as to the FDA because they consented to the use of the FDA for their accounts.  And they are subject to defenses of consent and ratification that would not be applicable to other defaulted individuals.  *See In re Digit. Music Antitrust Litig.*, 321 F.R.D. 64, 88 (S.D.N.Y. 2017) (typicality not met where claims of proposed class members were likely subject to defenses).  Conclusively identifying these individuals and the date at which they first consented to or ratified the use of the FDA as a default, however, would require individualized inquiries regarding their interactions with the Plan, investment preferences, and knowledge of the default.  *Supra* p. 7.

      2.      *The FDA is a particularly appropriate default for certain individuals.*

      FDA Default Subclass members also lack a common thread because, consistent with the myriad reasons why individuals allow themselves to be defaulted, many individuals were

especially benefited by the use of the FDA as the default.  Indeed, in sworn testimony, several

Plaintiffs conceded that—based on their experiences providing investment recommendations to

clients—the appropriateness of an investment turns on individual circumstances that may only be

learned through detailed questioning of that person, and that the FDA may be an appropriate

default for certain individuals.  For example, one Plaintiff, Rafael Musni, who was registered to

sell securities, testified that whether the FDA is an appropriate default depends on "the

characteristics of the individual and . . . what they might be going through at the time."[67]  The

broad FDA Default Subclass is inconsistent with this necessary, individualized inquiry.

   ***First***, the FDA is a particularly appropriate default for individuals with an aversion to

downside risk.[68]  As Committee member Katherine O'Brien testified, NY Life is "somewhat a

fiscally conservative culture" and so many employees and agents "really liked the FDA" because

of its "stable return."[69]  The Committees' consideration of these preferences shows proper

fiduciary behavior; because "[p]articipant choice is the centerpiece of what ERISA envisions for

defined-contribution plans," a fiduciary does not breach duties by making available investments

that are "popular among plan participants."  *Cunningham*, 2019 WL 4735876, at *14 (S.D.N.Y.

Sept. 27, 2019), *appeal docketed* No. 21-88 (2d Cir. Jan. 13, 2021).  Plaintiff Joseph Bendrihem,

who had registrations to sell both insurance products and securities, agreed that participants

seeking "[p]reservation of capital" might prefer that the FDA be designated as the Plans' default

investment.[70]  And some Plaintiffs agreed that the only way to know a person's risk tolerance is

to ask them questions about their preferences.[71]

---

[67] Tr. of the Dep. of Rafael Musni ("Musni Tr.") 94:21–97:8, 191:9–193:8, Rosenberg Decl. Ex. 5.
[68] Strombom Decl. ¶ 35.
[69] O'Brien Tr. 122:3–123:5, Rosenberg Decl. Ex. 2.
[70] Bendrihem Tr. 17:15–24:12, 217:25–218:7, Rosenberg Decl. Ex. 4.
[71] *Id.* 36:19–37:10; Musni Tr. 29:18–32:10, Rosenberg Decl. Ex. 5; Tr. of the Dep. of Anthony Medici ("Medici Tr.") 29:8–24, Rosenberg Decl. Ex. 8.

17

**Second**, as Plaintiffs acknowledged earlier in this litigation, the FDA is a particularly appropriate default for older participants.[72]  Mr. Musni agreed that the FDA may be an "ideal" default for older individuals, and Mr. Bendrihem similarly said that the FDA was a particularly appropriate investment "for someone nearing retirement."[73]  Plaintiffs do not, nor could they, assert that NY Life employs only younger workers.  Rather, in both Plans more participants are aged over 70 than under 30, and the largest cohort of APSI Plan participants are aged 50–69.[74]

**Third**, as Plaintiffs also acknowledged, the FDA is a particularly appropriate default for someone with significant retirement assets outside of the Plan, particularly if those assets are held in riskier investments.[75]  Mr. Musni explained that, when evaluating the appropriateness of the FDA for a specific individual, one would need to know about the person's investments outside of the Plans and that the FDA may be an appropriate investment for someone who otherwise maintains "risky investments."[76]  And Plaintiffs concede that the only way to learn about these investments would be to engage in individualized inquiries of each person.[77]

      3.     *Some FDA and At-Issue MainStay Funds investors achieved higher returns due to the Plans' use of those funds.*

Moreover, Plan participants who were defaulted into the FDA or invested in the At-Issue MainStay Funds during periods when those investments outperformed Plaintiffs' chosen comparators incurred no loss by the use of those investments in the Plans.  They therefore lack a common thread with potential class members who invested during periods of underperformance against Plaintiffs' comparators and therefore could have suffered a financial loss under Plaintiffs'

---

[72] MTD Opp. at 14 n.3.  *See generally* Strombom Decl. ¶ 35.
[73] Musni Tr. 186:3–5, 188:8–16, Rosenberg Decl. Ex. 5; Bendrihem Tr. 214:15–16, Rosenberg Decl. Ex. 4.
[74] Strombom Decl. Ex. 7A.
[75] MTD Opp. at 14 n.3.  *See generally* Strombom Decl. ¶ 36.
[76] Musni Tr. 187:12–188:7, Rosenberg Decl. Ex. 5.
[77] *See* Musni Tr. 32:11–34:18, Rosenberg Decl. Ex. 5; Bendrihem Tr. 63:17–22, Rosenberg Decl. Ex. 4; Medici Tr. 53:15–54:2, Rosenberg Decl. Ex. 8.

theory of damages.  *See Beach*, 2019 WL 2428631, at *7 (ERISA class members who did not

pay excessive fees lacked a common thread with those that did); *In re Principal U.S. Prop. Acct.*

*ERISA Litig.*, 2013 WL 7218827, at *32 (typicality not met where whether potential ERISA class

members were harmed depended on "the timing" of individuals' investments).

 Although Plaintiffs' expert did not calculate damages arising from the use of the FDA as

the Plans' default, he opined that damages could be calculated by comparing the FDA's returns

to: (i) the Vanguard TDFs and (ii) the Retirement Funds until they were removed from the Plans

in 2019, and then the Vanguard TDFs.[78]  But as Plaintiffs have conceded, the FDA outperformed

the Vanguard TDFs in 2015 and 2018, and also outperformed balanced funds, another type of

QDIA, in the same years.  SAC ¶ 120; *supra* p. 5.  The FDA also outperformed the Retirement

Funds in 2015 and 2018, and outperformed the Vanguard TDFs in 2022.[79]  In total, nearly 40%

of participants who may have been defaulted into the FDA achieved better performance than

they would have under Plaintiffs' chosen comparators, and therefore incurred no loss under

Plaintiffs' theory.[80]  For example, Plaintiff Scanni's investments in the FDA earned higher

returns over the Putative Class Period than she would have earned in the Vanguard TDFs.[81]  That

a significant percentage of FDA Default Subclass members benefited from the conduct Plaintiffs

challenge demonstrates the sort of serious intra-class conflict that would make certification of a

class inappropriate.  *See Hubert v. Med. Info. Tech., Inc.*, No. 05-10269, 2007 WL 9797660, at

*7 (D. Mass. Mar. 20, 2007) (denying certification where ERISA plaintiffs sought relief that

would not benefit some absent class members).

 Similarly, many At-Issue MainStay Funds investors incurred no loss from the use of

---

[78] Pomerantz Decl. ¶¶ 57–59.
[79] Strombom Decl. ¶ 38 & Ex. 11C.
[80] *Id.* ¶ 42 & Ex. 13.
[81] *Id.* ¶ 42.

those funds in the Plans under Plaintiffs' theory because they invested in them during the periods

the funds outperformed even Plaintiffs' expert's chosen comparators.  Each of the At-Issue

MainStay Funds outperformed Plaintiffs' comparators during portions of the Putative Class

Period.  *Supra* pp. 8–10.  For example, approximately 30% of the Plans' participants invested in

the Income Builder Fund obtained higher returns over the Putative Class Period than they would

have obtained had the Plans instead offered one of Plaintiffs' experts' comparators.[82]  Plaintiff

Stuart Krohnengold is one of these individuals.[83]

### B.    Plaintiffs Have Not Satisfied Their Burden of Proving Commonality.

Plaintiffs also have not, and cannot, meet their burden to establish commonality as to any

class.  To do so, Plaintiffs must demonstrate that "there are questions of law or fact common to

the class" that will "generate common answers apt to drive the resolution of the litigation."  *Wal-

Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (citations omitted).  "[A]ll the claims

should rise or fall—at least in part—on the determination of a single question."  *Hasemann v.

Gerber Prods. Co.*, No. 15-2995, 2019 WL 2250687, at \*4 (E.D.N.Y. Feb. 20, 2019), *report and

recommendation adopted as modified*, 331 F.R.D. 239 (E.D.N.Y. 2019).  Plaintiffs cannot meet

this burden as to the FDA Default Subclass and MainStay Funds Class due to the differences

among potential class members described in Argument Section II.A.  *See Saleem*, 2013 WL

6061340, at \*7 (holding that typicality and commonality were not met for the same reasons).

And they additionally cannot do so with respect to the FDA Class or MainStay Funds Class

because those claims will turn on year-by-year (FDA Class) or fund-by-fund (MainStay Funds)

questions.[84]

---

[82] Strombom Decl. ¶ 58 & Ex. 22A.
[83] *Id.* ¶ 58.
[84] Having made the strategic decision to seek certification of these broad classes, Plaintiffs may not on reply seek
certification instead of narrower classes or subclasses unique to each MainStay Fund or to those invested in the FDA

Indeed, although Plaintiffs identify what they believe to be five common questions (Pls.'
Br. at 15–17), these questions are insufficient to meet their burden because Plaintiffs cannot
show that these questions result in common answers on which the proposed classes' claims will
rise or fall. *See Dukes*, 564 U.S. at 349 ("any competently crafted class complaint literally raises
common questions," and therefore simply identifying such questions is not enough). Two of
their questions—whether Defendants are fiduciaries and engaged in prohibited transactions—fail
under even a case Plaintiffs cite because they are "not apt to drive the resolution of the
litigation." *Leber*, 323 F.R.D. at 160 (internal quotations omitted). The remaining three—
whether Defendants breached their duties, the Plans' participants were harmed, or class members
are entitled to damages—also fail because they will not generate common answers.[85]

### 1. The FDA Class requires year-by-year inquiries.

Plaintiffs' prohibited transaction claim is barred if the FDA falls under one of ERISA's
prohibited transaction exemptions. That defense—which will drive liability and which requires
year-by-year inquiries inconsistent with Plaintiffs' broad class—must be considered in
determining if a class should be certified. In *Haley*, the Second Circuit recently reversed grant of
class certification where the district court did not determine whether a prohibited transaction
exemption could apply class-wide. 54 F.4th 115, 123 (2d Cir. 2022). *See generally Saleem*,
2013 WL 6061340, at *4 (commonality asks whether "the most important question . . . can be
answered through common evidence").

Here, ERISA § 408(b)(5) provides an exemption against prohibited transaction claims

---

in certain years. *See Haley v. Tchrs. Ins. and Annuity Ass'n*, No. 17-855-JPO, 2023 WL 4198746, at *7–8 (S.D.N.Y.
June 27, 2023) (denying request for leave to seek certification of subclasses where plaintiffs had not sought
certification of such classes initially).
[85] Where Plaintiffs cannot meet their burden as to commonality, they likewise cannot meet their burden under Rule
23(b)(3) to show that common questions predominate over individual ones. *See Saleem*, 2013 WL 6061340, at *7
(predominance requirement of Rule 23(b)(3) not met where commonality was not met).

relating to insurance contracts like the FDA so long as certain criteria are met, including that "the plan pays no more than adequate consideration." 29 U.S.C. § 1108(b)(5). For assets like the FDA, "adequate consideration" means that "the value assigned to an asset must reflect its fair market value [and] be the product of a determination made by the fiduciary in good faith." *Henry v. Champlain Enters.*, 445 F.3d 610, 618–19 (2d Cir. 2006) (internal quotations omitted). Both are "expressly focused on the conduct of the fiduciaries." *Id.* (internal quotations omitted).

Because the value of the FDA changed every year during the Putative Class Period—and NY Life's inquiry differed depending on the circumstances—determining whether adequate consideration was received will require separate and different analyses specific to each year. The FDA's rate was negotiated and discussed each year and varied depending on the year. *Supra* pp. 3–4. In certain years that rate of return was higher than even the rate of return of those investments Plaintiffs claim should have been the Plans' default investment option. *Supra* pp. 4–5. Some years the Committees pushed back on NY Life's proposed rate and negotiated a higher rate, while in other years they felt the proposed rate was sufficient and therefore did not negotiate for a different rate. *Supra* p. 4. Further, in 2017 NY Life changed the methodology used to calculate the FDA's rate of return to better reflect its actual expenses from managing the FDA and, in response, the Committees received an explicit recommendation from LCG to not remove the FDA from the Plans in part because its rate was "competitive." *Id.* There is therefore no single common question of law or fact that would determine whether the Plans' fiduciaries agreed to no more than adequate consideration for the FDA for all of the more than eight years of the Putative Class Period on which the FDA Class's claims will rise or fall.

2.      *The MainStay Funds Class requires fund-by-fund inquiries.*

Plaintiffs also cannot meet their burden as to the MainStay Funds Class because it encompasses ***all*** of the At-Issue MainStay Funds. Rather, the questions as to whether

Defendants are liable will differ fund-by-fund, as the Court has already acknowledged when granting Defendants' motion to dismiss as to the MainStay International Equity Fund but denying it as to the At-Issue MainStay Funds. Dismissal Order at 19–20.

Unlike the ERISA cases on which Plaintiffs rely,[86] Plaintiffs do not allege that Defendants violated ERISA as part of processes or motivations common to all funds in the Plans or even to all proprietary funds in the Plans. Accordingly, to resolve Plaintiffs' claims, the Court will need to review evidence fund-by-fund, which will be different for each fund: the At-Issue MainStay Funds did not underperform peers, Plaintiffs' alternatives, and/or benchmarks at the same times; they received different ratings from the Consultants at the same meetings; and they were removed, and the Consultants recommended removal, at different times for different reasons. *Supra* pp. 8–10. Plaintiffs' own Motion, and its recitation of facts, shows differing facts and time periods as to each fund. Pls. Br. at 5–10.[87] And Plaintiffs' expert identified different purported comparators for each At-Issue MainStay Fund, and determining whether those funds are, in fact, appropriate comparators will vary by fund.[88]

### C.   Plaintiffs Have Not Satisfied Their Burden of Proving Ascertainability as to the FDA Default Subclass.

Finally, Plaintiffs have not, and cannot, meet their burden of demonstrating that the FDA Default Subclass is ascertainable. Ascertainability requires that Plaintiffs show that "it is

---

[86] *Leber*, 323 F.R.D. at 150–51 (plaintiffs challenged all proprietary funds that experienced losses during class period); *Moreno*, 2017 WL 3868803, at *2 (plaintiffs challenged all proprietary funds); *Beach*, Second Am. Compl. ¶ 5 (S.D.N.Y. July 10, 2017) (alleging deficiencies in the fiduciaries' processes common to all proprietary funds); *see also In re Marsh ERISA Litig.*, 265 F.R.D. at 142 (concerning unopposed settlement class).

[87] Resolution of Plaintiffs' prohibited transaction claims as to the MainStay Funds will likewise depend on fund-by-fund distinctions. Defendants contend that Prohibited Transaction Exemption 77-3 permits the Plans to offer the MainStay Funds; that exemption requires a fund-by-fund analysis as to the terms each fund was offered to the Plans and to similarly situated investors. *See* Class Exemption Involving Mutual Fund In-House Plans Requested by the Investment Company Institute, 42 Fed. Reg. 18734, 18735 (Apr. 8, 1977). By contrast, Plaintiffs cite two decisions they claim certified classes for prohibited transaction claims; one concerned a claim about one transaction involving company stock, and the other approved an unopposed settlement class. *Kindle v. Dejana*, 315 F.R.D. 7, 9, 11 (E.D.N.Y. 2016); *Gatto v. Sentry Servs., Inc.*, No. 13-5721, 2014 WL 7338721, at *2 (S.D.N.Y. Dec. 19, 2014).

[88] Strombom Decl. ¶¶ 46–53.

'administratively feasible' to determine whether someone is a member." *Beach*, 2019 WL 2428631, at *8 (quoting *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017)).

Plaintiffs cannot meet their burden where neither they nor their expert have proposed any methodology for ascertaining members of this subclass, let alone show that it would be administratively feasible to identify such individuals.  Pls. Br. at 21; Pomerantz Decl. ¶¶ 60–61. Plaintiffs state only that they believe membership can be ascertained because NY Life provided a "breakdown" to NEPC that estimated the number of individuals defaulted for just two of the several reasons that individuals can be defaulted.  Pls. Br. at 21; *supra* p. 6 & n.34.  This does not prove that the entire subclass can be ascertained, or that it would be administratively feasible to do so.

Indeed, as Mr. Antoine's own example makes clear, it is not administratively feasible to identify which participants invested in the FDA were defaulted, as opposed to those that affirmatively selected the FDA.  There is no data field showing which individuals were defaulted.  *Supra* p. 6.  Although the parties and Court could analyze the Plans' data to estimate some individuals who might have been defaulted, these methods do not identify all defaults, and Plaintiffs have disputed the data's accuracy by asserting that Plaintiff Antoine was defaulted even though the data show he was not.  *Supra* pp. 6, 12.  Determining precisely who was defaulted would therefore require examining each individual, and reviewing extensive records relating to their Plan investments, interactions with the Plan, and employment with NY Life. *Supra* pp. 6, 11.  And just as Mr. Antoine testified regarding his recollection of his own choices, at least hundreds of other participants may need to be consulted regarding their own recollections, and the Court would need to weigh that evidence against the evidence in the Plans' and NY Life's possession.

Where determining who is in a class requires "mini-hearings" like these, a class is not ascertainable and certification should be denied. *Appiah v. Home Depot U.S.A., Inc.*, No. 20-489, 2021 WL 5847150, at *5 (D. Conn. Dec. 9, 2021) (ascertainability not met where class membership could only be determined through "a detailed inquiry" of potential class members); *cf. Beach*, 2019 WL 2428631, at *8 (ascertainability met where "[t]he class members can be identified from the [p]lan's records through a simple search for those invested in the subject funds during the relevant time."). As the Second Circuit has ruled, ascertainability cannot be met where no list of class members exists, no such list "was likely to emerge," and "proposed class members could not realistically be expected to recall" the events at-issue or "retain any concrete documentation" of it. *Leyse v. Lifetime Entm't Servs., LLC*, 679 F. App'x 44, 47 (2d Cir. 2017).[89] The *Leyse* factors are met here—no list of class members exists or can reliably be generated, and potential class members are unlikely to recall whether they did or did not affirmatively select investment options through brief phone calls or website visits that could have taken place years prior. Indeed, several Plaintiffs, like Mr. Antoine, testified that they could not recall whether they selected investments for their Plan accounts when they joined the Plans.[90]

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

---

[89] *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), cited by Plaintiffs, is an outlier. Certification of a class where there was unlikely to be an accurate method of identifying class members is inconsistent with the "rigorous analysis" courts are required to undertake. *See Ebin*, 297 F.R.D. at 567. The other two decisions Plaintiffs cite are inapposite. In one, the defendants did not challenge ascertainability. *Falberg v. Goldman Sachs Grp., Inc.*, No. 19-9910-ER, 2022 WL 538146, at *10 (S.D.N.Y. Feb. 14, 2022). In the other, the defendants merely argued that the class period was not properly limited to the statute of limitation period. *Jacobs v. Verizon Commc'ns Inc.*, No. 16-1082, 2020 WL 4601243-RWL, at *10 (S.D.N.Y. June 1, 2020).

[90] *E.g.*, Musni Tr. 145:12–146:3, 153:18–154:13, Rosenberg Decl. 5 (did not recall when he joined the APSI Plan or how he did so, including whether he selected investments for his account at that time); Medici Tr. 75:8–11, Rosenberg Decl. Ex. 8 (did not recall if he affirmatively decided to join the APSI Plan); *supra* p. 12.

Dated: August 10, 2023                    Respectfully submitted,

                                          /s/ *James O. Fleckner*
                                          James O. Fleckner, *admitted pro hac vice*
                                          Dave Rosenberg, *admitted pro hac vice*
                                          GOODWIN PROCTER LLP
                                          100 Northern Avenue
                                          Boston, MA 02210
                                          Tel.: (617) 570-1000
                                          Fax: (617) 523-1231
                                          jfleckner@goodwinlaw.com
                                          drosenberg@goodwinlaw.com

                                          William J. Harrington
                                          GOODWIN PROCTER LLP
                                          The New York Times Building
                                          620 Eighth Avenue
                                          New York, NY 10018
                                          Tel.: (212) 813-8800
                                          Fax: (212) 355-3333
                                          wharrington@goodwinlaw.com

                                          *Counsel for Defendants*